Exhibit 1

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

| | |
|---|---|
| VICKI STILLMUNKES,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>GIVAUDAN FLAVORS CORPORATION, a Delaware corporation; DOE DEFENDANTS 1-20; FIRMENICH INCORPORATED; and SYMRISE, INC., formerly doing business as Dragoco, Inc.,<br><br>　　　　Defendants,<br><br>and<br><br>SYMRISE, INC.,<br><br>　　　　Third Party Plaintiff,<br><br>vs.<br><br>POLAROME MANUFACTURING CO., a/k/a Polarome International, Inc.,<br><br>　　　　Third Party Defendant. | No. C04-85-MWB<br><br><br><br><br><br>**ORDER REGARDING DEFENDANTS' AND THIRD PARTY DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT** |



**EXHIBIT
1**

## I. INTRODUCTION AND BACKGROUND

On July 19, 2004, plaintiff Vicki Stillmunkes filed an Amended Complaint against defendants International Flavors & Fragrances, Inc. ("IFF"), Bush Boake Allen, Inc. ("BBA"), Givaudan Flavors Corp. ("Givaudan"), Firmenich Incorporated ("Firmenich"),

APP 0001

Symrise, Inc. ("Symrise"), Dragoco, Inc. ("Dragoco"), and five "John Doe" Defendants.[1] In her Amended Complaint, plaintiff Stillmunkes sets out claims against the six named defendants, all manufacturers, designers, or sellers of butter flavorings, for a design defect and a failure to warn regarding their butter flavorings containing diacetyl which she was exposed to during the course of her employment at a General Mills microwave popcorn plant in Iowa City, Iowa.[2] Symrise, in turn, filed a third party complaint against Polarome International, Inc. ("Polarome"), a distributor of diacetyl, for contribution.

Defendant Symrise and third-party defendant Polarome have each filed motions for summary judgment. In addition, defendant Firmenich has filed a joinder with defendant Symrise's motion for summary judgment. Defendant Symrise's motion seeks dismissal of both claims against it on the following grounds: first, that plaintiff Stillmunkes's product defect claim fails as a matter of law because plaintiff Stillmunkes cannot offer any evidence of an alternative design; second, that plaintiff Stillmunkes's failure to warn claim fails because Symrise did not know or could reasonably have known that diacetyl could cause bronchiolitis obliterans; third, that plaintiff Stillmunkes's failure to warn claim fails even if Symrise did know that diacetyl could cause bronchiolitis obliterans because Symrise did not have a duty to warn plaintiff Stillmunkes since her employer was a sophisticated user; and, finally, that plaintiff Stillmunkes's failure to warn claim fails because Symrise's failure to warn was not the proximate cause of plaintiff Stillmunkes's injuries. In its joinder of defendant Symrise's motion for summary judgment, defendant Firmenich argues that plaintiff Stillmunkes's failure to warn claim against it fails because Firmenich did not

---

[1]Symrise was created from a merger involving Dragoco and another entity. For the purposes of this order the court will refer to them collectively as Symrise.

[2]Defendants IFF and and BBA were dismissed from the case on June 21, 2005, by joint stipulation of the parties.

APP 0002

know, or have any reason to know, of the alleged health hazards of diacetyl during the time that plaintiff Stillmunkes was exposed to butter flavorings containing diacetyl.

Third-party defendant Polarome adopts in its summary judgment motion all of the arguments put forth by defendant Symrise in its motion for summary judgment and argues that because summary judgment should be granted in favor of defendant Symrise, defendant Symrise's claim against Polarome for contribution is moot.    Third-party defendant Polarome also argues that it did not have a duty to warn defendant Symrise regarding diacetyl because Symrise is a sophisticated user.  Finally, third-party defendant Polarome asserts that it is entitled to summary judgment on defendant Symrise's contribution claim because defendant Symrise has failed to produce any evidence that Polarome failed to satisfy or comply with industry standards associated with such a distributor.

## II.  LEGAL ANALYSIS

Because the court wishes to apprise the parties of the disposition of the pending motions for summary judgment so that they may continue their pretrial preparations, the circumstances necessitate that a "summary" summary judgment ruling must suffice.

As this court has often explained, applying the standards of Rule 56 of the Federal Rules of Civil Procedure, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990).  The parties are to be complimented on their thorough and exhaustive briefing of the issues involved in this litigation.  Upon review of the record, however, the court is compelled to conclude that genuine issues of material fact preclude summary judgment in

3

defendant Symrise, defendant Firmenich, or third-party defendant Polarome's favor on any of the issues or claims on which defendant Symrise, defendant Firmenich, and third-party defendant Polarome seek such judgment.

Therefore, defendant Symrise and third-party defendant Polarome's respective motions for summary judgement, as well as defendant Firmenich's joinder of defendant Symrise's motion, are each **denied**.

**IT IS SO ORDERED.**

**DATED** this 27th day of March, 2008.

Mark W. Bennett

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA

4

# Exhibit 2

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF IOWA
 2                   WESTERN DIVISION
 3   RONALD KUIPER, ET AL.,        )  NO. C06-4009-MWB
                                   )
 4                                 )  VIDEOTAPED
            PLAINTIFFS,            )  DEPOSITION OF
 5                                 )  GREGORY HOFFMAN
        VS.                        )  TAKEN ON BEHALF OF
 6                                 )  DEFENDANT GIVAUDAN
     INTERNATIONAL FLAVORS &       )
 7   FRAGRANCES, INC., ET AL.,     )
                                   )
 8          DEFENDANTS.            )
 9   - - - - - - - - - - - - - - - -
10              VIDEOTAPED DEPOSITION OF GREGORY HOFFMAN,
11   taken before Kristin M. Teel, Registered
12   Professional Reporter, General Notary Public within
13   and for the State of Nebraska, beginning at
14   12:34 p.m., on March 19, 2008, at the Law Offices of
15   Thomas & Poulson, 705 Douglas Street, Sioux City,
16   Iowa.
17
18
19
20
21
22
23
24
25
```

EXHIBIT

2

APPEARANCES

FOR THE PLAINTIFFS:
MR. STEVEN E. CRICK
HUMPHREY, FARRINGTON & McCLAIN
221 West Lexington, Suite 400
Independence, Missouri 64051
(816)836-5050 FAX 836-8966
sec@hfmlegal.com
FOR THE DEFENDANT GIVAUDAN:
MR. MICHAEL T. ZARRO
MORGAN, LEWIS & BOCKIUS
300 South Grand Avenue, Suite 2200
Los Angeles, California 90071
(213)612-7362 FAX 612-2501
mzarro@morganlewis.com
FOR THE DEPONENT:
MR. JEFFREY L. POULSON
THOMAS & POULSON
705 Douglas Street, Suite 509
Sioux City, Iowa 51101
(712)258-6555 FAX 252-3746
jeff@thomaspoulsonlaw.com
ALSO PRESENT
VIDEOGRAPHER:
MR. JAY ROLLINS
THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO
3861 Farnam Street
Omaha, Nebraska 68131
(402)556-5000 FAX (402)556-2037

2

EXHIBITS:                    MARKED:

14. Invoice ........................... 70
15. Invoices .......................... 70
16. Invoices .......................... 70
17. Invoices .......................... 70
18. Invoices .......................... 70
19. Invoices .......................... 70
20. Letter of August 9, 1984 .......... 70
21. Letter of April 18, 1989 .......... 70
22. Letter of January 19, 1990 ........ 70
23. Letter of April 18, 1990 .......... 70
24. Letter of March 1, 1991 ........... 70
25. Notes of December 13, 1991 ........ 70
26. Notes of March 5, 1992 ............ 70
27. Fax of August 27, 1993 ............ 70
28. Tastemaker Operational Procedures . 82

4

INDEX

CASE CAPTION ............................ Page   1
APPEARANCES ............................. Page   2
INDEX ................................... Page   3
TESTIMONY ............................... Page   4
REPORTER CERTIFICATE ................... Page   87
COST CERTIFICATE ....................... Page   88

DIRECT EXAMINATION:
    By Mr. Zarro ...................... Page   6
CROSS-EXAMINATION:
    By Mr. Hoffman .................... Page   71

REDIRECT EXAMINATION:
    By Mr. Zarro ...................... Page   80
RECROSS-EXAMINATION:
    By Mr. Crick ...................... Page   82

EXHIBITS:                    MARKED:
 1. Letter of May 30, 2002 ........... 45
 2. Letter of February 28, 2003 ...... 53
 3. MSDS #247027 ..................... 60
 4. MSDS #247028 ..................... 60
 5. Invoices .......................... 70
 6. Invoice ........................... 70
 7. Invoices .......................... 70
 8. Invoices .......................... 70
 9. Invoices .......................... 70
10. Invoices .......................... 70
11. Invoices .......................... 70
12. Invoice ........................... 70
13. Invoices .......................... 70

3

(Whereupon, the following proceedings were had, to-wit:)

VIDEOGRAPHER: Hi. I'm Jay Rollins, your videographer. I represent Thomas & Thomas Court Reporting in Omaha, Nebraska. I am not financially interested in this action, nor am I a relative or employee of any attorney or any of the parties.

The date is March 19, the year 2008. The time is approximately 12:34 p.m. The deponent is Greg Hoffman. This deposition is taking place at the Thomas & Poulson Law Firm located at 705 Douglas Street, Sioux City, Iowa, Suite 509. This is case No. C06-4009-MWB, entitled, In the United States District Court, Northern District of Iowa, Western Division; Ronald Kuiper, et al., Plaintiffs, versus International Flavors & Fragrances, Incorporated, et al., Defendants. Your court reporter is Kristin Teel from Thomas & Thomas Court Reporting in Omaha, Nebraska.

Will counsel please introduce themselves for the record.

MR. CRICK: Steven Crick for the plaintiffs.

MR. ZARRO: Good morning. I'm Mike

5

6

```
1    Zarro for Defendant Givaudan.
2         MR. POULSON: Jeff Poulson
3    representing the witness.
4              GREGORY HOFFMAN,
5         having been first duly sworn,
6         was examined and testified as follows:
7              DIRECT EXAMINATION
8    BY MR. ZARRO:
9         Q    Could you state and spell your full name
10   for the record for us.
11        A    Certainly.  My full name is Gregory Steven
12   Hoffman, G-R-E-G-O-R-Y, S., and then Hoffman,
13   H-O-F-F-M-A-N.
14        Q    Thanks.  What is your current position
15   with American Popcorn?
16        A    I'm the vice president of production.
17        Q    Could you give us a brief description of
18   your role in the company?
19        A    Certainly.  Effectively, it could easily
20   be also titled vice president of operations.  I'm
21   involved with the day-to-day production as well as
22   overseeing the HR segment as well as what we call
23   our field department, which involves the contracting
24   and growing of our popcorn.
25        Q    Now, when you say the day-to-day
```

```
1    the husk and the chaff and everything.
2         And so Ron was one of our -- our shell --
3    on the shelling crew, and so I would have
4    communicated with Ron, sometimes on a daily basis,
5    identifying what section of what crib and what
6    hybrid and just overall discussion about what his --
7    his daily responsibilities would be.
8         Q    Now, at that time what was your position?
9         A    I was -- I was part of the field
10   department, which is certainly part of what I
11   currently do.  But at that time, I was responsible
12   for the growing crop as well as when it was
13   delivered at harvest.  And my responsibility
14   somewhat ended at the -- at the packaging facility,
15   so from the -- from the farmer up through the
16   milling and cleaning process and up to the package,
17   so that would have been everything in between.
18        Q    Okay.  And just so I get my dates
19   straight, when did you say you first met Ron Kuiper?
20   Would it have been sometime between '85 and '89?
21        A    It would have been in '89 that I would
22   have had direct contact with Mr. Kuiper.
23        Q    Okay.
24        A    I believe he was -- yeah, that's correct.
25        Q    So just going to go ahead and finish up
```

8

```
1    operations, would that be here in Sioux City?
2         A    That's correct, at our -- our main
3    facility.  Our primary facility is here in
4    Sioux City, and that is -- that is -- that is my
5    resident place of business, yes, sir.
6         Q    Okay.  Do you know Ron Kuiper, the
7    plaintiff in this case?
8         A    Yes, I do.
9         Q    Okay.  How long have you known Ron Kuiper?
10        A    I've -- I came to work in 1985.  I started
11   actually in -- in a small satellite facility in
12   Schaller, Iowa.  I was transferred into Sioux City
13   at the -- at our main facility in 1989.
14        Ron was actually part of our shelling
15   crew, if you will, at that time, and I had some
16   direct communication with Ron when I first came on
17   board in Sioux City in 1989.
18        Q    What did you talk to Mr. Kuiper about
19   there when you first came on in 1989?
20        A    Well, his duties encompassed the shelling
21   of the ear corn, which -- which literally means when
22   the corn was delivered on the cob, it went through a
23   process coming out of our corncribs.  It went
24   through a motorized sheller where we would spin off
25   the kernels, if you will, and separate the cob and
```

```
1    the chronology of --
2         A    Uh-huh.
3         Q    -- your work with APC.  After you worked
4    in the field department running that operation, when
5    did you sort of assume the -- the position of vice
6    president of production?
7         A    That actually wasn't until my -- my
8    predecessor left, Larry Bruyer, which would -- I
9    think I took over that role in 1998, I believe I
10   took on the vice president role.
11        Q    So --
12        A    But let me back up just a little bit, sir.
13        Q    Sure.
14        A    I was actually involved in -- early on,
15   probably around '93, '94, I became HR director as
16   well.  So it was a -- certainly a mixed bag, but
17   nonetheless, I was involved in the -- not only in
18   the field department, but certainly in the hiring
19   and the -- being a resource for our -- our working
20   population.
21        Q    So how long was Mr. Kuiper part of the
22   shelling crew, to your knowledge?
23        A    I believe Mr. Kuiper was hired in -- in
24   1986.  And if -- if memory serves me correctly,
25   he -- he actually was invited to come down and be
```

7

9

Pages 6 to 9

APP 0007
Case 5:17-cv-04008-LTS-KEM   Document 102-6   Filed 03/26/18   Page 9 of 65

**Page 62**

1  Odor: A light yellow powder with characteristic
2  aroma, in both of these. And another one says, A
3  light to medium yellow powder with characteristic
4  aroma. That was two different -- do those
5  descriptions help you at all place this in what
6  product it might be?
7      A   I'm sorry, I would be misleading you if I
8  said yes.
9      Q   No. Again, the whole process is to get
10  your best estimates and your specific testimony, not
11  any speculation, so we'll move right along.
12      A   Okay.
13      Q   Have you ever seen these material
14  safety --
15          MR. CRICK: I can print out a
16  document that says it, if you want it. I'll do it
17  when it's my turn.
18          MR. ZARRO: Okay. You pull it
19  together for us then.
20          MR. CRICK: I did. Both of them.
21  BY MR. ZARRO:
22      Q   The -- do you recognize these material
23  safety data sheets?
24      A   Yes. I have seen data sheets like this
25  before.

**Page 63**

1      Q   Okay. Do you recall reviewing material
2  safety data sheets from Tastemaker at any time?
3      A   Yes.
4      Q   Okay. In what context would you review a
5  material safety data sheet?
6      A   In the context of shipping and receiving,
7  warehousing, overall fire hazard, as well as -- as
8  well as certainly any personal safety concerns.
9      Q   Okay. Got it. Now, in the context of
10  personal safety concerns, have you ever reviewed a
11  material safety data sheet for butter flavoring
12  relating to an employee complaint?
13      A   Relating to an employee complaint?
14      Q   Well, I need to give you a time frame, so
15  I'll withdraw the question.
16          We're going to focus on the time
17  Mr. Kuiper worked in the mixing room, from '92 to
18  '99. Do you recall ever reviewing with a member of
19  the mixing room team the contents of a material
20  safety data sheet?
21      A   Kevin Remmes was our -- oftentimes part of
22  the gatekeeping process for our MSDSs as they came
23  in. He would help to ensure that we received
24  current -- so I would have been talking to Kevin
25  about this at times, yes.

**Page 64**

1      Q   Okay. How about Mr. Kuiper?
2      A   Not specifically to Mr. Kuiper, no.
3      Q   Okay. Did American Popcorn store material
4  safety data sheets on site at the plant?
5      A   Yes.
6      Q   Where would you store them?
7      A   They're stored in our -- in our -- what we
8  call our primary passage hallway where everyone goes
9  to and from the production floor, accesses to the
10  upstairs break room. It is front and center --
11  right next to where they put on their hair nets and
12  their earplugs every day.
13      Q   Are members of the mixing room team,
14  between '92 and '99, trained regarding the location
15  and use of material safety data sheets?
16      A   Yes.
17      Q   Okay. Is that part of what the safety
18  team, you and Mr. Hartshorn, train the employees to
19  do?
20      A   Yes.
21      Q   Okay. Have you ever had any
22  conversations -- a big, broad question -- with
23  anyone at Tastemaker between 1992 and 1999?
24      A   Personally, no.
25      Q   Okay. How about Givaudan, anybody --

**Page 65**

1  between that -- in that time frame, say about '97 to
2  '99?
3      A   No, I did not.
4      Q   Okay. Did you receive any communications
5  from Tastemaker relating to their butter flavoring
6  products other than these material safety data
7  sheets?
8      A   That would have been primarily
9  Mr. Hartshorn's responsibilities. I would not have
10  been part of that loop.
11      Q   Okay. The health hazard rating of one up
12  in the upper right-hand corner, can you give me an
13  understanding of what that means?
14          (Phone ringing.)
15          THE WITNESS: Well, quite frankly I
16  would -- I would reference the -- the -- what each
17  one of these would be, you know, and -- and
18  typically on a -- you know, with a cheat sheet on
19  the back, that's typically attached. And that --
20  but it represents -- I would say most of us would
21  recognize a one as a -- that of very little concern.
22  BY MR. ZARRO:
23      Q   Okay. But looking down at the -- let me
24  ask you this.
25          Do you look at material safety data sheets

| | |
|---|---|
| 1 as a whole? In other words, as an entire document? | 1 How about skin? |
| 2 MR. CRICK: What does that mean? | 2 A We provided coveralls, if you will. I'm |
| 3 THE WITNESS: Yes, in that every | 3 not absolutely certain when that -- when that part |
| 4 safety data sheet for the last ten years has used, | 4 of the protective equipment program was initiated. |
| 5 you know, a different format in terms of how it's | 5 We've always had gloves available. We've always had |
| 6 structured and how it's laid out. So oftentimes, in | 6 long rubber, rather thick, neoprene style that went |
| 7 order to understand how it's put together, we would | 7 clear up to the elbow have always been available. |
| 8 typically try to look at the whole document rather | 8 We would typically -- a well-dressed mixer |
| 9 than just one page. | 9 would have a pair of cotton gloves with these arm |
| 10 BY MR. ZARRO: | 10 length gloves over the top of them because |
| 11 Q There you go. That's what I'm looking | 11 oftentimes in the mixing room, we would be -- we |
| 12 for. | 12 would be spraying water and some different things so |

Above text continues with page 66 (left) and page 68 (right).

**Page 66 (left column):**

1 as a whole? In other words, as an entire document?
2      MR. CRICK: What does that mean?
3      THE WITNESS: Yes, in that every
4 safety data sheet for the last ten years has used,
5 you know, a different format in terms of how it's
6 structured and how it's laid out. So oftentimes, in
7 order to understand how it's put together, we would
8 typically try to look at the whole document rather
9 than just one page.
10 BY MR. ZARRO:
11     Q There you go. That's what I'm looking
12 for.
13      Now, if you look at the health hazard data
14 in this -- well, let's take a look at 2472027. It
15 says, Skin, eyes -- May be irritating to skin, eyes.
16 Do you see that there?
17     A Uh-huh.
18     Q At this point in time, this -- the
19 document, if we would go all the way back to the --
20 the final page -- let's give a time frame -- it
21 says, Date of issue, 3-19-93, right?
22     A Okay.
23     Q So as of March 1993, you already had
24 measures in place to protect skin and eyes from
25 butter flavoring; is that right?

66

1      MR. CRICK: That's an overstatement.
2 I object.
3      MR. ZARRO: How about this, simple
4 question.
5 BY MR. ZARRO:
6     Q Did the mixing room team wear gloves when
7 they handled butter flavoring in 1993?
8     A I would say that some did and some didn't,
9 to be honest with you.
10     Q All right. Now, in terms of the eye
11 protection, we've gone over that at length, yes?
12     A Yes.
13     Q Okay. Now, going further down, it says,
14 Inhalation. Inhalation is irritating to nose,
15 throat and lungs.
16      Can you give me your understanding of what
17 it means to -- for a -- for a product to be
18 irritating to the nose, throat and lungs?
19     A That description tells me that it's a
20 nuisance, that it's nothing of significance.
21     Q Okay. Under applicable control measures,
22 it says, Avoid contact with eyes, skin and clothing.
23      Can you describe for me what -- I guess
24 you may have already described for me what American
25 Popcorn Company has done to avoid contact with eyes.

67

**Page 68 (right column):**

1 How about skin?
2     A We provided coveralls, if you will. I'm
3 not absolutely certain when that -- when that part
4 of the protective equipment program was initiated.
5 We've always had gloves available. We've always had
6 long rubber, rather thick, neoprene style that went
7 clear up to the elbow have always been available.
8      We would typically -- a well-dressed mixer
9 would have a pair of cotton gloves with these arm
10 length gloves over the top of them because
11 oftentimes in the mixing room, we would be -- we
12 would be spraying water and some different things so
13 it was also a function of keeping --
14     Q Okay. You also see under appropriate
15 hygienic practices it says, Avoid breathing fumes.
16 Can you give me your understanding of how you would
17 respond to that?
18     A Given the rating and -- and given the
19 other directives within this MSDS, we did not take
20 that as a mandate to -- or a communication to -- to
21 be absolutely careful not to inhale the fumes.
22     Q Did you have any sort of procedures for
23 your employees to avoid breathing fumes that come
24 from a butter-flavoring product like this?
25     A Anytime anyone was in the mixing room,

68

1 we -- the policy was that we -- and we asked and
2 reinforced all the time that they should be wearing
3 a full-faced respirator.
4     Q Under engineering controls, it says,
5 Provide adequate ventilation. Does the term
6 adequate ventilation have a meaning in the trade?
7     A It may, sir, but none that -- that I put
8 in an engineering formulary, so --
9     Q Have you seen this type of warning under
10 engineering controls in other MSDS?
11     A In a lot of applications, yes.
12     Q So can you give me your understanding of
13 what adequate ventilation would be?
14     A Don't use it in a nonventilated area.
15      MR. ZARRO: Okay. Let's call a
16 time-out.
17      VIDEOGRAPHER: The time is 2:27 p.m.
18 Counsel, we're off the record.
19      (Short break taken.)
20      VIDEOGRAPHER: The time is 2:34 p.m.
21 Counsel, we're back on the record.
22 BY MR. ZARRO:
23     Q Mr. Hoffman, do you live in Iowa?
24     A Yes, I do.
25     Q Very good. Thank you. I want to -- if I

69

Case 5:17-cv-04008-LTS-KEM   Document 102-6   Filed 03/26/18   Page 11 of 65

1 about those. I just wanted to mark those for now.
2 BY MR. CRICK:
3 Q Did you ever meet with anyone from
4 Fries & Fries?
5 A No, sir.
6 Q Okay. I took your deposition before and I
7 went through a lot of these things before so I'm not
8 going to do it again. But let me just ask you, in
9 context with these, during the time that you were
10 buying from Fries & Fries in the -- in the early
11 '90s when you were just getting started, did anybody
12 from that company tell you that they were having
13 experiences of bronchiolitis obliterans at their
14 plant?
15 A No.
16 Q And did anyone from Fries & Fries tell you
17 that they were investigating the link to diacetyl to
18 bronchiolitis obliterans at their plant?
19 A No, sir.
20 MR. ZARRO: Objection, assumes facts.
21 Go ahead.
22 BY MR. CRICK:
23 Q And did they tell you that employees were
24 complaining of breathing problems when working
25 around diacetyl?
78

1 MR. ZARRO: Objection --
2 THE WITNESS: No.
3 MR. ZARRO: -- assumes fact.
4 BY MR. CRICK:
5 Q And Mr. Zarro showed you the material
6 safety data sheet for Butter Flavor 247027 and
7 247028. Those indicated that no respiratory
8 protection was required. Did you observe that?
9 A Yes, sir.
10 Q And were you aware that at the
11 Fries & Fries plant, that anytime that someone was
12 in a room where diacetyl was present, respirators
13 were to be worn?
14 A I was not aware of that.
15 Q And you tried to do everything that you
16 could, being on the safety committee, to make sure
17 that you were aware of information to protect your
18 employees; is that fair?
19 A To the best of our ability.
20 Q Exhibit No. 23 is an April 18, 1990,
21 letter from Fries & Fries to Dale Hartshorn
22 discussing diacetyl, and it indicates that, In the
23 United States, diacetyl has been deemed to be
24 generally recognized as safe and that it was
25 approved for food use.
79

1 . Do you recall Fries & Fries or Tastemaker
2 or Givaudan writing another letter about diacetyl
3 indicating that it could cause bronchiolitis
4 obliterans?
5 MR. ZARRO: Objection, vague.
6 THE WITNESS: No, sir.
7 BY MR. CRICK:
8 Q Mr. Zarro asked you some questions about
9 Mr. Kuiper. You obviously are not a medical doctor?
10 A That is correct.
11 Q And you never made any diagnosis of
12 Mr. Kuiper that he had any disease that was caused
13 by flavoring, did you?
14 A No.
15 Q That would have been out of your area of
16 expertise?
17 A Yes.
18 MR. CRICK: That's all the questions
19 I have.
20 THE WITNESS: Very good.
21 MR. ZARRO: Okay. I've got a
22 follow-up, as long as we're on the record.
23 REDIRECT EXAMINATION
24 BY MR. ZARRO:
25 Q If you look at the -- let's just take the
80

1 one we marked as Exhibit 3, 2020 -- 247027, the MSDS
2 that we marked --
3 THE WITNESS: I gave that back to
4 you. Could I get that from you? I think it's in
5 your pile right there, maybe.
6 COURT REPORTER: I'm sorry.
7 BY MR. ZARRO:
8 Q Okay. Under personal protective
9 equipment, does it say respirators are not
10 necessary?
11 A Okay. Which -- which section --
12 Q If you'll look under Section Roman
13 Numeral VII, Applicable control measures --
14 A Very good. Okay.
15 Q -- and if you'll look under personal
16 protective equipment, it doesn't say that they're --
17 does it say that respirators are not required?
18 A No.
19 Q So you just took Mr. Crick's
20 misrepresentation of what it said at face value, if
21 you understand what I'm saying? It does not say,
22 Don't use respirators, right?
23 A It does not say, Do not use respirators,
24 correct.
25 MR. ZARRO: All right. That's all I
81

| | |
|---|---|
| 1       MR. CRICK:  No more questions.  Thank | 1          UNITED STATES DISTRICT COURT |

**Left column — Page 86**

1       MR. CRICK:  No more questions.  Thank
2 you.
3       THE WITNESS:  Thank you.
4       VIDEOGRAPHER:  The time is 3:06 p.m.
5 Counsel, we're off the record.
6       (Adjournment - 3:06 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
          86

**Right column — Page 88**

1         UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF IOWA
3           WESTERN DIVISION
  RONALD KUIPER, ET AL.,   ) NO. C06-4009-MWB
              )
4              ) VIDEOTAPED
     PLAINTIFFS,   ) DEPOSITION OF
5             ) GREGORY HOFFMAN
  VS.        ) TAKEN ON BEHALF OF
6            ) DEFENDANT GIVAUDAN
  INTERNATIONAL FLAVORS &  )
7   FRAGRANCES, INC., ET AL.,   )
           ) COST CERTIFICATE
8      DEFENDANTS.   )
9  - - - - - - - - - - - - - - - - -
10      I, Kristin Teel, Registered Professional
  Reporter, General Notary Public within and for the
11 State of Nebraska, do hereby certify that the
  following costs should be assessed in the
12 above-entitled matter to:
13     DEFENDANT
    DEPOSITION OF:  GREGORY HOFFMAN
14     DATE TAKEN:  March 19, 2008
    AMOUNT: $
15     ORIG. DELIVERED TO:  Mr. Zarro
    ATTORNEY FOR:  Defendant Givaudan
16     DATE DELIVERED:
17
18            _____
           KRISTIN TEEL, RPR, CSR
19            GENERAL NOTARY PUBLIC
20
21
  My Commission Expires:
22
23
24
25
          88

**Lower left column — Page 87**

1       C E R T I F I C A T E
2 STATE OF NEBRASKA   )
           ) ss.
3 COUNTY OF DOUGLAS   )
4      I, Kristin DeRocher Teel, Registered
5 Professional Reporter, General Notary Public within
6 and for the State of Nebraska, do hereby certify
7 that the foregoing testimony of GREGORY HOFFMAN was
8 taken by me in shorthand and thereafter reduced to
9 typewriting by use of Computer-Aided Transcription,
10 and the foregoing eighty-five (85) pages contain a
11 full, true and correct transcription of all the
12 testimony of said witness, to the best of my
13 ability;
14     That I am not a kin or in any way
15 associated with any of the parties to said cause of
16 action, or their counsel, and that I am not
17 interested in the event thereof.
18     IN WITNESS WHEREOF, I hereunto affix my
19 signature and seal this  day of     , 2008.
20
21       _____
      KRISTIN TEEL, RPR, CSR
      GENERAL NOTARY PUBLIC
22
23
  My Commission Expires:
24
25
          87

Case 5:17-cv-04008-LTS-KEM   Document 102-6   Filed 03/26/18   Page 13 of 65

APP 0011

Exhibit 3

EXHIBIT

3

**1**

1  March 3, 2009, in front of Judge Bennett for day 9 in
2  Kuiper versus Givaudan. ^ 8:02
3      THE COURT: Okay. Good morning. We have the Rule
4  50 motion. I've read it. Anything you want to add to it?
5      MR. DONOVAN: Your Honor, we have made the basic
6  arguments in the document. I'm glad to restate those, to
7  emphasize a few of them, or to respond to any questions Your
8  Honor may have regarding the arguments.
9      THE COURT: Well, it's like we're trying two
10  different cases, the one I see and the one you see, so no
11  point adding anything for my benefit. I find the motion
12  inconceivable.
13      MR. DONOVAN: Your Honor, do you want me for the
14  record --
15      THE COURT: It's not the case I'm trying. Might be
16  a canned brief for some other case but not the case I'm
17  trying, so motion's denied. Anything else?
18      MR. DONOVAN: No, Your Honor.
19      THE COURT: Now, on the jury instructions issue, I
20  am not reinstructing, so to the extent you're asking me --
21  I'm not sure what you're asking me to reinstruct on. I've
22  never reinstructed on a case. I've tried hundreds of cases
23  this way. Never once I've been asked to reinstruct, and if
24  I had been asked to reinstruct in every case, I would have
25  said no. There's absolutely no reason to reinstruct.

**2**

1      Again, you're like the -- you're the team who cried
2  wolf. You're saying if I give one supplemental instruction
3  that somehow you're going to be prejudiced just like you'd
4  be prejudiced if you hadn't have done cumulative testimony
5  on your witness yesterday, just like -- you know, everything
6  that doesn't go your way, it's a scream of prejudice. And
7  so you really are like the team who cried wolf. That is in
8  my opinion about as ludicrous an objection as I've seen in
9  15 years.
10      Now, if there are other things that need further
11  supplemental instruction, I'm open to that. I'm open to
12  that. I'm not -- but to say that -- I don't -- and I didn't
13  understand even what your objection was to my supplemental
14  instruction. It's not an incorrect statement of the law.
15  Or are you claiming that it is?
16      MR. DONOVAN: Your Honor, our position was that the
17  instruction that was given is consistent with the standard
18  instruction in the law and does adequately cover the fact of
19  what a manufacturer knew or should have known and there has
20  been evidence on that. And in addition, in the wake of the
21  Wright decision, it is not clear that this remains a part of
22  kind of the formulation of what is considered in determining
23  design defect and failure to warn. We felt the instruction
24  as given adequately met both what the parties had requested
25  initially and what the standard instruction included, and

**3**

1  that was the main basis for the objection to it.
2      THE COURT: Well, are you saying it's a wrong
3  statement of the law?
4      MR. DONOVAN: I think it's -- I think it's somewhat
5  unclear in the wake of Wright whether there's been any case
6  law addressing that. It was certainly the statement that
7  was formulated in Olson as Your Honor noted and has been
8  applied by Your Honor I know in pre-Wright cases. So that
9  was the basis. And we also objected just on the fact that
10  it tends to bring to the front at the end one aspect of this
11  broader determination as opposed to, you know, other aspects
12  that are significant in the jury's consideration. So in
13  that sense we thought it unduly emphasized one piece of
14  this.
15      THE COURT: Well, then I can put some language in
16  there you should take this along with all of the
17  instructions and treat them as a whole language. Doesn't
18  that obviate any concern you would have about that it calls
19  special attention to it?
20      MR. DONOVAN: I think, Your Honor --
21      THE COURT: What do you want me to do? Read them
22  all over again?
23      MR. DONOVAN: Well, we did -- we filed, Your Honor,
24  a short -- in response to your request a document with
25  briefing on the two proposed supplemental instructions that

**4**

1  Your Honor had raised last week. And we also proposed
2  several clarifying instructions additionally. We believe
3  that it would make the most sense to recharge on this. We
4  understand that that's a significant amount of time, but we
5  feel it brings a couple of different aspects out of -- kind
6  of pulls them out and puts them in front of the jury at the
7  end of the case when it's --
8      THE COURT: Well, if you tell them you should treat
9  any supplement -- I told them at the beginning that there
10  might be supplemental instructions. So if you tell them
11  that you should just treat the supplemental instructions as
12  they do all the other instructions and treat them as a
13  whole, how can there possibly -- I -- do you have any
14  evidence that there would be any prejudice?
15      MR. DONOVAN: No, Your Honor.
16      THE COURT: Well, what's your basis for the
17  argument that there would be prejudice?
18      MR. DONOVAN: Just the primacy of the one statement
19  versus the distant instruction prior to that and the fact
20  that Your Honor is focusing on those.
21      THE COURT: Okay. Well, I told everybody and I
22  told the jury that I was going to read their instruction on
23  duty on deliberations and I save that for last until after
24  closing argument. Is that prejudicial?
25      MR. DONOVAN: No, Your Honor, I don't believe so,

**125**

1   that local exhaust, that in effect in the period between
2   '92 and '96?
3   A.  Yes.
4   Q.  Now, was NIOSH at the end of this process, were they
5   critical of what you were doing in the workplace?
6   A.  No, just the opposite.  They were very complimentary.
7   You know, in their experience what they had seen in other
8   microwave manufacturing facilities -- and I certainly can't
9   tell you which ones they are -- but Dr. Kanwal and Dr. Kullman
10  were very impressed by many of the practices and protocols
11  that we had in place.
12  Q.  Now, there's some mention of Mr. Kuiper training the
13  next person who took over the mixing function after he left
14  the mixing room, just tell you that.  Was Mr. Kuiper -- did he
15  need to be present in the mixing room to do the training?
16  A.  No, sir.
17  Q.  Why is that?
18  A.  Well, it's an isolated room, but it also has glass
19  windows going into the mixing room itself.  There's several
20  ways it could be done without him entering into the room, and
21  our efforts were to keep him out of the room.  So he could --
22  he could direct the trainee, if you will, either by hand
23  motions or by having the individual come out into the hallway
24  outside of the mixing room, draw him a map, if you will, but
25  most of it was done -- was done orally and/or on a dry run

**126**

1   when there was no mixing going on in the room.
2   Q.  You said there was an effort to keep Mr. Kuiper out of
3   the mixing room.  Why is that, Mr. Hoffman?
4   A.  In order for us to keep our respirator policy intact,
5   we -- anyone that was wearing a mask at American Pop Corn
6   Company, whether it be anyone working in any of our corn
7   receiving area, in any of our production areas, we were all
8   required to do fit testing.  And then the full face
9   respirators required a certain level of respiratory function
10  in order to qualify to wear a respirator in the mixing room.
11  Mr. Kuiper, his P F T was not high enough to qualify, if you
12  will, to wear a respirator at that time.
13  Q.  Okay.
14      MR. PAGLIARO:  I have no further questions, Your
15  Honor.  Thank you.  Thank you, Mr. Hoffman.
16      THE COURT:  Thank you.  Why don't we take a stretch
17  break.  Then we'll hear from Mr. McClain.
18      Thank you.  Please be seated.
19      Mr. McClain?
20          CROSS-EXAMINATION
21  BY MR. MCCLAIN:
22  Q.  Still morning, Mr. Hoffman, so good morning.
23  A.  Good morning, sir.
24  Q.  Mr. Hoffman, did you know that Givaudan is blaming
25  American Pop Corn for whatever injury occurred to Ron Kuiper

**127**

1   in this case?
2       MR. PAGLIARO:  Objection, Your Honor.  No
3   foundation.
4       MR. MCCLAIN:  Well, let me --
5       THE COURT:  Objection's overruled.
6   BY MR. MCCLAIN:
7   Q.  Did you know that?
8   A.  No, sir.
9   Q.  Well, I want to show you an instruction that is on one of
10  Givaudan's defenses, the sophisticated user defense it's
11  so-called.  It says that -- no, go up to the top, Scott, would
12  you?  It says Givaudan's third defense to the Kuipers' claim
13  is that Ronald Kuiper's employer, American Pop Corn Company,
14  was a, quote, unquote, sophisticated user of butter flavor
15  and, therefore, was responsible for providing warnings about
16  the safe usage of such products to its employees such as Ron
17  Kuiper.
18      And then it says, one -- to prove this defense, it lays
19  out the elements.  And it says the first thing is, one,
20  American Pop Corn Company knew or should have known of the
21  potential dangers of butter flavors containing diacetyl.
22      Now, Mr. Hoffman, did the American Pop Corn Company in
23  the time that Ron Kuiper was a mixer know about the hazards of
24  diacetyl in the butter flavor?
25  A.  No, sir.

**128**

1   Q.  Is that a completely false statement that you knew about
2   the hazards of butter flavor?
3       MR. PAGLIARO:  Objection, Your Honor.  That's an
4   instruction.  It's not a statement.
5       THE COURT:  Overruled.
6   A.  Would you please repeat the question?  I'm sorry.
7   BY MR. MCCLAIN:
8   Q.  Was it true that you knew the hazards of butter flavor
9   when Ron Kuiper was working in the mixing room?
10  A.  Butter flavor or diacetyl?
11  Q.  Well, both.  I mean, butter flavor containing diacetyl.
12  A.  Not all aspects of it, no, sir.
13  Q.  I mean, in other words, did you know it would cause
14  permanent lung injury to people working around it?
15  A.  No.
16  Q.  I mean, would you have ever subjected Ron Kuiper to that
17  kind of hazard if you had known about it?
18  A.  No, sir.
19  Q.  Would you have ever risked your employees' health working
20  around butter flavor if you'd known of the dangers?
21  A.  No, sir.
22  Q.  Before we get into other aspects of your relationship
23  with Fries and Fries, let me just ask you, Fries and Fries,
24  Tastemaker, Givaudan, did Givaudan ever warn you about the
25  hazards of working around butter flavor even through the

**133**

1  Q.  And these are the shipments to Fries and Fries but
2  delivered to the new horizon warehouse in 1992 from Givaudan
3  and that would be consistent with your recollection?
4  A.  Yes, sir.
5  Q.  And then there's a summary document which summarizes
6  those from 2,000 -- or 2212 is the summary document which
7  shows in '92.  2212, Your Honor, I'm not sure whether it's in
8  or out, but Mr. Pagliaro has no objection?
9      THE COURT:  Okay.
10     MR. MCCLAIN:
11  Q.  2212 shows that in 1992, the first full year that Ron was
12  in the mixing room, the overwhelming quantity of materials
13  used were Fries and Fries or Tastemaker, Givaudan.  Is that
14  consistent with your recollection?
15  A.  Yes, it is.
16  Q.  And likewise this is our stipulation number 25.  Your
17  Honor, after '93, this is the amount that is stipulated that
18  went directly to Sioux City from Givaudan.  Roughly 50,000
19  pounds every, a little more than that.  That was the butter
20  flavor you were buying.
21  A.  I can't -- I've never seen this document.  I can't speak
22  that this is a summary document of all the butter flavor that
23  we produced coming into Sioux City, no.
24  Q.  Well, this -- they have stipulated that that's the butter
25  flavor they sold.  I'll show you another document, 2213, which

**134**

1  is --
2      MR. MCCLAIN:  No objection to that, Your Honor,
3  2213, is the summary document which shows that in the
4  year -- in the years 2,000 -- 1993 through 1995, that the
5  majority of product was Fries and Fries.  Go on.  Scott, to
6  '93 on.  With a small quantity in '94 of flavors of north
7  America, 105 pounds and in '94, 245 pounds of flavors of
8  north America.  Does that refresh your recollection that the
9  overwhelming amount of butter flavor through '94 was
10  Tastemaker.
11  A.  Yes, I'll agree with that.
12  Q.  Okay.  Now, I just wanted to clarify all that so that we
13  know that you had a very strong relationship with Givaudan,
14  Tastemaker.  You were in constant communication with them.
15  Did you ever hear from Givaudan in those years when they were
16  selling you so much butter flavor that workers in their own
17  plant were being diagnosed with bronchiolitis obliterans?
18  A.  No, sir.
19  Q.  Did you know that from 1995 -- 1985 they knew that
20  breathing diacetyl was harmful?
21  A.  No, sir.
22  Q.  Or it would cause systemic toxicity.
23  A.  No, sir.
24  Q.  Would you put that FFIDS up, Scott, so I can be sure that
25  Mr. Hoffman's never seen anything like this from Givaudan?

**135**

1  You can see here this relates to diacetyl.  Would you go over
2  to that hazards section?  Did Givaudan in any of this time
3  period or even through today, did they -- have they ever told
4  you that by inhalation diacetyl is harmful and that it's
5  capable of producing systemic toxicity?  Did you ever have any
6  indication from them about these facts, Mr. Hoffman?
7  A.  No, sir.
8  Q.  Is that something you would have liked to have known?
9  A.  Yes.
10  Q.  Do you know or did you have any indication in 1991 that
11  Givaudan was warned by its supplier of diacetyl that you had
12  to use air supplied respirators?
13  A.  No.
14  Q.  These little cartridge deals that you had the guys
15  wearing in the mixing room were not to protect against the
16  breathing vapors of diacetyl, were they?  They were organic
17  cartridges.
18  A.  Organic and particulate cartridges.
19  Q.  Right.  Now you've got your workers in scuba gear
20  essentially; right?
21  A.  Supplied air, yes.
22  Q.  Scott, will you show that clip?  Has Mr. Pagliaro seen
23  this?  Well, hang on for a minute because I want -- is there a
24  way to show him first?
25      THE COURT:  Yeah, there is.

**136**

1      MR. MCCLAIN:  Okay.  Go ahead and show Mr. Pagliaro
2  that and make sure that . . .
3      What's the exhibit number for this?  2141.  Mr. --
4      THE COURT:  Well, what'd you all decide?
5      MR. MCCLAIN:  There's no objection to it.
6      THE COURT:  Okay.
7      MR. PAGLIARO:  As long as the witness --
8      THE COURT:  We're going -- I'm sorry.
9      MR. PAGLIARO:  I'm sorry.
10     THE COURT:  It's going to be used as a
11  demonstrative exhibit.
12     MR. MCCLAIN:  Sure, it is.
13     MR. PAGLIARO:  As long as the witness can eye
14  dent -- excuse me, authenticate it, Your Honor.
15     THE COURT:  Well --
16     MR. MCCLAIN:  Let me just ask.
17     THE COURT:  I don't know what you mean by
18  authenticate as long as he says he can -- no.  It's
19  not -- he doesn't have to authenticate him.
20     MR. MCCLAIN:  It's him in the video, Your Honor.
21     THE COURT:  That's a different issue.
22     MR. MCCLAIN:  It's the witness in the video.
23     THE COURT:  Well, okay.  But all he has to do is be
24  able to say what similarities, if any, it has to the closed
25  air system so . . .

**137**

1    MR. PAGLIARO:  And I apologize.  I used the wrong
2    word.
3        THE COURT:  That's okay.
4        Video was played in open court.
5        MR. MCCLAIN:  Turn the volume down.  I don't want
6    the volume playing on that.
7    BY MR. MCCLAIN:
8    Q.  Mr. Hoffman, are you familiar with this video?
9    A.  Yes, I am.
10   Q.  Okay.  You were involved in its creation?
11   A.  That's correct.
12   Q.  Now, I just want to back up, Scott, without the audio.
13   Stop it right there, Scott.  Can you pause it?  What's being
14   depicted there, can you describe that in terms of personal
15   protective equipment?
16   A.  Correct.  The gentleman that's entering into the -- and I
17   must say it was a temporary mixing area because we were in the
18   process of building an additional mixing room.  It's what is
19   called a supplied air respirator system.
20       MR. MCCLAIN:  Go ahead and play the rest of the
21   tape, Scott, so we can see more of that.
22       Continuation of video played in open court.
23   Q.  Is that a better view of it right there?
24   A.  Correct.
25   Q.  Okay.  And that's designed to protect workers from

**138**

1    exposure to vapors like from diacetyl; is that right?
2    A.  Correct.
3    Q.  That's not what they were wearing back in '92 to '95, is
4    it?
5    A.  No, sir.
6    Q.  Now -- but here's the question.
7        MR. MCCLAIN:  Scott, would you go to 2172 Berje
8    material safety data sheet?
9    Q.  This is in evidence.  One of their suppliers was
10   recommending back in '91 use positive pressure self containing
11   breathing apparatus.  That's what you're using now, isn't it?
12   A.  A form of, yes, sir.
13   Q.  And if anybody had told you back in '91 to use this kind
14   of breathing apparatus, you would have used it to protect your
15   workers; isn't that right?
16   A.  Yes, we would have.
17   Q.  Absolutely.  No question.
18   A.  That's correct.  We would have used it.
19   Q.  Now, did you have any sense back during this entire time
20   period that this was going on that Givaudan was looking into
21   this and had a team of doctors working on it and were
22   examining the effect that diacetyl had upon workers?
23   A.  Can you give me a time frame?
24   Q.  '92 to '95.
25   A.  No, I was not aware of that.

**139**

1    Q.  Would you have liked to have known that?
2    A.  Yes, sir.
3    Q.  And if they had told you there was any question about
4    this material, would you have taken precautions for your
5    workers?
6    A.  We would have taken appropriate precautions, yes.
7    Q.  In other words, if they'd told you that this is possible,
8    it's not been proven, but it's possible, would you have taken
9    the precautions to protect your workers?
10   A.  If it was possible that it could cause worker injury,
11   absolutely.  We would have taken additional precautions.
12   Q.  I mean, from your standpoint, is there anything more
13   important than the health of your employees, Mr. Hoffman?
14   A.  No, sir.
15   Q.  I mean, you've lost a lot of sleep over this issue,
16   haven't you?
17   A.  Yes, you could say that.
18   Q.  And you've worried about Ron Kuiper since he's been
19   diagnosed.
20   A.  Has he been diagnosed with bronchiolitis obliterans?
21   Q.  Yes, sir.
22   A.  I've been worried about Ron Kuiper for a long time, but I
23   was not aware that he had been diagnosed.
24   Q.  He's been out of the plant for some time.
25   A.  Yes, he has.

**140**

1    Q.  And -- but you're still concerned about him even though
2    he's been out of the plant.
3    A.  Absolutely.
4        MR. MCCLAIN:  Thank you, Mr. Hoffman.  No further
5    questions.
6        THE COURT:  Any redirect?
7        MR. PAGLIARO:  I have a couple questions.
8        THE COURT:  Yes.  Thank you.
9        MR. PAGLIARO:  Just a few.
10       REDIRECT EXAMINATION
11   BY MR. PAGLIARO:
12   Q.  Now, Mr. Hoffman, from the late 1980s, the workers in the
13   mixing room were assigned to and were required to wear
14   respirators.  You testified to that?
15   A.  That's correct.
16   Q.  And the government described those respirators and as you
17   described them, they were not only for particulates, were
18   they, Mr. Hoffman?
19   A.  Certainly not.  They were -- they were the best
20   protection that we were aware of in terms of the organic
21   filters at that time.
22   Q.  So they had organic vapor cartridges on them as well?
23   A.  Yes, they did.
24   Q.  Okay.  And you instituted that policy because of
25   something that happened; isn't that correct?

Exhibit 4



# Tastemaker

110 E. 70th Street
Cincinnati, OH 45216
Telephone 513 948 8000
Facsimile 513 948 5435

EMERGENCY PHONE NUMBER (513) 768-3650

# M A T E R I A L   S A F E T Y   D A T A   S H E E T



**HAZARD RATINGS**
Health - 1
Flammability - 1
Reactivity - 0

## I.  PRODUCT IDENTIFICATION

**Name:** NATURAL BUTTER FLAVOR WONF #247027
**Formula:** Specific formulation withheld as a trade secret pursuant to provisions of 29 CFR 1910.1200 (i).
**Synonym:** N/A
**CAS:** N/A

## II.  PHYSICAL & CHEMICAL CHARACTERISTICS

| Hazardous Ingredients | % | PEL ppm | mg/m3 | TLV ppm | mg/m3 |
|---|---|---|---|---|---|
| None | | | | | |

**Appearance and Odor:** A light yellow powder with characteristic aroma
**Specific Gravity (@ 20/20 C):** N/A     **Vapor Pressure (@ 20 C):** N/A
**Solubility in Water:** Complete     **Vapor Density (air = 1):** N/A
**Melting Point:** N/A
**Boiling Point:** N/A

## III. FIRE, EXPLOSION, AND REACTIVITY HAZARD DATA

WARNING!  MAY FORM FLAMMABLE DUST-AIR MIXTURES.  STATIC CHARGES
GENERATED BY EMPTYING PACKAGE MAY CAUSE FLASH FIRE.  EMPTYING PACKAGE
IN OR NEAR FLAMMABLE VAPORS MAY INCREASE THE CHANCE OF STATIC CHARGES
CAUSING A FLASH FIRE.  Avoid all ignition sources such as heat, spark
and flame.  Minimize the amount of dust in air by pouring material
slowly into a conductive, ground chute.  Do not remove or shake plastic
liner.  Ground operator and all equipment.  Blanket receiving vessel
with inert gas.

**Flash Point (TCC; F):** N/A
**DOT Classification:** Slightly Combustible
**Extinguishing Media:** CO(2) X   Foam X   Dry Chemical X
**Special Fire Fighting Procedures:** Use standard procedures and preferred extinguishing media above.
**Unusual Fire & Explosion Hazards:** Flammable dust when finely divided and suspended in air.
**Hazardous Decomposition:** None known
**Incompatibility:** Strong oxidizing agents
**Hazardous Combustion Products:** Burning generates CO, CO2, irritating smoke
**Hazardous Polymerization:** Will not occur

EXHIBIT
tables  4

APP 0016

AmerPC 06819

Case 5:17-cv-04008-LTS-KEM   Document 102-6   Filed 03/26/18   Page 20 of 65

MIS11070



# Tastemaker

110 E. 70th Street
Cincinnati, OH 45216
Telephone 513 948 8000
Facsimile 513 948 5435

## IV. SPILL & LEAK PROCEDURES

If Released or Spilled: Sweep up spilled material for disposal. Flush spill area with water spray.

Waste Disposal Method: CAUTION! Material on wet floor may be slippery. Incinerate or landfill in accordance with local, state, or federal regulations.

## V. HEALTH HAZARD DATA

Permissible Exposure Limit (PEL): Not established
Threshold Limit Value (TLV): Not established
Possible Route(s) of Entry: Skin; eyes; ingestion; inhalation of vapors

Health Hazard Determination: This mixture has not been tested as a whole. None of the ingredients have been listed as a carcinogen by NTP (National Toxicology Program), OSHA (Occupational Safety & Health Administration); or or IARC (International Agency for Research on Cancer). The mixture includes, however, ingredients at concentrations greater than or equal to 1% which, undiluted, could present the following hazards to health:

Skin/Eyes:

May be irritating to skin and eyes.

Ingestion:

No known health hazards.

Inhalation:

Inhalation is irritating to nose, throat, and lungs.

Misc:

Medical Conditions Generally Recognized As Being Aggravated By Exposure: None known for normal conditions of use.

## VI. EMERGENCY AND FIRST AID PROCEDURES

Eyes: Flush immediately with water for at least 15 minutes. Remove any contact lenses to ensure thorough flushing. Contact a physician as necessary.

Skin: Wash affected areas thoroughly with soap and water for at least 15 minutes. Remove any contaminated clothing or shoes; wash clothing before reuse. Contact a physician as necessary.

AmerPC 06820



# Tastemaker

#247027

110 E. 70th Street
Cincinnati, OH 45216
Telephone 513 948 8000
Facsimile 513 948 5435

**Ingestion:** Give 1-2 glasses of water or milk to dilute the material.
Seek medical attention immediately. Never give fluids or induce vomiting if
person is unconscious, incoherent, or experiencing convulsions.
**Inhalation:** Remove to fresh air. If breathing has stopped, administer
artificial respiration and oxygen if available. Contact a physician as nec-
essary.

## VII. APPLICABLE CONTROL MEASURES

**Appropriate hygienic practices:** Avoid contact with eyes, skin, and clothing.
Wash thoroughly after handling. Avoid
breathing fumes.

**Personal protective equipment:** Protective gloves, chemical splash goggles

**Handling and storage precautions:** Keep containers closed.
Store in sprinklered warehouse. Keep
temperature below 50 C (120 F) for quality
control.

**Engineering controls:** Provide adequate ventilation.
Eyewash fountains and safety showers should be easily
accessible.

## VIII. SECTION 313 SUPPLIER NOTIFICATION

This product contains the following toxic chemicals subject to the
reporting requirements of Section 313 of the Emergency Planning and
Community Right-To-Know Act of 1986 and of 40 CFR 372:

| Chemical | CAS # | % by Weight |
|---|---|---|
| None | | |

## IX. TASTEMAKER HEALTH RATINGS

The information contained herein is provided in good faith and is believed to
be correct as of the date hereof. However, Tastemaker makes no representation
as to the comprehensiveness or accuracy of the information. It is expected
that individuals receiving the information will exercise their independent
judgment in determining its appropriateness for a particular purpose. Accord-
ingly, Tastemaker will not be responsible for damages of any kind resulting
from the use or reliance upon such information.

APP 0018          AmerPC 06821
Case 5:17-cv-04008-LTS-KEM   Document 102-6   Filed 03/26/18   Page 22 of 65



# Tastemaker

#247027

110 E. 70th Street
Cincinnati, OH 45216
Telephone 513 948 8000
Facsimile 513 948 5435

NO REPRESENTATIONS OR WARRANTIES, EITHER EXPRESSED OR IMPLIED, NO MERCHANTABIL-
ITY, FITNESS FOR A PARTICULAR PURPOSE OR OF ANY OTHER NATURE ARE MADE HEREUNDER
WITH RESPECT TO THE INFORMATION SET FORTH HEREIN REGARDING THE PRODUCT TO WHICH
THE INFORMATION REFERS.

Health Hazard: 0 = Normal material, 1 = Slightly hazardous, 2 = Hazardous
3 = Extreme danger, 4 = Deadly

Fire Hazard: 0 = Will not burn; 1 = Above 200 F; 2 = Above 100 F, not
not exceeding 200 F.; 3 = Below 73 F (Boiling pt at/above
100 F) and/or at/above 73 F. not exceeding 100 F;
4 = Below 73 F (Boiling pt. below 100 F)

Reactivity: 0 = Stable; 1 = Unstable if heated, 2 = Violent chemical
change; 3 = Shock and heat may detonate; 4 = May detonate

Date of Issue: 03/19/93          Date of Last Revision: 3/19/93

APP 0019          AmerPC 06822

# Tastemaker

## M A T E R I A L   S A F E T Y   D A T A   S H E E T

110 E. 70th Street
Cincinnati, OH 45216
Telephone 513 948 8000
Facsimile 513 948 5435



HAZARD RATINGS
Health – 1
Flammability – 1
Reactivity – 0

## I.  PRODUCT IDENTIFICATION

Name:      NATURAL BUTTER FLAVOR WONF #247028
Formula:   Specific formulation withheld as a trade secret pursuant to
           provisions of 29 CFR 1910.1200 (i).
Synonym:   N/A
CAS:       N/A

## II.  PHYSICAL & CHEMICAL CHARACTERISTICS

| Hazardous Ingredients | % | PEL ppm | mg/m3 | TLV ppm | mg/m3 |
|---|---|---|---|---|---|
| None | | | | | |

Appearance and Odor:  A light to medium yellow powder with characteristic aroma

Specific Gravity (@ 20/20 C):  N/A          Vapor Pressure (@ 20 C):  N/A
Solubility in Water:  Complete              Vapor Density (air = 1):  N/A
Melting Point:  N/A
Boiling Point:  N/A

## III. FIRE, EXPLOSION, AND REACTIVITY HAZARD DATA

WARNING!  MAY FORM FLAMMABLE DUST-AIR MIXTURES.  STATIC CHARGES
GENERATED BY EMPTYING PACKAGE MAY CAUSE FLASH FIRE.  EMPTYING PACKAGE
IN OR NEAR FLAMMABLE VAPORS MAY INCREASE THE CHANCE OF STATIC CHARGES
CAUSING A FLASH FIRE.  Avoid all ignition sources such as heat, spark
and flame.  Minimize the amount of dust in air by pouring material
slowly into a conductive, ground chute.  Do not remove or shake plastic
liner.  Ground operator and all equipment.  Blanket receiving vessel
with inert gas.

Flash Point (TCC; F): N/A
DOT Classification:   Slightly Combustible
Extinguishing Media:  CO(2) X  Foam X  Dry Chemical X
Special Fire Fighting Procedures: Use standard procedures and preferred
                                  extinguishing media above.
Unusual Fire & Explosion Hazards: Flammable dust when finely divided and
                                  suspended in air.
Hazardous Decomposition: None known
Incompatibility: Strong oxidizing agents
Hazardous Combustion Products: Burning generates CO, CO2, irritating smoke
Hazardous Polymerization: Will not occur

AmerPC 06823



# Tastemaker

110 E. 70th Street
Cincinnati, OH 45216
Telephone 513 948 8000
Facsimile 513 948 5435

## IV. SPILL & LEAK PROCEDURES

**If Released or Spilled:** Sweep up spilled material for disposal. Flush spill area with water spray.
CAUTION! Material on wet floor may be slippery.

**Waste Disposal Method:** Incinerate or landfill in accordance with local, state, or federal regulations.

## V. HEALTH HAZARD DATA

**Permissible Exposure Limit (PEL):** Not established
**Threshold Limit Value (TLV):** Not established
**Possible Route(s) of Entry:** Skin; eyes; ingestion; inhalation of vapors

**Health Hazard Determination:** This mixture has not been tested as a whole. None of the ingredients have been listed as a carcinogen by NTP (National Toxicology Program), OSHA (Occupational Safety & Health Administration); or or IARC (International Agency for Research on Cancer).
The mixture includes, however, ingredients at concentrations greater than or equal to 1% which, undiluted, could present the following hazards to health:

**Skin/Eyes:**
May be irritating to skin and eyes.

**Ingestions:**
Ingestion may cause irritation in mouth and stomach.

**Inhalation:**
Nuisance mist or dust; high levels in air may be irritating.
**Misc:**

**Medical Conditions Generally Recognized As Being Aggravated By Exposure:** None known for normal conditions of use.

## VI. EMERGENCY AND FIRST AID PROCEDURES

**Eyes:** Flush immediately with water for at least 15 minutes. Remove any contact lenses to ensure thorough flushing. Contact a physician as necessary.
**Skin:** Wash affected areas thoroughly with soap and water for at least 15 minutes. Remove any contaminated clothing or shoes; wash clothing before reuse. Contact a physician as necessary.

AmerPC 06824



# Tastemaker

#247028

110 E. 70th Street
Cincinnati, OH 45216
Telephone 513 948 8000
Facsimile 513 948 5435

Ingestion:  Give 1-2 glasses of water or milk to dilute the material.
Seek medical attention immediately.  Never give fluids or induce vomiting if
person is unconscious, incoherent, or experiencing convulsions.
Inhalation:  Remove to fresh air.  If breathing has stopped, administer
artificial respiration and oxygen if available.  Contact a physician as nec-
essary.

## VII. APPLICABLE CONTROL MEASURES

Appropriate hygienic practices:  Avoid contact with eyes, skin, and clothing.
                                 Wash thoroughly after handling.  Avoid
                                 breathing fumes.

Personal protective equipment:  Protective gloves, chemical splash goggles

Handling and storage precautions:  Keep containers closed.
                                   Store in sprinklered warehouse.  Keep
                                   temperature below 50 C (120 F) for quality
                                   control.

Engineering controls:  Provide adequate ventilation.
                       Eyewash fountains and safety showers should be easily
                       accessible.

## VIII. SECTION 313 SUPPLIER NOTIFICATION

This product contains the following toxic chemicals subject to the
reporting requirements of Section 313 of the Emergency Planning and
Community Right-To-Know Act of 1986 and of 40 CFR 372:

| Chemical | CAS # | % by Weight |
|----------|-------|-------------|
| None | | |

## IX.  TASTEMAKER HEALTH RATINGS

The information  contained  herein is provided in good faith and is believed to
be correct  as of the date hereof.  However, Tastemaker makes no representation
as to  the  comprehensiveness  or  accuracy of the information.  It is expected
that  individuals  receiving  the  information  will  exercise their independent
judgment  in  determining its appropriateness for a particular purpose.  Accord-
ingly, Tastemaker  will  not  be  responsible for damages of any kind resulting
from the use or reliance upon such information.

AmerPC 06825

APP 0022



# Tastemaker

#247028

110 E. 70th Street
Cincinnati, OH 45216
Telephone 513 948 8000
Facsimile 513 948 5435

NO REPRESENTATIONS OR WARRANTIES, EITHER EXPRESSED OR IMPLIED, NO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OF ANY OTHER NATURE ARE MADE HEREUNDER WITH RESPECT TO THE INFORMATION SET FORTH HEREIN REGARDING THE PRODUCT TO WHICH THE INFORMATION REFERS.

<u>Health Hazard:</u>   0 = Normal material, 1 = Slightly hazardous, 2 = Hazardous
               3 = Extreme danger,  4 = Deadly

<u>Fire  Hazard:</u>   0 = Will not burn; 1 = Above 200 F.; 2 = Above 100 F, not
               not exceeding 200 F.; 3 = Below 73 F (Boiling pt at/above
               100 F) and/or at/above 73 F. not exceeding 100 F;
               4 = Below 73 F (Boiling pt. below 100 F)

<u>Reactivity:</u>    0 = Stable; 1 = Unstable if heated, 2 = Violent chemical
               Change; 3 = Shock and heat may detonate; 4 = May detonate

Date of Issue:  03/19/93        Date of Last Revision: 3/19/93

AmerPC 06826

# Tastemaker

EMERGENCY PHONE NUMBER (513) 768-3650

### M A T E R I A L   S A F E T Y   D A T A   S H E E T

110 E. 70th Street
Cincinnati, OH 45216
Telephone 513 948 8000
Facsimile 513 948 5435



**HAZARD RATINGS**
Health - 1
Flammability - 1
Reactivity - 0

## I.   PRODUCT IDENTIFICATION

**Name:** NATURAL BUTTER FLAVOR WONF #205103
**Formula:** Specific formulation withheld as a trade secret pursuant to provisions of 29 CFR 1910.1200 (i).
**Synonym:** N/A
**CAS:** N/A

## II.   PHYSICAL & CHEMICAL CHARACTERISTICS

| Hazardous Ingredients | % | PEL ppm | mg/m3 | TLV ppm | mg/m3 |
|---|---|---|---|---|---|
| None | | | | | |

**Appearance and Odor:** A yellow paste with characteristic aroma
**Specific Gravity (@ 20/20 C):** N/A          **Vapor Pressure (@ 20 C):** N/A
**Solubility in Water:** Negative                **Vapor Density (air = 1):** N/A
**Melting Point:** N/A
**Boiling Point:** N/A

## III. FIRE, EXPLOSION, AND REACTIVITY HAZARD DATA

WARNING!  MAY FORM FLAMMABLE DUST-AIR MIXTURES.  STATIC CHARGES GENERATED BY EMPTYING PACKAGE MAY CAUSE FLASH FIRE.  EMPTYING PACKAGE IN OR NEAR FLAMMABLE VAPORS MAY INCREASE THE CHANCE OF STATIC CHARGES CAUSING A FLASH FIRE.  Avoid all ignition sources such as heat, spark and flame.  Minimize the amount of dust in air by pouring material slowly into a conductive, ground chute.  Do not remove or shake plastic liner.  Ground operator and all equipment.  Blanket receiving vessel with inert gas.

**Flash Point (TCC; F):** N/A
**DOT Classification:** Slightly Combustible
**Extinguishing Media:** CO(2) X  Foam X  Dry Chemical X
**Special Fire Fighting Procedures:** Use standard procedures and preferred extinguishing media above.
**Unusual Fire & Explosion Hazards:** Flammable dust when finely divided and suspended in air.
**Hazardous Decomposition:** None known
**Incompatibility:** Strong oxidizing agents
**Hazardous Combustion Products:** Burning generates CO, CO2, irritating smoke
**Hazardous Polymerization:** Will not occur

APP 0024                    AmerPC 06827



# Tastemaker

110 E. 70th Street
Cincinnati, OH 45216
Telephone 513 948 8000
Facsimile 513 948 5435

#205103

## IV. SPILL & LEAK PROCEDURES

**If Released or Spilled:** Sweep up spilled material for disposal. Flush spill area with water spray.
CAUTION! Material on wet floor may be slippery.

**Waste Disposal Method:** Incinerate or landfill in accordance with local, state, or federal regulations.

## V. HEALTH HAZARD DATA

**Permissible Exposure Limit (PEL):** Not established
**Threshold Limit Value (TLV):** Not established
**Possible Route(s) of Entry:** Skin; eyes; ingestion; inhalation of vapors

**Health Hazard Determination:** This mixture has not been tested as a whole. None of the ingredients have been listed as a carcinogen by NTP (National Toxicology Program), OSHA (Occupational Safety & Health Administration); or or IARC (International Agency for Research on Cancer).
The mixture includes, however, ingredients at concentrations greater than or equal to 1% which, undiluted, could present the following hazards to health:

**Skin/Eyes:**
Irritating to skin and eyes.

**Ingestion:**
No known health hazards.

**Inhalation:**
Inhalation is irritating to nose, throat, and lungs.

**Misc:**

**Medical Conditions Generally Recognized As Being Aggravated By Exposure:** None known for normal conditions of use.

## VI. EMERGENCY AND FIRST AID PROCEDURES

**Eyes:** Flush immediately with water for at least 15 minutes. Remove any contact lenses to ensure thorough flushing. Contact a physician as necessary.
**Skin:** Wash affected areas thoroughly with soap and water for at least 15 minutes. Remove any contaminated clothing or shoes; wash clothing before reuse. Contact a physician as necessary.

AmerPC 06828



# Tastemaker

#205103

110 E. 70th Street
Cincinnati, OH 45216
Telephone 513 948 8000
Facsimile 513 948 5435

Ingestion: Give 1-2 glasses of water or milk to dilute the material. Seek medical attention immediately. Never give fluids or induce vomiting if person is unconscious, incoherent, or experiencing convulsions.

Inhalation: Remove to fresh air. If breathing has stopped, administer artificial respiration and oxygen if available. Contact a physician as necessary.

## VII. APPLICABLE CONTROL MEASURES

Appropriate hygienic practices: Avoid contact with eyes, skin, and clothing. Wash thoroughly after handling. Avoid breathing fumes.

Personal protective equipment: Protective gloves, chemical splash goggles

Handling and storage precautions: Keep containers closed. Store in sprinklered warehouse. Keep temperature below 50 C (120 F) for quality control.

Engineering controls: Provide adequate ventilation. Eyewash fountains and safety showers should be easily accessible.

## VIII. SECTION 313 SUPPLIER NOTIFICATION

This product contains the following toxic chemicals subject to the reporting requirements of Section 313 of the Emergency Planning and Community Right-To-Know Act of 1986 and of 40 CFR 372:

| Chemical | CAS # | % by Weight |
|----------|-------|-------------|
| None | | |

## IX. TASTEMAKER HEALTH RATINGS

The information contained herein is provided in good faith and is believed to be correct as of the date hereof. However, Tastemaker makes no representation as to the comprehensiveness or accuracy of the information. It is expected that individuals receiving the information will exercise their independent judgment in determining its appropriateness for a particular purpose. Accordingly, Tastemaker will not be responsible for damages of any kind resulting from the use or reliance upon such information.

AmerPC 06829



# Tastemaker

#205103

110 E. 70th Street
Cincinnati, OH 45216
Telephone 513 948 8000
Facsimile 513 948 5435

NO REPRESENTATIONS OR WARRANTIES, EITHER EXPRESSED OR IMPLIED, NO MERCHANTABIL-
ITY, FITNESS FOR A PARTICULAR PURPOSE OR OF ANY OTHER NATURE ARE MADE HEREUNDER
WITH RESPECT TO THE INFORMATION SET FORTH HEREIN REGARDING THE PRODUCT TO WHICH
THE INFORMATION REFERS.

Health Hazard:   0 = Normal material, 1 = Slightly hazardous, 2 = Hazardous
                 3 = Extreme danger,  4 = Deadly
Fire  Hazard:    0 = Will not burn; 1 = Above 200 F; 2 = Above 100 F, not
                 not exceeding 200 F.; 3 = Below 73 F (Boiling pt at/above
                 100 F) and/or at/above 73 F. not exceeding 100 F;
                 4 = Below 73 F (Boiling pt. below 100 F)
Reactivity:      0 = Stable; 1 = Unstable if heated, 2 = Violent chemical
                 change; 3 = Shock and heat may detonate; 4 = May detonate

Date of Issue:   03/19/93      Date of Last Revision: 3/19/93

APP 0027      AmerPC 06830



# Tastemaker

## M A T E R I A L   S A F E T Y   D A T A   S H E E T

110 E. 70th Street
Cincinnati, OH 45216
Telephone 513 948 8000
Facsimile 513 948 5435



**HAZARD RATINGS**
Health - 1
Flammability - 1
Reactivity - 0

## I.   PRODUCT IDENTIFICATION

**Name:**     NATURAL BUTTER FLAVOR WONF #220108
**Formula:**  Specific formulation withheld as a trade secret pursuant to
             provisions of 29 CFR 1910.1200 (i).
**Synonym:**  N/A
**CAS:**      N/A

## II.  PHYSICAL & CHEMICAL CHARACTERISTICS

| Hazardous Ingredients | % | PEL ppm  mg/m3 | TLV ppm  mg/m3 |
|---|---|---|---|
| None | | | |

**Appearance and Odor:** A yellow paste with characteristic aroma
**Specific Gravity (@ 20/20 C):** N/A
**Solubility in Water:** Negative          **Vapor Pressure (@ 20 C):** N/A
**Melting Point:** N/A                     **Vapor Density (air =1):** N/A
**Boiling Point:** N/A

## III. FIRE, EXPLOSION, AND REACTIVITY HAZARD DATA

WARNING!  MAY FORM FLAMMABLE DUST-AIR MIXTURES.  STATIC CHARGES
GENERATED BY EMPTYING PACKAGE MAY CAUSE FLASH FIRE.  EMPTYING PACKAGE
IN OR NEAR FLAMMABLE VAPORS MAY INCREASE THE CHANCE OF STATIC CHARGES
CAUSING A FLASH FIRE.  Avoid all ignition sources such as heat, spark
and flame.  Minimize the amount of dust in air by pouring material
slowly into a conductive, ground chute.  Do not remove or shake plastic
liner.  Ground operator and all equipment.  Blanket receiving vessel
with inert gas.

**Flash Point (TCC; F):** N/A
**DOT Classification:** Slightly Combustible
**Extinguishing Media:** CO(2) X   Foam X   Dry Chemical X
**Special Fire Fighting Procedures:** Use standard procedures and preferred
                                      extinguishing media above.
**Unusual Fire & Explosion Hazards:** Flammable dust when finely divided and
                                      suspended in air.
**Hazardous Decomposition:** None known
**Incompatibility:** Strong oxidizing agents
**Hazardous Combustion Products:** Burning generates CO, $CO_2$, irritating smoke
**Hazardous Polymerization:** Will not occur

APP 0028

AmerPC 06815



# Tastemaker

#220108

110 E. 70th Street
Cincinnati, OH 45216
Telephone 513 948 8000
Facsimile 513 948 5435

## IV. SPILL & LEAK PROCEDURES

**If Released or Spilled:** Sweep up spilled material for disposal. Flush spill area with water spray.
**Waste Disposal Method:** CAUTION! Material on wet floor may be slippery. Incinerate or landfill in accordance with local, state, or federal regulations.

## V. HEALTH HAZARD DATA

**Permissible Exposure Limit (PEL):** Not established
**Threshold Limit Value (TLV):** Not established
**Possible Route(s) of Entry:** Skin; eyes; ingestion; inhalation of vapors

**Health Hazard Determination:** This mixture has not been tested as a whole. None of the ingredients have been listed as a carcinogen by NTP (National Toxicology Program), OSHA (Occupational Safety & Health Administration); or or IARC (International Agency for Research on Cancer). The mixture includes, however, ingredients at concentrations greater than or equal to 1% which, undiluted, could present the following hazards to health:

**Skin/Eyes:**
May be irritating to skin and eyes.

**Ingestion:**
No known health hazards.

**Inhalation:**
Inhalation is irritating to nose, throat, and lungs.

**Misc:**

**Medical Conditions Generally Recognized As Being Aggravated By Exposure:** None known for normal conditions of use.

## VI. EMERGENCY AND FIRST AID PROCEDURES

**Eyes:** Flush immediately with water for at least 15 minutes. Remove any contact lenses to ensure thorough flushing. Contact a physician as necessary.
**Skin:** Wash affected areas thoroughly with soap and water for at least 15 minutes. Remove any contaminated clothing or shoes; wash clothing before reuse. Contact a physician as necessary.

AmerPC 06816

APP 0029

MIS1187A



# Tastemaker

#220108

110 E. 70th Street
Cincinnati, OH 45216
Telephone 513 948 8000
Facsimile 513 948 5435

Ingestion: Give 1-2 glasses of water or milk to dilute the material.
Seek medical attention immediately. Never give fluids or induce vomiting if
person is unconscious, incoherent, or experiencing convulsions.
Inhalation: Remove to fresh air. If breathing has stopped, administer
artificial respiration and oxygen if available. Contact a physician as nec-
essary.

## VII. APPLICABLE CONTROL MEASURES

Appropriate hygienic practices:    Avoid contact with eyes, skin, and clothing.
                                   Wash thoroughly after handling. Avoid
                                   breathing fumes.

Personal protective equipment:    Protective gloves, chemical splash goggles

Handling and storage precautions:    Keep containers closed.
                                     Store in sprinklered warehouse. Keep
                                     temperature below 50 C (120 F) for quality
                                     control.

Engineering controls:    Provide adequate ventilation.
                         Eyewash fountains and safety showers should be easily
                         accessible.

## VIII. SECTION 313 SUPPLIER NOTIFICATION

This product contains the following toxic chemicals subject to the
reporting requirements of Section 313 of the Emergency Planning and
Community Right-To-Know Act of 1986 and of 40 CFR 372:

| Chemical | CAS # | % by Weight |
|----------|-------|-------------|
| None     |       |             |

## IX.  TASTEMAKER HEALTH RATINGS

The information contained herein is provided in good faith and is believed to
be correct as of the date hereof. However, Tastemaker makes no representation
as to the comprehensiveness or accuracy of the information. It is expected
that individuals receiving the information will exercise their independent
judgment in determining its appropriateness for a particular purpose. Accord-
ingly, Tastemaker will not be responsible for damages of any kind resulting
from the use or reliance upon such information.

AmerPC 06817



# Tastemaker

110 E. 70th Street
Cincinnati, OH 45216
Telephone 513 948 8000
Facsimile 513 948 5435

NO REPRESENTATIONS OR WARRANTIES, EITHER EXPRESSED OR IMPLIED, NO MERCHANTABIL-ITY, FITNESS FOR A PARTICULAR PURPOSE OR OF ANY OTHER NATURE ARE MADE HEREUNDER WITH RESPECT TO THE INFORMATION SET FORTH HEREIN REGARDING THE PRODUCT TO WHICH THE INFORMATION REFERS.

Health Hazard:   0 = Normal material, 1 = Slightly hazardous, 2 = Hazardous
                 3 = Extreme danger,  4 = Deadly
Fire  Hazard:    0 = Will not burn; 1 = Above 200 F; 2 = Above 100 F, not
                 not exceeding 200 F.; 3 = Below 73 F (Boiling pt at/above
                 100 F) and/or at/above 73 F. not exceeding 100 F;
                 4 = Below 73 F (Boiling pt. below 100 F)
Reactivity:      0 = Stable; 1 = Unstable if heated, 2 = Violent chemical
                 change; 3 = Shock and heat may detonate; 4 = May detonate

Date of Issue:   03/19/93          Date of Last Revision: 3/19/93

AmerPC 06818

MIS11678

Exhibit 5



# FRIES & FRIES

### The Flavormakers®

1199 Edison Drive / Cincinnati, Ohio 45216

NATURAL BUTTER FLAVOR WONF (LIGHT) #202944 (PA)
We certify that all flavor ingredients contained in this product are listed as
being generally recognized as safe on a reliable published industry
association (F.E.M.A.) list, and/or are approved for use in a regulation of the
Food & Drug Administration.

NON-FLAVOR INGREDIENTS: PARTIALLY HYDROGENATED
VEGETABLE OILS (SOYBEAN/COTTONSEED), MALTO
DEXTRIN.

American Pop Corn
Code # 11478
3-4-91

FRIES & FRIES, INC.

EXHIBIT
tabbies
5

APP 0032

TM-APC000000083

DATE: 2-2-93    CUSTOMER NAME: American Popcorn    CUST. # 94

PRODUCT: Natural Butter Flavor WONF #247027 (SDB)
F. & F. CODE: 22692    FLASH POINT: _____

STENCIL THE FOLLOWING:    See Label Below

**USE LARGE LETTER SIZE STENCIL
LOT NUMBER _____
CUSTOMER CODE: 4858
P.O. NUMBER _____
GROSS,TARE,NET    (Y)    (N)
WEIGHT IN GALLONS (Y)    (N)
"FOOD GRADE"    (Y)    (N)
MANUFACTURE DATE (Y)    (N)
# OF CONTAINERS  (Y)    (N)
OTHER: _____

LABELING INSTRUCTIONS

RABBI STAMP LABELS    (Y)    (N)
INGREDIENT LABELS    (Y)    (N)
ADDRESS LABELS    (Y)    (N)
REQUIRES REFRIGERATION (Y)    (N)
FLAMMABLE    (Y)    (N)
TAPE BAND    (Y)    (N)
SPECIAL INSTRUCTIONS: _____

**********************************************

QUALITY CONTROL REQUIREMENTS

*COA*    (Y)    (N)
*MICROS*    (Y)    (N)
*MSDS*    (Y)    (N)
*W/SHIPMENT (Y) MAIL (Y) FAX (Y)
PRESHIPMENT SAMPLE    (Y)    (N)
COSHIPMENT SAMPLE    (Y)    (N)
REQUIRES REFRIGERATION (Y)    (N)
SPECIAL INSTRUCTIONS: _____

PACKAGING INSTRUCTIONS

TYPE OF DRUM: _____
TYPE OF PAIL: _____
IF COLORED WHAT COLOR: _____
TYPE OF JUG: _____
# PER EACH CONTAINER 100 X 50#
SLIP SHEETS (Y) (N)
ON PALLETS (Y) (N) SIZE _____
STRETCH WRAP (Y) (N)    of app.
PACKING LIST (Y) (N)
OTHER: _____

**********************************************

BILLING DEPT. NOTE:    SEND COPY OF FRT. BILL W/INVOICE (Y)
SEND PACKING LIST W/INVOICE (Y)    SEND COPY OF B/L WITH INVOICE (Y)
SEND ADDITIONAL INVOICE TO: _____
OTHER: _____

**********************************************

SHIPPING INSTRUCTIONS    - SHIP VIA _____ , PPA
DOCK APPOINTMENT REQUIRED? (Y) (N) IF YES, MAKE NOTATION ON B/L
*****SEE ABOVE FOR DOCUMENTS WHICH SHOULD GO WITH SHIPMENT******
OTHER: _____

NATURAL BUTTER FLAVOR WONF #247027 (SDB)

We certify that all flavor ingredients contained in this product are listed as being
generally recognized as safe on a reliable published industry association (F.E.M.A.) list,
and/or are approved for use in a regulation of the Food & Drug Administration.

Non-Flavor Ingredients:

MALTODEXTRIN, MODIFIED CORNSTARCH, CORN SYRUP
SOLIDS, PARTIALLY HYDROGENATED SOYBEAN OIL
TRICALCIUM PHOSPHATE.

CUSTOMER ASSIGNED CODE:

American PopCorn

Tastemaker

110 E. 70th Street Cincinnati OH 45216

APP 0032-a

DATE: _____ CUSTOMER NAME: *American Popcorn* CUST. #: _____

PRODUCT: *Nat (WONF Butter (SDB) 247028*
F. & F. CODE *264051* FLASH POINT _____

*See Label Below*

STENCIL THE FOLLOWING:
**USE LARGE LETTER SIZE STENCIL
LOT NUMBER _____
CUSTOMER CODE *057-82*
P.O. NUMBER _____ (M v N)
GROSS, TARE, NET (Y) (N)
WEIGHT IN GALLONS (Y) (N)
"FOOD GRADE" (Y) (N)
MANUFACTURE DATE (Y) (N)
# OF CONTAINERS (Y) (N)
OTHER: _____

LABELING INSTRUCTIONS
RABBI STAMP LABELS (Y) (N)
INGREDIENT LABELS (Y) (N)
ADDRESS LABELS (Y) (N)
REQUIRES REFRIGERATION (Y) (N)
FLAMMABLE (Y) (N)
TAPE BAND
SPECIAL INSTRUCTIONS: *Bottle*
*tap on top of boxes*

QUALITY CONTROL REQUIREMENTS
*COA* (Y) (N)
*MICROS* (Y) (N)
*MSDS* (Y) (N)
*W/SHIPMENT (Y) MAIL (Y) FAX (N)
PRESHIPMENT SAMPLE (Y) (N)
COSHIPMENT SAMPLE (Y) (N)
REQUIRES REFRIGERATION (Y) (N)
SPECIAL INSTRUCTIONS: _____
_____

PACKAGING INSTRUCTIONS
TYPE OF DRUM: _____
TYPE OF PAIL: _____
IF COLORED WHAT COLOR: _____
TYPE OF JUG: _____
# PER EACH CONTAINER _____
SLIP SHEETS (Y) (N)
ON PALLETS (Y) (N) SIZE *4 app*
STRETCH WRAP (Y) (N)
PACKING _____
OTHER: *20 @ 50# keep per box*

BILLING DEPT. NOTE:
SEND PACKING LIST W/INVOICE (Y)
SEND ADDITIONAL INVOICE TO: _____
OTHER: _____

SEND COPY OF FRT. BILL W/INVOICE (Y)
SEND COPY OF B/L WITH INVOICE (Y)

SHIPPING INSTRUCTIONS - SHIP VIA _____ / *PPA*
DOCK APPOINTMENT REQUIRED? (Y) (N) IF YES, MAKE NOTATION ON B/L
*****SEE ABOVE FOR DOCUMENTS WHICH SHOULD GO WITH SHIPMENT*****
OTHER: _____

NATURAL BUTTER FLAVOR WONF (SDB)
#247028

We certify that all flavor ingredients contained in this product are listed as being
generally recognized as safe on a reliable published industry association (F.E.M.A.) list,
and/or are approved for use in regulation of the Food & Drug Administration.

Non-Flavor Ingredients:

MALTODEXTRIN, MODIFIED CORNSTARCH,
CORN SYRUP SOLIDS, PARTIALLY HYDROGENATED
SOYBEAN OIL, TRICALCIUM PHOSPHATE.

Tastemaker

110 E. 70th Street Cincinnati OH 45216

APP 0032-b

DATE: _____ CUSTOMER NAME: *American Popcorn* CUST _____

PRODUCT: *Nat WONF Butter (SDB) 247028*
F. & F. CODE *282051* FLASH POINT _____

STENCIL THE FOLLOWING: *See Label Below*
**USE LARGE LETTER SIZE STENCIL**

LOT NUMBER
CUSTOMER CODE *057-80*
P.O. NUMBER *#866/Rel 1212*
GROSS,TARE,NET                    (Y)  (N)
WEIGHT IN GALLONS        (Y)  (N)
"FOOD GRADE"                    (Y)  (N)
MANUFACTURE DATE         (Y)  (N)
# OF CONTAINERS             (Y)  (N)
OTHER: _____

LABELING INSTRUCTIONS

RABBI STAMP LABELS          (Y)  (N)
INGREDIENT LABELS             (Y)  (N)
ADDRESS LABELS                  (Y)  (N)
REQUIRES REFRIGERATION    (Y)  (N)
FLAMMABLE                            (Y)  (N)
TAPE BAND                            (Y)  (N)
SPECIAL INSTRUCTIONS: *Bottle*
*Tap on Top of Boxes*

QUALITY CONTROL REQUIREMENTS

"COA"                                  (Y)  (N)
"MICROS"                            (Y)  (N)
"MSDS"                               (Y)  (N)
"W/SHIPMENT (Y) MAIL (Y) FAX (N)
PRESHIPMENT SAMPLE           (Y)  (N)
COSHIPMENT SAMPLE            (Y)  (N)
REQUIRES REFRIGERATION    (Y)  (N)
SPECIAL INSTRUCTIONS: _____

PACKAGING INSTRUCTIONS

TYPE OF DRUM: _____
TYPE OF PAIL: _____
IF COLORED WHAT COLOR: _____
TYPE OF JUG: _____
# PER EACH CONTAINER _____
SLIP SHEETS  (Y) (N)
ON PALLETS (Y) (N) SIZE *If app*
STRETCH WRAP  (Y)  (N)
PACKING _____
OTHER: *2 @ 50# Poop per box*

BILLING DEPT. NOTE:            SEND COPY OF FRT. BILL W/INVOICE (Y)
SEND PACKING LIST W/INVOICE (Y)     SEND COPY OF B/L WITH INVOICE (Y)
SEND ADDITIONAL INVOICE TO:
OTHER: _____

SHIPPING INSTRUCTIONS  - SHIP VIA _____ / *PPA*
DOCK APPOINTMENT REQUIRED? (Y) (N) IF YES, MAKE NOTATION ON B/L
*****SEE ABOVE FOR DOCUMENTS WHICH SHOULD GO WITH SHIPMENT*****
OTHER: _____

---

NATURAL BUTTER FLAVOR WONF                    (SDB)
#247028

We certify that all flavor ingredients contained in this product are listed as being
generally recognized as safe on a reliable published industry association (F.E.M.A.) list,
and/or are approved for use in regulation of the Food & Drug Administration.

Non-Flavor Ingredients:

MALTODEXTRIN, MODIFIED CORNSTARCH,
CORN SYRUP SOLIDS, PARTIALLY HYDROGENATED
SOYBEAN OIL, TRICALCIUM PHOSPHATE.

Tastemaker

110 E. 70th Street  Cincinnati  OH  45216

APP 0032-c

DATE: _____  CUSTOMER NAME: *American Popcorn*  CUST. #: _____

PRODUCT: *Nat (WONF Butter (SDB) 247028*

F. & F. CODE *221031*  FLASH POINT _____

**STENCIL THE FOLLOWING:**  *See Label Below*

**USE LARGE LETTER SIZE STENCIL**

LOT NUMBER _____
CUSTOMER CODE *059-82*
P.O. NUMBER _____  *M & N*
GROSS,TARE,NET  (Y)  (N)
WEIGHT IN GALLONS  (Y)  (N)
"FOOD GRADE"  (Y)  (N)
MANUFACTURE DATE  (Y)  (N)
# OF CONTAINERS  (Y)  (N)
OTHER: _____

| **LABELING INSTRUCTIONS** | | |
| --- | --- | --- |
| RABBI STAMP LABELS | (Y) | (N) |
| INGREDIENT LABELS | (Y) | (N) |
| ADDRESS LABELS | (Y) | (N) |
| REQUIRES REFRIGERATION | (Y) | (N) |
| FLAMMABLE | | |
| TAPE BAND | | |

SPECIAL INSTRUCTIONS: *Blue tap on top of boxes*

**QUALITY CONTROL REQUIREMENTS**

"COA"  (Y)  (N)
"MICROS"  (Y)  (N)
"MSDS"  (Y)  (N)
W/SHIPMENT (Y) MAIL (Y) FAX (N)
PRESHIPMENT SAMPLE  (Y)  (N)
COSHIPMENT SAMPLE  (Y)  (N)
REQUIRES REFRIGERATION  (Y)  (N)
SPECIAL INSTRUCTIONS: _____

**PACKAGING INSTRUCTIONS**

TYPE OF DRUM: _____
TYPE OF PAIL: _____
IF COLORED WHAT COLOR: _____
TYPE OF JUG: _____
# PER EACH CONTAINER _____
SLIP SHEETS  (Y)  (N)
ON PALLETS (Y) (N) SIZE _____  *Y app*
STRETCH WRAP (Y)  (N)
PACKING LIST _____
OTHER: *2@50# bag per box*

**BILLING DEPT. NOTE:**

SEND PACKING LIST W/INVOICE (Y)   SEND COPY OF FRT. BILL W/INVOICE (Y)
                                   SEND COPY OF B/L WITH INVOICE (Y)
SEND ADDITIONAL INVOICE TO: _____
OTHER: _____

**SHIPPING INSTRUCTIONS**  - SHIP VIA _____  *PPA*
DOCK APPOINTMENT REQUIRED? (Y) (N) IF YES, MAKE NOTATION ON B/L
*****SEE ABOVE FOR DOCUMENTS WHICH SHOULD GO WITH SHIPMENT*****
OTHER: _____

NATURAL BUTTER FLAVOR WONF          (SDB)
#247028

We certify that all flavor ingredients contained in this product are listed as being
generally recognized as safe on a reliable published industry association (F.E.M.A.) list,
and/or are approved for use in regulation of the Food & Drug Administration.

Non-Flavor Ingredients:

MALTODEXTRIN, MODIFIED CORNSTARCH,
CORN SYRUP SOLIDS, PARTIALLY HYDROGENATED
SOYBEAN OIL, TRICALCIUM PHOSPHATE.

Tastemaker

110 E. 70th Street  Cincinnati  OH. 45216

APP 0032-d

Case 5:17-cv-04008-LTS-KEM   Document 102-6   Filed 03/26/18   Page 41 of 65

TM(HERC)-APC000169

DATE: _____ CUSTOMER NAME: *American Popcorn* CUST. _____

PRODUCT: *Nat WONF Butter (SDB) 247028*
F. & F. CODE: *2205* FLASH POINT: _____

STENCIL THE FOLLOWING:                          *See Label Below*

**USE LARGE LETTER SIZE STENCIL
LOT NUMBER
CUSTOMER CODE *057-82*
P.O. NUMBER
GROSS,TARE,NET          (Y)  (N)
WEIGHT IN GALLONS      (Y)  (N)
"FOOD GRADE"             (Y)  (N)
MANUFACTURE DATE      (Y)  (N)
# OF CONTAINERS         (Y)  (N)
OTHER:

LABELING INSTRUCTIONS:

RABBI STAMP LABELS        (Y)  (N)
INGREDIENT LABELS         (Y)  (N)
ADDRESS LABELS            (Y)  (N)
REQUIRES REFRIGERATION   (Y)  (N)
FLAMMABLE                 (Y)  (N)
TAPE BAND                 (Y)  (N)
SPECIAL INSTRUCTIONS: *Rabbi*
*Tap on top of boxes*

QUALITY CONTROL REQUIREMENTS:

*COA*                     (Y)  (N)
*MICROS*                  (Y)  (N)
*MSDS*                    (Y)  (N)
*W/SHIPMENT (Y) MAIL (Y) FAX (Y)
PRESHIPMENT SAMPLE       (Y)  (N)
COSHIPMENT SAMPLE        (Y)  (N)
REQUIRES REFRIGERATION   (Y)  (N)
SPECIAL INSTRUCTIONS:

PACKAGING INSTRUCTIONS:

TYPE OF DRUM:
TYPE OF PAIL:
IF COLORED WHAT COLOR:
TYPE OF JUG:
# PER EACH CONTAINER:
SLIP SHEETS  (Y)  (N)
ON PALLETS  (Y)  (N) SIZE *of app*
STRETCH WRAP (Y)  (N)
PACKING:
OTHER: *2@50# bags per box*

BILLING DEPT. NOTE:                 SEND COPY OF FRT BILL W/INVOICE (Y)
SEND PACKING LIST W/INVOICE (Y)    SEND COPY OF B/L WITH INVOICE (Y)
SEND ADDITIONAL INVOICE TO:
OTHER:

SHIPPING INSTRUCTIONS:  SHIP VIA: *PPA*
DOCK APPOINTMENT REQUIRED? (Y) (N) IF YES, MAKE NOTATION ON B/L
****SEE ABOVE FOR DOCUMENTS WHICH SHOULD GO WITH SHIPMENT****
OTHER:

---

NATURAL BUTTER FLAVOR WONF                    (SDB)
#247028

We certify that all flavor ingredients contained in this product are listed as being
generally recognized as safe on a reliable published industry association (F.E.M.A.) list,
and/or are approved for use in regulation of the Food & Drug Administration.

Non-Flavor Ingredients:

MALTODEXTRIN, MODIFIED CORNSTARCH,
CORN SYRUP SOLIDS, PARTIALLY HYDROGENATED
SOYBEAN OIL, TRICALCIUM PHOSPHATE.

Tastemaker

110 E. 70th Street  Cincinnati  OH  45216

APP 0032-e

Case 5:17-cv-04008-LTS-KEM  Document 102-6  Filed 03/26/18  Page 42 of 65
TM(HERC)-APC000184

DATE: _____     CUSTOMER NAME: *American Popcorn*   CUST. #

PRODUCT: *Nat WONF Butter (SDB) 247028*
F. & F. CODE *224431*     FLASH POINT _____
*See Label Below*

STENCIL THE FOLLOWING:
**USE LARGE LETTER SIZE STENCIL**

| | |
|---|---|
| LOT NUMBER | _____ |
| CUSTOMER CODE | *45282* |
| P.O. NUMBER | *4896* |
| GROSS,TARE,NET | (Y) (N) |
| WEIGHT IN GALLONS | (Y) (N) |
| "FOOD GRADE" | (Y) (N) |
| MANUFACTURE DATE | (Y) (N) |
| # OF CONTAINERS | (Y) (N) |
| OTHER: | _____ |

LABELING INSTRUCTIONS:

| | |
|---|---|
| RABBI STAMP LABELS | (Y) (N) |
| INGREDIENT LABELS | (Y) (N) |
| ADDRESS LABELS | (Y) (N) |
| REQUIRES REFRIGERATION | (Y) (N) |
| FLAMMABLE | (Y) |
| TAPE BAND | (Y) |
| SPECIAL INSTRUCTIONS: | _____ |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

QUALITY CONTROL REQUIREMENTS

| | |
|---|---|
| *COA* | (Y) (N) |
| *MICROS* | (Y) (N) |
| *MSDS* | (Y) (N) |
| *W/SHIPMENT (Y) MAIL (Y) FAX* | (N) |
| PRESHIPMENT SAMPLE | (Y) (N) |
| COSHIPMENT SAMPLE | (Y) (N) |
| REQUIRES REFRIGERATION | (Y) (N) |
| SPECIAL INSTRUCTIONS: | _____ |

PACKAGING INSTRUCTIONS

| | |
|---|---|
| TYPE OF DRUM: | _____ |
| TYPE OF PAIL: | _____ |
| IF COLORED WHAT COLOR: | _____ |
| TYPE OF JUG: | _____ |
| # PER EACH CONTAINER | *X100#* |
| SLIP SHEETS (Y) (N) | |
| ON PALLETS (Y) (N) SIZE | *X APP* |
| STRETCH WRAP (Y) (N) | |
| PACKING LIST (Y) (N) | |
| OTHER: | _____ |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

BILLING DEPT. NOTE:
SEND PACKING LIST W/INVOICE (Y)   SEND COPY OF FRT. BILL W/INVOICE (Y)
SEND ADDITIONAL INVOICE TO:    SEND COPY OF B/L WITH INVOICE (Y)
OTHER: _____ *PPA*

SHIPPING INSTRUCTIONS   - SHIP VIA _____
DOCK APPOINTMENT REQUIRED? (Y) (N) IF YES, MAKE NOTATION ON B/L
*****SEE ABOVE FOR DOCUMENTS WHICH SHOULD GO WITH SHIPMENT*****

OTHER: _____

NATURAL BUTTER FLAVOR WONF     (SDB)
#247028

We certify that all flavor ingredients contained in this product are listed as being
generally recognized as safe on a reliable published industry association (F.E.M.A.) list,
and/or are approved for use in regulation of the Food & Drug Administration.

Non-Flavor Ingredients:

MALTODEXTRIN, MODIFIED CORNSTARCH,
CORN SYRUP SOLIDS, PARTIALLY HYDROGENATED
SOYBEAN OIL, TRICALCIUM PHOSPHATE.

Tastemaker

110 E. 70th Street   Cincinnati   OH   45216

APP 0032-f

Case 5:17-cv-04008-LTS-KEM   Document 102-6   Filed 03/26/18   Page 43 of 65
TM(HERC)-APC000229

Exhibit 6

```
 1            UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF IOWA
 2                  WESTERN DIVISION
 3   KEVIN REMMES,           ) Case No. 5:04-cv-04061-MWB
                             )
 4        Plaintiff,         )
                             )
 5   vs.                     )
                             )
 6   INTERNATIONAL FLAVORS & )
     FRAGRANCES, INC., ET AL.,)
 7                           )
          Defendants.        )
 8
 9   _____
10        VIDEOTAPED DEPOSITION OF GREG HOFFMAN
     _____
11
12
13   Taken on behalf of the defendants at 701 Pierce
14   Street, Suite 200, Sioux City, Iowa, on Wednesday,
15   November 30, 2005, at 1:05 p.m.
16
17                    *    *    *    *
18     Court Reporter:  Denise R. Leonard-Derby, CSR, RPR
                        Siouxland Reporting Service
19                      PO Box 2241
                        Sioux City, Iowa   51104
20                      (712) 252-5208
21                 *    *    *    *
22
23   Videographer:  Jay Rollins of American Legal Media
                    1-888-757-5551
24
25
```

EXHIBIT
6

APP 0033

1   A P P E A R A N C E S
2
3   For the Plaintiff:
4       MR. STEVEN E. CRICK
        Attorney at Law
5       Humphrey, Farrington & McClain, P.C.
        221 W. Lexington, Suite 400
6       Independence, Missouri 64050
        (816)836-5050
7       sec@hfmlegal.com
8
9   For International Flavors & Fragrances, Inc.:
10      MS. MARY JO MIDDELHOFF
        Attorney at Law
11      Dinsmore & Shohl, LLP
        255 East Fifth Street, Suite 1900
12      Cincinnati, Ohio 45202
        (513) 977-8622
13      middelho@dinslaw.com
14
    For Flavors of North America, Inc.:
15
        MR. RONALD B. LEE
16      Attorney at Law
        Roetzel & Andress
17      222 South Main Street
        Akron, Ohio 44308
18      (330) 849-6648
        rlee@ralaw.com
19
20  For Givaudan Flavors Corporation:
21      MR. DAMOND R. MACE
        Attorney at Law
22      Squire, Sanders & Dempsey LLP
        4900 Key Tower
23      127 Public Square
        Cleveland, Ohio 44114
24      (216) 479-8500
        dmace@ssd.com
25
                                                    2

1   A P P E A R A N C E S (Continued)
2
    For Sensient Flavors, Inc.:
3
        MR. PAUL E. BENSON
4       Attorney at Law
        Michael Best & Friedrich LLP
5       100 East Wisconsin Avenue, Suite 3300
        Milwaukee, Wisconsin 53202
6       (414) 225-2757
        pebenson@michaelbest.com
7
        MR. MAURICE B. NIELAND
8       Attorney at Law
        Rawlings, Nieland, Probasco, Killinger,
9       Ellwanger, Jacobs & Mohrhauser
        522 4th Street, Suite 300
10      Sioux City, Iowa 51101
        (712) 277-2373
11
12  For The American Pop Corn Company:
13      MR. JEFFREY L. POULSON
        Attorney at Law
14      Corbett, Anderson, Corbett, Poulson &
        Vellinga, LLP
15      400 Security National Bank Building
        423 6th Street
16      Sioux City, Iowa 51101
        (712) 277-1261
17      jpoulson@corbettanderson.com
18
19
20
21
22
23
24
25
                                                    3

1                 C O N T E N T S
2
3                                           Page
4   Examination by Mr. Mace                    9
5   Recess, 2:35 p.m. to 2:45 p.m.            66
6   Examination by Ms. Middelhoff            121
7   Recess, 4:15 p.m. to 4:20 p.m.           128
8   Examination by Mr. Lee                   132
9   Examination by Mr. Benson                153
10  Recess, 5:25 to 5:30 p.m.                176
11  Proceedings adjourned 5:30 p.m., 11/30/05  176
12  Proceedings resumed 8:05 a.m., 12/1/05   176
13  Examination (Continued) by Mr. Benson    176
14  Examination by Mr. Crick                 195
15  Recess, 9:05 a.m. to 9:10 a.m.           218
16  Further Examination by Mr. Mace          253
17  Recess, 10:10 a.m. to 10:15 a.m.         263
18  Further Examination by Ms. Middelhoff    286
19  Further Examination by Mr. Lee           287
20  Further Examination by Mr. Benson        292
21  Further Examination by Mr. Crick         296
22  Addendum to Deposition                   300
23  Certificate of Deponent                  301
24  Certificate of Reporter                  302
25              *   *   *   *
                                                    4

1           INDEX TO EXHIBITS
2   Number and Description        First Referenced
3   1 - May 30, 2002 letter                   23
4   2 - NIOSH Health Hazard Evaluation        24
        Report
5
6   3 - May 10, 2004 Loss Prevention          27
        Services Report
7   4 - Kevin Remmes wage schedule            30
8   5 - Formulas                              40
9   6 - Ingredients Batching System           43
10  7 - Cargill Salt MSDS                     59
11  8 - Summary of emission points            66
12  9 - Document indicating (#3g)             72
13  10 - Popcorn board ad hoc committee       84
        meeting notes
14
    11 - Agenda for The Popcorn Board,        95
15      8/20
16  12 - Agenda for The Popcorn Board,       100
        12/4/03
17
    13 - Respiratory Protection Program      147
18      Pulmonary Function Testing
19  14 - American Pop Corn management        158
20  15 - Document indicating (#3c)           159
21  16 - Butter Flavor Alert Timeline        162
22  17 - Document indicating #19             164
23  18 - Food Establishment Inspection       205
24  19 - Memo from Orthodox Union,           207
        12/26/00
25
                                                    5

| Number and Description | First Referenced |
|---|---|
| 20 - Iowa Dept. of Agriculture and Land Stewardship | 214 |
| 21 - Photographs numbered 1-33 | 217 |
| 22 - Abstract | 227 |
| 23 - Letter from Tastemaker to Dr. Lockey, 7/10/95 | 230 |
| 24 - Memo of Dr. Lockey | 231 |
| 25 - Handwritten Givaudan records dated November 1992 | 234 |
| 26 - Handwritten records indicating 3502 on top | 235 |
| 27 - Diacetyl FCC MSDS | 236 |
| 28 - Toxicology report | 236 |
| 29 - NIOSHTIC document | 238 |
| 30 - Raw Material Sensitivity List | 239 |
| 31 - Handwritten document "John & Dan" | 240 |
| 32 - FEMA's Respiratory Safety in the Flavor and Fragrance Workplace | 242 |
| 33 - Nametags for registrants of respiratory safety workshop, 3/27/97 | 243 |
| 34 - MSDS for natural and artificial butter flavor from Givaudan | 244 |
| 35 - MSDS for Item #297373 from Givaudan | 245 |
| 36 - Respiratory Protection Program Pulmonary Function Testing | 256 |
| 37 - Floor plan by Davy McKee Corporation | 262 |
| 38 - Shipping document from Givaudan to American Pop Corn Company | 272 |

6

| Number and Description | First Referenced |
|---|---|
| 40 - MSDS for Item #297369 from Givaudan | 277 |
| 41 - Iowa Department of Employment Services | 283 |
| 42 - Letter to Ms. Bryant from Mr. Bruyer | 285 |
| 43 - FONA documents | 296 |

7

THE VIDEOGRAPHER: This is the beginning of Videotape Number 1. I'm your videographer, Jay Rollins. I represent American Legal Media in Moorhead, Iowa. I'm not financially interested in this action; nor am I a relative or employee of any attorney of any of the parties. The date is November 30th, year 2005. The time is 1:05 p.m.

This deposition is taking place at the Heidman Law Firm, 701 Pierce Street, Sioux City, Iowa. The case number is 5:04-cv-04061-MWB entitled Kevin Remmes versus International Flavors and Fragrances, Incorporated.

Your court reporter is Denise Leonard from Siouxland Court Reporting in Sioux City, Iowa. Counsel will now introduce themselves.

MR. CRICK: Steven Crick for the plaintiffs.

MR. POULSON: Jeffrey Poulson representing American Pop Corn Company.

MR. BENSON: Paul Benson on behalf of Sensient Flavors.

MR. LEE: Ron Lee on behalf of Flavors of North America.

MR. NIELAND: Maurice Nieland on behalf of Sensient.

8

MS. MIDDELHOFF: Mary Jo Middelhoff for International Flavors and Fragrances.

MR. MACE: Damond Mace on behalf of Givaudan Flavors Corporation.

GREG HOFFMAN,
having been first duly sworn, testified as follows:

EXAMINATION
BY MR. MACE:

Q  Good afternoon, Mr. Hoffman.

A  Good afternoon.

Q  Have you ever been deposed before?

A  No, sir.

Q  All right. Just a few ground rules. As you can see, you're being videotaped, but it's also important that you answer the questions orally, not just with nods of the head, okay?

A  Very good.

Q  And it's important that you understand our questions. If you don't understand one of our questions, will you please let us know?

A  Yes, sir.

Q  And if you need a break at any time, just let us know. But we would ask that you give us a few minutes' warning so we don't have to break in the middle of something, all right?

9

Case 5:17-cv-04008-LTS-KEM   Document 102-6   Filed 03/26/18   Page 47 of 65

39 - MSDS for Item #297373 from Givaudan

1    inspection report.  Is this an example of an
2    inspection report for your plant?
3         MR. MACE:  Do you have copies, Counsel?
4         MR. CRICK:  You know, these first couple I
5    don't.  And I'll show it to you.
6    A    This particular one references our plant in
7    Schaller, Iowa.  This is not our Sioux City plant.
8    Q    (By Mr. Crick) Could I see that?
9    A    Sure.
10   Q    This is the type of inspection that takes
11   place for the Sioux City plant, though; is that
12   correct?
13   A    With all due respect, this is a 1982 form.
14   The more recent and current ones are actually a lot
15   more involved than this.
16   Q    Is that right?  And that one's looking for
17   plant cleanliness.  They're asking if there's any
18   ventilation in the plant, if there's any toxic
19   materials that are being used, all as far as back as
20   '82?
21   A    Correct.
22   Q    And the inspections today are even more
23   specific and intense; is that right?
24        MR. MACE:  Objection.  Leading.
25   A    Yes, sir.

1    Q    (By Mr. Crick) Let me show you Exhibit
2    Number 19.  Can you tell me what that is?
3    A    This is the format for our relationship
4    with our Orthodox Union.  And this is a verification
5    of actually a certification coming from them on our
6    products.
7    Q    Now, American Pop Corn sells some products
8    that are kosher; is that right?
9    A    That's correct.
10   Q    And so in order to get the kosher label,
11   the Orthodox Union does an inspection; is that right?
12   A    That is correct.
13   Q    And they bring in persons with experience
14   in food preparation to be able to inspect your plant?
15   A    That's correct.
16   Q    Now, you listed off a number of
17   organizations that did inspections.  In addition,
18   Curtis Salter has done an inspection of your plant;
19   is that right?  He was an industrial hygienist for
20   your workers' compensation.
21   A    That's correct, yes.
22   Q    Besides the organizations and your insurer,
23   customers periodically will come to your plant, too;
24   is that right?
25   A    Quite frequently, yes.

1    Q    And I'm sure that's something you're proud
2    of, showing them what the interior of your plant is
3    as a selling point in asking them to buy your
4    popcorn?
5    A    The primary difference is that we work
6    through a network of brokers, and so it's more of a
7    showing our brokers what we represent.  And then it's
8    their responsibility to sell to it to the customer.
9    Q    But you have the brokers who are able to
10   come and see where and how your product is made?
11   A    Yes, sir.
12   Q    To see if it meets their satisfaction for
13   them to be able to then present it to their clients?
14   A    That is correct.
15   Q    In addition to all of these folks, some of
16   the butter flavoring company employees have also been
17   to your plant; is that right?
18   A    That's correct.
19   Q    Givaudan employees have been to your plant;
20   is that correct?
21   A    Yes, sir.
22   Q    Flavors of North America, have their
23   employees been to your plant?
24   A    Yes, sir.
25   Q    Sensient, have their employees been at your

1    plant?
2    A    Yes, sir.
3    Q    These companies, were they all aware that
4    their butter flavorings were being used to make
5    microwave popcorn?
6    A    Yes, sir.
7    Q    That's why the butter flavorings were
8    purchased in the first place was for microwave
9    popcorn?
10        MR. MACE:  Objection.  Leading.
11   A    That's correct.
12   Q    (By Mr. Crick) And were these butter
13   flavoring products actually made for American Pop
14   Corn?
15   A    In most cases, yes.
16        MR. BENSON:  Attorney Crick, while there's
17   just a second, can we have an agreement on the record
18   that if one objects, that's an objection for everyone
19   so that --
20        MR. CRICK:  Yes.
21        MR. BENSON:  -- we don't have four
22   people --
23        MR. CRICK:  Yes.
24        MR. BENSON:  Okay.
25   Q    (By Mr. Crick) Before NIOSH came to your

1  plant, did anyone from Givaudan ever tell you that
2  its butter flavoring product could cause permanent
3  lung injury?
4      MR. MACE: Objection.
5      MR. LEE: Objection.
6      A   Not that I'm aware of.
7      Q   (By Mr. Crick) Before NIOSH came to the
8  plant, did anyone from Sensient ever tell you that
9  its butter flavoring could cause permanent lung
10  injury?
11      A   Not that I am aware of.
12      Q   Before NIOSH came to the plant, did anyone
13  from Flavors of North America ever tell you that
14  their butter flavoring could cause permanent lung
15  injury?
16      MR. LEE: Objection.
17      A   Not that I'm aware of.
18      Q   (By Mr. Crick) Now, you testified earlier
19  that your employees began wearing respirators around
20  the time of the 1990-1991 incident that took place in
21  the mixing tank.
22      A   Correct.
23      Q   And that several employees had developed
24  some severe eye irritation and burns on their eyes.
25      A   That's correct.

210

1      Q   Your position at that time was what?
2      A   I really had no direct contact with the
3  microwave at that point. I was still in the field
4  department.
5      Q   Who would have had more of a direct role in
6  looking into the issues that happened in that tank
7  that day?
8      A   My direct boss, Larry Bruyer and Dale
9  Hartshorn.
10      Q   Now, yesterday you testified that the
11  company had contacted the salt supplier —
12      A   Mm-hmm (Yes).
13      Q   — to see if that product had caused the
14  problem?
15      A   Yes, sir.
16      Q   And you found out that they had not had any
17  experience with salt causing eye burns like that?
18      A   That is correct.
19      MR. MACE: Object to the hearsay. Move to
20  strike.
21      Q   (By Mr. Crick) Was the intent at that time
22  to try to investigate with all the ingredient
23  suppliers that were in the tanks on that day to try
24  to figure out if their products could have
25  contributed to the injuries your employees were

211

1  having?
2      MR. MACE: Objection. Foundation.
3      A   I would ask Dale Hartshorn that question.
4      Q   (By Mr. Crick) Nobody from Givaudan gave
5  you any information that said our product could cause
6  a serious injury to your customers?
7      MR. MACE: Objection.
8      A   Not that I'm aware of, sir.
9      Q   (By Mr. Crick) In any event, without any
10  information from the butter flavoring suppliers, your
11  company started suggesting that masks or respirators
12  be used in the mixing area?
13      MR. LEE: Objection.
14      MS. MIDDELHOFF: Objection.
15      MR. MACE: Objection.
16      A   That's correct.
17      Q   (By Mr. Crick) And that was for eye
18  protection in the main?
19      A   Yes.
20      Q   Now, you subsequently started having
21  pulmonary function tests of your employees in '97,
22  about six years later?
23      A   Correct.
24      Q   The reason that the pulmonary function
25  tests were conducted in '97 was because your doctor

212

1  recognized that in order to be properly fit tested
2  for a respirator, you needed to have a pulmonary
3  function test; is that right?
4      MR. MACE: Objection.
5      A   I think that was one of the criteria for
6  that decision, yes.
7      Q   (By Mr. Crick) Now, at American Pop Corn
8  you had safety meetings?
9      A   Yes, sir.
10      Q   You posted safety information on a board at
11  the plant for people to see?
12      A   Not on a regular basis, but as needed, yes,
13  sir.
14      Q   And you made the MSDS sheets available for
15  people to see?
16      A   Yes, sir.
17      Q   You had ventilation in the building?
18      A   Yes, sir.
19      Q   As far as you knew, you were doing all the
20  proper things that you needed to do to keep the
21  building in a good, safe, usable fashion?
22      A   Yes.
23      Q   Nobody from any flavoring company ever
24  suggested you needed a different type of ventilation,
25  did they?

213

| | |
|---|---|
| 1 record. | 1 Q That's for the salt? |
| 2 * * * | 2 A That's for the salt primarily, yes, sir. |
| 3 (Recess taken from 9:05 a.m. to 9:10 a.m.) | 3 Q Photograph Number 5, the gentleman working |
| 4 * * * | 4 by the mixer, what's he wearing over his head? |
| 5 THE VIDEOGRAPHER: Counsel, we're back on | 5 A He's wearing an air supplied hooded |
| 6 the record. | 6 respiratory protection device. |
| 7 MR. POULSON: Before we go any further, the | 7 Q Now, no one from a flavoring company ever |
| 8 witness was presented some pictures, and included | 8 suggested that you needed to wear a hooded air supply |
| 9 within these pictures -- and I'm referring to | 9 respirator; is that right? |
| 10 Exhibits Number 10, 13, 16, 17, 18, 19, 20, 21, 22, | 10 A That's correct. |
| 11 24, 25, 26, and 27 are pictures of what appears to be | 11 Q Now, your counsel read off some numbers. |
| 12 buckets containing -- buckets and other containers | 12 There's some photographs of butter flavoring packages |
| 13 containing Givaudan products. The labels on these | 13 in this group; is that right? |
| 14 buckets show very specific ingredients. These | 14 A That's correct. |
| 15 ingredients are especially formulated for my client's | 15 Q Looking at Photograph Number 10, is that a |
| 16 products and are considered to be proprietary and | 16 photograph of the Flavors of North America bucket? |
| 17 should be considered confidential. | 17 A That's correct. |
| 18 Q (By Mr. Crick) Exhibit 21, these -- just to | 18 MR. LEE: Objection. |
| 19 restate my question, these are pictures of the | 19 Q (By Mr. Crick) Do you see any kind of a |
| 20 interior of the American Pop Corn plant? | 20 warning on that bucket? |
| 21 A Yes, sir. | 21 MR. LEE: Objection. |
| 22 MR. MACE: To address Mr. Poulson's | 22 A I can't read the fine print, but nothing |
| 23 concern, I think there is on the second page of the | 23 that's bold enough and large enough for me to read. |
| 24 labels, Counsel, some blank ones. I suggest you put | 24 Q (By Mr. Crick) Let's look at Photograph |
| 25 one on the cover of that and write the word | 25 Number 20. Is that a closeup of a Flavors of North |
| 218 | 220 |

| | |
|---|---|
| 1 "confidential" so that it's been marked under the | 1 America label? |
| 2 order. | 2 MR. LEE: Objection. |
| 3 MR. CRICK: I don't have any problem doing | 3 A Yes, sir. |
| 4 that. | 4 Q (By Mr. Crick) Do you see a warning |
| 5 MR. MACE: Let's do it now so it doesn't | 5 anywhere in that? |
| 6 get missed. Would you hand me the labels back. | 6 A No, sir. |
| 7 * * * | 7 MR. LEE: Again, objection. |
| 8 (Document marked confidential.) | 8 Q (By Mr. Crick) Seventeen. Is this a |
| 9 * * * | 9 Givaudan bucket? |
| 10 MR. POULSON: Thank you. | 10 A Yes, sir. |
| 11 Q (By Mr. Crick) Photographs 4, 5, 6, 7, | 11 Q Now, there is a warning on that bucket. Do |
| 12 these show -- what do those show? | 12 you see that? |
| 13 A They show the interior of our current | 13 A Yes, I do. |
| 14 mixing room and some of the mixing and blending | 14 Q And it says children can fall in bucket and |
| 15 tanks. | 15 drown. Do you see that? |
| 16 Q Is that the room Mr. Remmes would have | 16 A Yes, sir. I see that picture, yes. |
| 17 worked in? | 17 Q And they have that -- they have a |
| 18 A That's correct. | 18 photograph and there's some language and -- or some |
| 19 Q And it shows the lid being opened and | 19 wording in three different languages below that |
| 20 someone -- is that where the ingredients would be | 20 picture? |
| 21 inserted? | 21 A Yes, sir. |
| 22 A In some cases. In Picture Number 9, that | 22 Q Have you ever seen a warning on a Givaudan |
| 23 is the DynaShear, the piece of equipment I referred | 23 bucket that inhaling butter flavor fumes can cause |
| 24 to that actually helps distribute some of the flavors | 24 permanent serious lung injury? |
| 25 as well. | 25 MR. MACE: Objection. |
| 219 | 221 |

1    A   Not specific to that, sir.

2    Q   (By Mr. Crick) Now, there's a warning that
3    children may drown.  Do you have any children that
4    work with the butter flavorings at American Pop Corn?

5    A   No, sir.

6    Q   And on Photographs 24, 23, 25, 26, these
7    are all photographs from another Givaudan product; is
8    that right?

9    A   Yes, sir.

10   Q   And there's a -- one of the photographs
11   shows a flammable label.  Do you see that?

12   A   Yes, sir.

13   Q   Do you see any warning that the product can
14   cause serious lung injury?

15       MR. MACE:  Objection.

16   A   I'm not sure what the codes above the
17   flammable liquid represent.

18   Q   (By Mr. Crick) They didn't tell you that
19   meant a serious lung injury, though?

20       MR. MACE:  Objection.

21   A   Not verbally.

22   Q   (By Mr. Crick) And if you just look through
23   the photographs that we have in here of the packages
24   and tell me if you see any packages that have a
25   warning about serious lung injury?

                                                      222

1    A   No, sir.

2    Q   In addition to receiving buckets and
3    packages of product from the flavoring companies,
4    American Pop Corn would have received written
5    materials from the companies on occasion; is that
6    right?

7    A   That is correct.

8    Q   And that could include invoices?

9    A   Correct.

10   Q   Or other shipping materials that accompany
11   the products?

12   A   Yes.

13   Q   And on occasion the actual written
14   communications?

15   A   Certificate of analysis, yes, sir.  All
16   kinds of things.

17   Q   In any of those written communications
18   you've received from any butter flavoring company,
19   have you ever seen any statement that says that
20   exposure to their butter flavoring product can cause
21   serious permanent lung injury?

22       MR. MACE:  Objection.

23   A   Recent MSDSs from IFF have indicated that.

24   Q   (By Mr. Crick) And that would be within the
25   last year?

                                                      223

1    A   Yeah.  Roughly, yes.

2    Q   And before that?

3    A   No, sir.

4    Q   Have you spoken to the butter flavoring
5    companies about this lung injury issue since the
6    NIOSH issue came about?

7    A   Please ask that question again.  I'm sorry.

8    Q   NIOSH came to your plant.

9    A   Yes, sir.

10   Q   Before that time, you'd never spoken to --
11   no one from a butter flavoring company had ever
12   really talked to you about its products causing
13   severe lung injury?

14       MR. MACE:  Objection.

15       MR. LEE:  Objection.

16   A   Not to me personally, no.

17   Q   (By Mr. Crick) Since that time, have you
18   had any discussions about this issue with any of the
19   butter flavoring companies?

20   A   Yes.  In general terms, yes.

21   Q   And can you tell me, who did you talk to?

22   A   Typically the sales representatives that
23   would come in on a fairly regular basis.  I must say
24   that, again, I personally am not that involved with
25   the day-to-day ordering or purchasing of the flavors.

                                                      224

1    And when lot of this information first came out, I
2    would be asked occasionally to come into a meeting
3    with the different flavor company sales personnel,
4    and this was discussed on a very general basis.  But
5    clearly not very much of it was discussed in depth.

6    Q   What did you learn from the flavoring
7    companies when this issue was discussed?

8    A   Very little.

9    Q   Did they agree that their products can
10   cause lung injury?

11       MR. MACE:  Objection.

12       MR. LEE:  Objection.

13   A   No, sir.

14   Q   (By Mr. Crick) Did they deny it?

15       MR. MACE:  Objection.

16       MR. BENSON:  Objection.

17       MR. LEE:  Objection.

18   A   In several cases, yes.

19   Q   (By Mr. Crick) Did they give you any advice
20   as to what precautions should be taken working around
21   their flavoring product?

22       MR. MACE:  Objection.

23   A   The tone was more of continue doing what
24   you're doing.

25   Q   (By Mr. Crick) Did any of the flavoring

                                                      225

```
 1    A   Mm-hmm (Yes).
 2    Q   Did you go to that?
 3    A   No, sir.
 4    Q   Okay.  But apparently Mr. Smith might have
 5  gone to that?
 6    A   Carlton, I believe, attended, yeah.
 7    Q   You don't know anything about this seminar
 8  particularly, though?
 9    A   I know more about it now how it's currently
10  being run.  I have no idea how it was done then.
11    Q   Does Flavors of North America have a
12  periodic seminar?
13    A   Yes, sir.
14    Q   Have you been to any of those?
15    A   I have not personally attended any of the
16  Flavor 101 or 201 series.
17    MR. CRICK:  Okay.  Thank you.
18    THE WITNESS:  Yes.
19    MR. LEE:  Mr. Crick, you know what it was?
20  I only pulled documents while your client worked
21  there.
22    MR. CRICK:  Okay.
23    MR. LEE:  That's the ones I have.  That's
24  why.
25    MR. CRICK:  Thank you very much.
                                              298
```

```
 1    MR. MACE:  Thanks for your time,
 2  Mr. Hoffman.
 3    THE WITNESS:  Yes.
 4    THE VIDEOGRAPHER:  This is the end of
 5  Videotape Number 4.  Counsel, we're off the record.
 6          * * *
 7    END OF PROCEEDINGS AT 11:00 a.m., 12/1/05.
 8          * * *
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                              299
```

```
 1  CASE NAME:  Remmes v. IFF, et al
 2        ADDENDUM TO DEPOSITION
 3  Page     Line          Change and Reason
 4
 5
 6
 7
 8
 9
10
11
12
13
                 To all of which I affix my signature this _____ day
14             of _____, _____, at the City of _____,
                 State of _____.
15
16
17             _____
18                       DEPONENT
19  I did witness the above signature on the_____ day of
               _____, _____, in the City of _____, State
20  of _____.
21
22             _____
23                     NOTARY PUBLIC
24
25
                                              300
```

```
 1  Case name:  Remmes v. IFF, et al
 2        CERTIFICATE OF DEPONENT
 3        I, the undersigned deponent, do hereby
 4  certify under oath that I did read the foregoing
 5  pages of transcript and that any corrections I want
 6  to make to the foregoing pages of transcript have
 7  been set out on the foregoing Addendum, and that I
 8  have indicated the correction itself, the page and
 9  line number of the correction, and the reason for the
10  correction, if any.
11        In witness whereof, I have hereunto affixed
12  my signature on this_____ day of _____,
13  _____, before the undersigned Notary Public.
14
15
16             _____
17                       DEPONENT
18  I hereby certify I did witness the above signature on
19  this the _____ day of _____, _____, in the City of
20  _____, County of _____, State of
21  _____.
22
23             _____
24                     NOTARY PUBLIC
25  My commission expires:
               _____.
                                              301
```

```
 1         CERTIFICATE OF REPORTER
 2
 3         I, Denise R. Leonard-Derby, Certified
 4    Shorthand Reporter in and for the State of Iowa, do
 5    hereby certify as follows:
 6         1.  That the deponent aforenamed was duly
 7    sworn prior to the taking of this deposition.
 8         2.  That I took down in shorthand correctly
 9    the testimony of said deponent and have caused the
10    same to be transcribed, and that this deposition is a
11    true and correct record of the testimony given by
12    said deponent at the time I affix my signature to
13    this certificate.
14         3.  That the total cost for reporting and
15    transcribing is in the sum of $_____, said sum
16    to be advanced and paid to Siouxland Reporting
17    Service, PO Box 2241, Sioux City, Iowa 51104, prior
18    to the use of said deposition at trial by Mr. Damond
19    Mace.
20         4.  That the original transcript of this
21    deposition is to be filed with Mr. Damond Mace.
22         5.  That a copy is to be delivered to
23    Mr. Damond Mace, Ms. Mary Jo Middelhoff, Mr. Ronald
24    Lee, Mr. Paul Benson, Mr. Jeffrey Poulson, and
25    Mr. Steven Crick.
                                                    302
```

```
 1         6.  I further certify that I am not related
 2    by consanguinity or affinity within the fourth degree
 3    to any party, his attorney, or any employee of any of
 4    them; that I am not financially interested in this
 5    action, and that I am not the attorney or employee of
 6    any party.
 7         7.  Exhibits 1 through and including 43 were
 8    filed with the original transcript and a copy was
 9    provided with each of the copies.
10         To all of which I have verily affixed my
11    signature this _____ day of _____, _____.
12
13         _____
14         DENISE R. LEONARD-DERBY, CSR, RPR
           Siouxland Reporting Service
15         PO Box 2241
           Sioux City, Iowa  51104
16         (712) 252-5208
17
18
19
20
21
22
23
24
25
                                                    303
```

Exhibit 7



*return to Dale*

April 18, 1990

Mr. Dale Hartshorn
AMERICAN POPCORN COMPANY
4332 Grant Ave.
Sioux City, IA 51102

Dear Mr. Hartshorn:

This letter is in response to your request for information on Fries & Fries flavor components diacetyl and delta decalactone and their regulatory status in West Germany.

Diacetyl is a ketone derived from fractional distillation of a fermentation product of glucose. It is a natural substance which has been found to occur in a variety of fruits, vegetables, breads, meats and dairy products. Concentrations of 0.3-2.2 ppm have been detected in butter, 4.0-5.2 ppm in wine and 15 ppm in cognac and whiskey.

In the United States, diacetyl has been deemed to be Generally Recognized as Safe (GRAS) as indicated by its designated FEMA #, 2370. It is approved for food use as defined in 21 CFR 184.1278 and meets FCC specifications. It has been given Council of Europe #752.

Delta decalactone is a nature identical cyclic ester. It has been identified as a natural constituent of coconuts, dairy products, animal fats, tea and rum. Butterfat contains about 9 ppm of the lactone and up to 7000 ppm has been detected in peaches.

Delta decalactone is approved for food use in the United States according to 21 CFR 172.515 and meets FCC specifications. It is recognized as GRAS by its FEMA #2361 and has also been assigned #621 by the Council of Europe.

With regard to the legal status of these chemicals, under West German law flavor substances are regulated according to their classification as either natural, nature identical or artificial. Thus, if a flavor is natural or nature identical, it is not regarded or regulated as a food additive per se. Such substances may be used without restriction as long as they are used in accordance with good manufacturing practices and do not appear on a "negative" or restricted list of natural or nature identical flavor substances. Neither diacetyl nor delta decalactone are found on such a list.

**EXHIBIT**
tabbies®
7

AmerPC 07877

"An Operating Unit of Mallinckrodt, Inc."

APP 0042        AMERPC007877



Division of Mallinckrodt Foods & Flavors, Inc.

Considering the GRAS status of these substances according to United States regulations and the classification of these materials as being either natural or nature identical, both diacetyl and delta decalactone comply with the regulations for use as flavoring components in West Germany.

If you have any questions or are in need of further assistance please do not hesitate to contact me at (513) 948-3569.

Sincerely,

*Joanne O. Lawson*

Joanne O. Lawson
Regulatory Department

Enclosures

cc:  S. Appleton
     File

"An Operating Unit of Mallinckrodt, Inc."

AmerPC 07878

APP 0043

# Exhibit 9

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF IOWA
 2                  WESTERN DIVISION
 3   KEVIN REMMES,              )  Case No. 5:04-cv-04061-MWB
                                )
 4        Plaintiff,            )
                                )
 5   vs.                        )
                                )
 6   INTERNATIONAL FLAVORS &    )
     FRAGRANCES, INC., ET AL.,  )
 7                              )
          Defendants.           )
 8
 9   _____
10        VIDEOTAPED DEPOSITION OF DALE HARTSHORN
     _____
11
12
13   Taken on behalf of the defendants at 701 Pierce
14   Street, Suite 200, Sioux City, Iowa, on Thursday,
15   December 1, 2005, at 1:40 p.m.
16
17                *    *    *    *
18   Court Reporter:  Denise R. Leonard-Derby, CSR, RPR
                      Siouxland Reporting Service
19                    PO Box 2241
                      Sioux City, Iowa   51104
20                    (712) 252-5208
21                *    *    *    *
22
23   Videographer:  Jay Rollins of American Legal Media
                    1-888-757-5551
24
25
```

EXHIBIT 9

APP 0045

## A P P E A R A N C E S

For the Plaintiff:
MR. STEVEN E. CRICK
   Attorney at Law
Humphrey, Farrington & McClain, P.C.
221 W. Lexington, Suite 400
Independence, Missouri 64050
(816)836-5050
sec@hfmlegal.com

For International Flavors & Fragrances, Inc.:
MS. MARY JO MIDDELHOFF
   Attorney at Law
Dinsmore & Shohl, LLP
255 East Fifth Street, Suite 1900
Cincinnati, Ohio 45202
(513) 977-8622
middelho@dinslaw.com

For Flavors of North America, Inc.:

MR. RONALD B. LEE
   Attorney at Law
Roetzel & Andress
222 South Main Street
Akron, Ohio 44308
(330) 849-6648
rlee@ralaw.com

For Givaudan Flavors Corporation:
MR. DAMOND R. MACE
   Attorney at Law
Squire, Sanders & Dempsey LLP
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114
(216) 479-8500
dmace@ssd.com

2

## C O N T E N T S

|  | Page |
| --- | --- |
| Examination by Mr. Mace | 7 |
| Recess, 2:35 p.m. to 2:40 p.m. | 49 |
| Examination by Ms. Middelhoff | 74 |
| Examination by Mr. Lee | 80 |
| Recess, 3:45 p.m. to 3:50 p.m. | 95 |
| Examination by Mr. Benson | 121 |
| Recess, 5:00 p.m. to 5:05 p.m. | 145 |
| Examination by Mr. Crick | 153 |
| Further Examination by Mr. Mace | 171 |
| Proceedings adjourned 5:45 p.m., 12/1/05 | 178 |
| Proceedings resumed 11:10 a.m., 12/2/05 | 178 |
| Further Examination (Continued) by Mr. Mace | 178 |
| Further Examination by Ms. Middelhoff | 184 |
| Further Examination by Mr. Lee | 184 |
| End of Proceedings, 11:20 a.m., 12/2/05 | 188 |
| Addendum to Deposition | 189 |
| Certificate of Deponent | 190 |
| Certificate of Reporter | 191 |

*   *   *   *

4

## A P P E A R A N C E S (Continued)

For Sensient Flavors, Inc.:

MR. PAUL E. BENSON
   Attorney at Law
Michael Best & Friedrich LLP
100 East Wisconsin Avenue, Suite 3300
Milwaukee, Wisconsin 53202
(414) 225-2757
pebenson@michaelbest.com

For The American Pop Corn Company:
MR. JEFFREY L. POULSON
   Attorney at Law
Corbett, Anderson, Corbett, Poulson &
   Vellinga, LLP
400 Security National Bank Building
423 6th Street
Sioux City, Iowa 51101
(712) 277-1261
jpoulson@corbettanderson.com

3

## INDEX TO EXHIBITS

| Number and Description | First Referenced |
| --- | --- |
| 1 - Letter to Burns from Hartshorn, 4/2/97 | 52 |
| 2 - Butter descriptive terms | 53 |
| 3 - FONA file re flavor descriptions | 54 |
| 4 - Employee Annual Performance Evaluation | 57 |
| 5 - American Pop Corn Company Pesticide Guidelines | 58 |
| 6 - Alphabetical list of chemicals | 102 |
| 7 - Health Hazard Evaluation Report July 2004 | 135 |
| 8 - Exhibit A to Givaudan Flavors Corporation's Response to Plaintiff's Interrogatory Number 2 | 162 |
| 9 - American Pop Corn Company invoice to Universal Flavors, 2/16/00 | 163 |
| 10 - American Pop Corn Company invoice to Flavors of North America, Inc., 9/16/99 | 163 |

5

Demo Only

**Page 6**

1     THE VIDEOGRAPHER: This is the beginning of
2 Videotape Number 1. I'm your videographer, Jay
3 Rollins. I represent American Legal Media in
4 Moorhead, Iowa. I am not financially interested in
5 this action, nor am I a relative or employee of any
6 attorney of any of the parties. The date is
7 December 1st. The time is 1:40 p.m.
8     This deposition is taking place at Heidman
9 Law Offices, 701 Pierce Street, Suite 200, Sioux
10 City, Iowa. This is Case Number 5:04-cv-04061-MWB
11 entitled Kevin Remmes versus International Flavors
12 and Fragrances, et al. The deponent is Dale
13 Hartshorn. This deposition is being taken on behalf
14 of the defendant. The court reporter is Denise
15 Leonard of Sioux land Court Reporting. Counsel will
16 now introduce themselves.
17     MR. CRICK: Steven Crick for the
18 plaintiffs.
19     MR. POULSON: Jeff Poulson, American Pop
20 Corn Company.
21     MR. BENSON: Paul Benson on behalf of
22 Sensient Flavors.
23     MR. LEE: Ron Lee on behalf of FONA.
24     MS. MIDDELHOFF: Mary Jo Middelhoff on
25 behalf of International Flavors and Fragrances.

**Page 7**

1     MR. MACE: Damond Mace representing
2 Givaudan Flavors Corporation.
3     DALE HARTSHORN
4 having been first duly sworn, testified as follows:
5     EXAMINATION
6 BY MR. MACE:
7     Q Mr. Hartshorn, have you ever had your
8 deposition taken before?
9     A Yes, once a long time ago, in a traffic
10 accident case.
11     Q Just to review briefly with you some of the
12 ground rules. It's important you answer orally; not
13 just with nods of the head, all right?
14     A (Nods head in affirmative answer.) Yes.
15     Q As you nod your head. It's important you
16 understand my questions. So if you don't understand
17 them, will you let me know?
18     A Yes.
19     Q Thank you. And if you need a break at any
20 time, just let us know. But we would ask that you
21 give us a five-minute warning so we can finish our
22 line of questioning, all right?
23     A Sure.
24     Q What's your job title, sir?
25     A Microwave product manager.

**Page 8**

1     Q How long have you been that?
2     A I've been employed since fall of 1988.
3     Q Let's go at it that way then. In the fall
4 of '88, what were you hired in as?
5     A I was hired to run the microwave production
6 facility that was being built.
7     Q Was your title microwave production manager
8 equivalent?
9     A I don't know that I had a title, but that's
10 essentially it.
11     Q Has there been any changes to your job
12 responsibilities through the years?
13     A Yes.
14     Q What changed and when?
15     A In January of 1989 another person quit and
16 I assumed their job responsibilities, which dealt
17 with working with co-packers.
18     Q Who was that?
19     A Pat Floyd.
20     Q How many different co-workers?
21     A We only had one co-packer at the time.
22     Q Who was that?
23     A Omark Packaging.
24     Q What years did American Pop Corn use Omark?
25     A I'm not sure the year they started, but

**Page 9**

1 they began packing microwave popcorn for American Pop
2 Corn Company before I started, several years before I
3 started.
4     Q And how long did that continue?
5     A Up until probably three or four years ago.
6     Q And how did the volume of what they
7 co-packed change over the years?
8     A As we increased lines in Sioux City, it
9 generally went down, although there were some dips
10 and valleys when our sales outstripped our capacity
11 in Sioux City and they packed for us again.
12     Q Were there only certain products that were
13 packed by Omark or . . . .
14     A They packed pretty much everything we
15 packed.
16     Q Okay. And were the raw materials that
17 Omark needed to pack your popcorn sent to Omark by
18 you, by American Pop Corn?
19     A They were either sent by us or they were
20 sent directly from other suppliers. We didn't ship
21 everything through Sioux City.
22     Q Where did you work prior to American Pop
23 Corn?
24     A Consolidated Popcorn Company in Schaller,
25 Iowa.

### Page 66

1    A    No.
2    Q    You're not aware of anyone else who did?
3    A    No.
4    Q    The other gentleman, you weren't sure which
5 of the other two, that had an issue, did they go to
6 the doctor?
7    A    I believe they went to the doctor when I
8 did.
9    Q    You went together?
10    A    I don't know if it was the same time, same
11 appointment or what, but they saw the doctor at the
12 same time. And I think we both went home for a
13 couple of days.
14    Q    Are you aware of anything that was done by
15 American Pop Corn to inform other microwave popcorn
16 companies about that?
17    A    I'm not aware of anything, no.
18    Q    Are you aware of anything that was done by
19 American Pop Corn to inform any customers of America
20 Pop Corn about that?
21    A    Not aware of anything, no.
22    Q    The person that you spoke with at Morton,
23 are you aware of whether they actually dealt with the
24 super fine salt?
25    A    That plant is where they produced it for

66

### Page 67

1 us, yes.
2    Q    Do you know what other products they made
3 there besides the super fine?
4    A    I believe they made many others. That was
5 one of their main plants.
6    Q    And the specific person you spoke with, do
7 you know if they ever had any personal experience
8 with the super fine?
9    A    No, I don't.
10    Q    Okay. Did you keep any type of notes or
11 records of this discussion with the person from
12 Morton?
13    A    I don't recall making -- I don't recall any
14 specific notes. I may have, but I don't recall right
15 now anything specific.
16    Q    Back -- you understand there's different
17 companies, Tastemaker and then Givaudan in '97?
18    A    Yes.
19    Q    I wanted to focus on pre '97 Tastemaker.
20 Had you ever been to Tastemaker's plant in
21 Cincinnati?
22    A    Yes.
23    Q    How many times?
24    A    I've probably been there -- you mean before
25 '97?

67

### Page 68

1    Q    Yes, sir. When it was Tastemaker.
2    A    I know I was there at least once. I think
3 probably twice.
4    Q    And then a new company was formed in the
5 spring of '97, Givaudan, that became known as
6 Givaudan Flavors Corporation today. How many times
7 have you been to that plant in Cincinnati?
8    A    At least once. And I don't know if I've
9 been there twice or not.
10    Q    You have at least once. When was that?
11    A    I visited there a year and a half ago.
12    Q    The Tastemaker visit or visits, do you know
13 when those were?
14    A    One would have been probably in '89 or '90.
15 I'm trying to recall. '89, '90, '91, somewhere in
16 there. And again about in '93 or '4. Again, I'm
17 not completely clear on which -- or when exactly,
18 but . . .
19    Q    Did you get a plant tour as part of those
20 trips?
21    A    Yes.
22    Q    Both of them?
23    A    Yes, I believe so.
24    Q    What was Tom Elsen's role in terms of the
25 flavor creation or working with the details of what

68

### Page 69

1 was in the flavors?
2    A    Tom would be -- he's a marketing person and
3 would deal with, you know, what kind of flavor do we
4 need. Do we need a movie theater butter or do we
5 need a new cheese flavor and then in taste testing.
6    Q    Is he still at the plant?
7    A    Yes.
8    Q    There's a document, Remmes Exhibit 3, that
9 refers in the middle of the paragraph to Mr. Remmes
10 being transferred to the night shift in December of
11 '98. Does that sound about right to you? This was
12 from American Pop Corn's answer --
13    A    That's very possible. I don't remember the
14 exact time.
15    Q    Now, was there already a night shift before
16 Mr. Remmes was transferred to it, or did he get
17 transferred to it at the -- when you first started
18 having a night shift?
19    A    I'm going to say that's probably about the
20 time we started our shift night. 1998 sounds about
21 right.
22    Q    Do you know when Mr. Remmes came back to
23 day shift?
24    A    No, I'm not -- I don't know.
25    Q    Back in the mid '90s, are you familiar with

69

| | |
|---|---|
| 1    Q   What's your testing protocol? | 1    production? Do you have a particularized timetable |
| 2    A   We do a couple things. We taste test. We | 2    on that? |
| 3   send it out for nutritional testing. | 3    A   Boy, that would vary a lot by flavor. Some |
| 4    Q   Okay. | 4   of them turn fairly rapidly. We may purchase a |
| 5    A   That's about it. | 5   flavor every six to eight weeks. Some of them we |
| 6    Q   Do you do any type of testing with respect | 6   would purchase perhaps once a year. Some of them |
| 7   to -- for example, when one opens the bag, any vapors | 7   just don't get used very much. |
| 8   or anything like that? | 8    Q   Okay. Final questions relate to the |
| 9    A   We don't test for volatiles specifically. | 9   shifts. I understand you have for some time now had |
| 10   We've tested the temperature of the air coming out of | 10   a night shift and a day shift; is that right? |
| 11   the popcorn bag. | 11    A   Yes. |
| 12    Q   Has there ever been, to your knowledge, any | 12    Q   Okay. Do the people, the mixers who work |
| 13   testing with regard to whether there are any volatile | 13   on the night shift versus the day shift, typically |
| 14   organic compounds that are affiliated with your | 14   make different products? |
| 15   microwave popcorn? | 15    A   They're generally the same. We have -- our |
| 16    A   Not -- maybe not ours specifically, but | 16   sugar flavor is a little more difficult to make. You |
| 17   there was a great deal of testing done about eight or | 17   have to make sure that it doesn't set up or get lumps |
| 18   nine years ago by another lab, another person. | 18   in it. So we've tended to stay on the day shift with |
| 19    Q   Who? | 19   that. Otherwise, the other flavors have been made by |
| 20    A   Sara Risch. | 20   everybody; and in fact, last night the night shift |
| 21    Q   Okay. And what did she find? | 21   made sugar. So they pretty much make everything on |
| 22    A   I would -- I can summarize what I remember | 22   both shifts. |
| 23   from it. There were any number of compounds that | 23    Q   Okay. |
| 24   were produced by microwave popcorn in very, very, | 24     MR. BENSON: I believe that's all I have, |
| 25   very small quantities. I think the concern at the | 25   Mr. Hartshorn. Thank you very much. |
|                              150 |                              152 |
| 1   time was whether the susceptor, the heat patch was | 1     THE WITNESS: Mm-hmm (Yes). |
| 2   heating things up so hot that it was creating | 2           EXAMINATION |
| 3   compounds that might be toxic. As I recall, they | 3          BY MR. CRICK: |
| 4   were talking about benzene or something like that. | 4    Q   My name's Steve Crick. I represent Kevin |
| 5   The study was to see where did they go? Did they | 5   Remmes. I'm going to repeat a few things just to put |
| 6   stay in the bag? Were they in the popcorn? | 6   them in context. |
| 7     Sara Risch and someone at a lab, Aspen Labs | 7     Can you tell me again what year you started |
| 8   or something, inserted tubes into the bags while they | 8   at American Pop Corn? |
| 9   popped and found various ways to capture the air or | 9    A   1988. |
| 10   gases or whatever and checked to see what was in | 10    Q   And you've been with American Pop Corn ever |
| 11   them. | 11   since that time? |
| 12    Q   Okay. And what was -- if you recall, what | 12    A   Yes. |
| 13   was the conclusion of her analysis? | 13    Q   And your position today is again what? |
| 14    A   Pretty innocuous. There were some things | 14    A   It's microwave product manager is the |
| 15   in there, but they compared the levels of them, for | 15   title. It's mostly production manager, though. |
| 16   instance, to breathing the air in a New York City | 16    Q   You've essentially been in that position |
| 17   street. You know, no worse than that. | 17   since '88 as well? |
| 18    Q   Okay. What is the shelf life of your | 18    A   Yes. I was really the production manager; |
| 19   products? | 19   then the product manager, and then the production |
| 20    A   We have a shelf life of a year and a half, | 20   kind of product manager. |
| 21   and that is really for popping purposes. They could | 21    Q   And American Pop Corn makes microwave |
| 22   be good to eat for even longer if kept properly. | 22   popcorn as one of its primary products? |
| 23    Q   Okay. And what's the typical turnaround | 23    Q   And it's one of the leading industries in |
| 24   time from a flavoring product coming into one of your | 24    Q   And it's one of the leading industries in |
| 25   warehouse facilities, and it actually going into | 25   the Sioux City area, I'm assuming. Would you agree? |
|                              151 |                              153 |

**154**

1  A  Yes. It's a decent-sized company.
2  Q  You have about 100 employees?
3  A  180 or so.
4  Q  180 employees?
5  A  Yeah.
6  Q  And essentially what you do is you make fun
7  food for people to eat at home or elsewhere?
8  A  That's the idea.
9  Q  In fact, your address is One Fun Place.
10  A  That is correct.
11  Q  Jolly Time. That's the brand name for the
12  products you make?
13  A  Yes.
14  Q  Has there been any particular point in time
15  in your career at American Pop Corn that you thought
16  you were manufacturing a food product that could hurt
17  people?
18  A  No.
19  Q  You said several times today that you've
20  heard of diacetyl. During the period of the '90s,
21  were you aware that diacetyl could cause serious lung
22  injury to people that worked —
23  MR. MACE: Objection.
24  Q  (By Mr. Crick) — at your place of
25  employment?

**155**

1  MR. BENSON: Objection.
2  MR. LEE: Objection.
3  MS. MIDDELHOFF: Objection.
4  A  No clue, no.
5  MR. BENSON: Again, Attorney Crick, in
6  interest of streamlining, if one person objects, can
7  that just be for everybody?
8  MR. CRICK: Yes.
9  MR. BENSON: Okay.
10  Q  (By Mr. Crick) You mentioned some flavors.
11  Essentially what you do at American Pop Corn is you
12  take popcorn and you mix it with oil, salt, some
13  flavorings in a bag that's a microwaveable bag and
14  then seal it, put it in boxes for people to purchase
15  at grocery stores?
16  A  Correct.
17  Q  And there's a Bartelt line that spits in
18  the popcorn, moves down the line, spits in the oils
19  and flavorings, and it folds the — seals and folds
20  the bags and wraps them in plastic for someone to put
21  in boxes. Is that a short description of how that
22  process works?
23  A  Yes.
24  Q  And before the mixture can be used at the
25  Bartelt line, there is a mixing area where people

**156**

1  like Kevin Remmes worked where he would mix
2  ingredients that would be used in the flavors?
3  A  Yes.
4  Q  Now, you were asked some questions earlier
5  today about different flavors that American Pop Corn
6  maked — makes. And I want to go through that a
7  little bit right now. What would you say is the most
8  popular flavor that's been manufactured at American
9  Pop Corn?
10  MR. MACE: Today or over all time?
11  Q  (By Mr. Crick) Well, today.
12  A  Blast O —
13  MR. POULSON: I'm going to object. That's
14  not relevant to anything and gets into some
15  proprietary issues. If you could limit yourself to
16  the period that Kevin Remmes was employed in the
17  mixing room.
18  Q  (By Mr. Crick) What's the most popular
19  product today?
20  MR. POULSON: Don't answer.
21  MR. CRICK: You're not going to say what
22  the most popular product is? How can that be
23  confidential?
24  MR. POULSON: Don't answer. It's not
25  relevant.

**157**

1  MR. CRICK: It is absolutely relevant,
2  because it establishes — I'm going to go all through
3  it in just a minute. It's going to establish the
4  relevance.
5  Q  (By Mr. Crick) What was the most popular
6  product during the period of '95 to 2001?
7  A  That's a good question. Blast O Butter
8  didn't exist in '95. Healthy Pop wasn't a big
9  seller. Probably Butter-Licious or butter was our
10  butter flavor in '95, '6, '7 in there.
11  Q  Okay. Who supplied the flavoring — the
12  butter flavoring for Butter-Licious?
13  A  I'd have to look. Givaudan for pretty much
14  that whole period.
15  Q  Do you know who supplied — I'm going to go
16  through each of them so we may repeat a little bit.
17  Blast O Butter. That was supplied by who?
18  A  That was Sensient.
19  Q  Butter-Licious. You just said that was
20  Givaudan?
21  A  Mm-hmm (Yes). Yes.
22  Q  Healthy Pop?
23  A  I've got to stop and remember which flavor
24  is which. That would be Givaudan.
25  Q  How about White & Buttery?

**Page 186**

```
 1   involved at that time was even a FONA flavor,
 2   correct?
 3       A   Not without looking at other records, I
 4   wouldn't recall what flavor it was.
 5       Q   What records would you have to look at to
 6   determine what flavor was being used?
 7       A   If I could find old formulas or old
 8   receipts for purchases to show what we were using at
 9   the time.
10       Q   Is it also your understanding that when you
11   talked with the people at FONA, you talked to them
12   because they were there for sales and things of that
13   nature; not because it was a FONA flavor?
14       A   Correct.  I don't think I was asking them
15   specifically about their flavor.  I was asking them
16   about flavors --
17       Q   Flavors in general?
18       A   Yes.
19       Q   And then FONA supplied you with information
20   that the flavors do contain diacetyl, correct?
21       A   Yes.
22       Q   And didn't they also talk to you about the
23   fact that you needed to have adequate ventilation?
24       A   During that conversation?
25       Q   Yes.
                                                    186
```

**Page 187**

```
 1       A   I'm trying to recall.  The most I recall is
 2   that they just talked about how the flavor was
 3   damaging to the eyeballs.  And I don't remember if
 4   they suggested any ventilation or not.
 5       Q   So you just don't remember one way or
 6   another?
 7       A   No, I don't.
 8       Q   Did they discuss with you how they handled
 9   any issues they had with diacetyl?
10       A   Not that I recall.
11       Q   Not that you recall?
12       A   Hmm-mm (No).
13       Q   There was also some indication about Kettle
14   Mania.  You indicated you used a FONA product.  Would
15   that have been an actual vanilla -- sweet vanilla
16   product and not a butter?
17       A   That is a sweeter flavor.  I don't believe
18   that's a butter flavor.  That's a sweet flavor.
19       Q   Right.  Sweet vanilla?
20       A   I don't know --
21       Q   You don't know?
22       A   -- if it's the right note, but it's a
23   sweet -- we just call it a sweet-style flavor.
24       Q   Yeah.  That's fine.
25       MR. LEE:  That's all I have.
                                                    187
```

**Page 188**

```
 1       MR. BENSON:  I have no questions.
 2       MR. CRICK:  I don't have any questions.
 3       MR. MACE:  We're done.
 4       THE VIDEOGRAPHER:  This is the end of
 5   Videotape Number 3.  Counsel, we're off the record.
 6              *  *  *
 7       END OF PROCEEDINGS AT 11:20 a.m., 12/2/05.
 8              *  *  *
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                    188
```

**Page 189**

```
 1   CASE NAME:  Remmes v. IFF, et al
 2
 3            ADDENDUM TO DEPOSITION
 4   Page      Line              Change and Reason
 5
 6
 7
 8
 9
10
11
12
13
14
     To all of which I affix my signature this ____ day
15   of _____, _____, at the City of _____,
     State of _____.
16
17
18
     _____
19            DEPONENT
20   I did witness the above signature on the_____ day of
     _____, _____, in the City of _____, State
21   of _____.
22
23
24   _____
            NOTARY PUBLIC
25
                                                    189
```

Case name: Remmes v. IFF, et al

**CERTIFICATE OF DEPONENT**

I, the undersigned deponent, do hereby certify under oath that I did read the foregoing pages of transcript and that any corrections I want to make to the foregoing pages of transcript have been set out on the foregoing Addendum, and that I have indicated the correction itself, the page and line number of the correction, and the reason for the correction, if any.

In witness whereof, I have hereunto affixed my signature on this_____ day of _____, _____, before the undersigned Notary Public.

_____
**DEPONENT**

I hereby certify I did witness the above signature on this the _____ day of _____, _____, in the City of _____, County of _____, State of _____.

_____
**NOTARY PUBLIC**

My commission expires:
_____.

190

---

6. I further certify that I am not related by consanguinity or affinity within the fourth degree to any party, his attorney, or any employee of any of them; that I am not financially interested in this action, and that I am not the attorney or employee of any party.

7. Exhibits 1 through and including 43 were filed with the original transcript and a copy was provided with each of the copies.

To all of which I have verily affixed my signature this _____ day of _____, _____.

_____

DENISE R. LEONARD-DERBY, CSR, RPR
Siouxland Reporting Service
PO Box 2241
Sioux City, Iowa 51104
(712) 252-5208

192

---

**CERTIFICATE OF REPORTER**

I, Denise R. Leonard-Derby, Certified Shorthand Reporter in and for the State of Iowa, do hereby certify as follows:

1. That the deponent aforenamed was duly sworn prior to the taking of this deposition.

2. That I took down in shorthand correctly the testimony of said deponent and have caused the same to be transcribed, and that this deposition is a true and correct record of the testimony given by said deponent at the time I affix my signature to this certificate.

3. That the total cost for reporting and transcribing is in the sum of $_____, said sum to be advanced and paid to Siouxland Reporting Service, PO Box 2241, Sioux City, Iowa 51104, prior to the use of said deposition at trial by Mr. Damond Mace.

4. That the original transcript of this deposition is to be filed with Mr. Damond Mace.

5. That a copy is to be delivered to Mr. Damond Mace, Ms. Mary Jo Middelhoff, Mr. Ronald Lee, Mr. Paul Benson, Mr. Jeffrey Poulson, and Mr. Steven Crick.

191