**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

| | |
|---|---|
| MARLIN HERBST,<br><br>          Plaintiff,<br>vs.<br><br>GIVAUDAN FLAVORS<br>CORPORATION and EMORAL, INC.,<br>f/k/a Polarome International, Inc.,<br><br>          Defendants. | No. C 17-4008-MWB<br><br>**OPINION AND ORDER<br>REGARDING DEFENDANT<br>GIVAUDAN'S MOTION FOR<br>SUMMARY JUDGMENT** |

_____

**TABLE OF CONTENTS**

*I.   INTRODUCTION..................................................................1*

*II.  LEGAL ANALYSIS .............................................................4*
     *A.   Standards For Summary Judgment ............................... 4*
     *B.   Governing Law.......................................................... 5*
     *C.   Discussion................................................................ 8*

*III. CONCLUSION ............................................................... 13*

## I.    INTRODUCTION

In this case, plaintiff Marlin Herbst alleges that he suffers from bronchiolitis obliterans (aka "popcorn lung") and/or other lung or respiratory diseases or impairments from working with butter flavorings containing diacetyl at the American Popcorn Company (APC) plant in Sioux City, Iowa, between 1991 and August 1993. On January

27, 2017, Herbst brought products liability claims under strict liability and negligence and a claim of breach of implied warranties against various "manufacturing defendants," which are companies that allegedly designed, manufactured, distributed, and/or sold diacetyl-containing butter flavorings to APC, and against various "diacetyl defendants," which are companies that allegedly designed, manufactured, marketed, distributed, and/or sold diacetyl that was used by APC. The remaining "manufacturing defendant" is Givaudan Flavors Corporation, and the remaining "diacetyl defendant" is Emoral, Inc.

This case is now before me on Givaudan's February 9, 2018, Motion For Summary Judgment seeking summary judgment on all of Herbst's claims on the ground that, as a matter of undisputed fact and law, his claims, brought nearly 23 years after his employment at APC ended, are barred by the applicable 15-year statute of repose, IOWA CODE § 614.1.[1] Moreover, Givaudan argues, Herbst cannot assert the statutory exception for latent injury caused by "harmful materials," in IOWA CODE § 614.1(2A)(b), for the reasons I stated in *Daughette v. Chr. Hansen, Inc.*, 960 F. Supp. 2d 849 (N.D. Iowa 2012).

In his Resistance, filed March 26, 2018, however, Herbst does not rely on the "harmful materials" exception. Instead, he relies on a different statutory exception, in IOWA CODE § 614.1(2A)(a), which excepts claims from the statute of repose "if the manufacturer, assembler, designer, supplier of specifications, seller, lessor, or distributor of the product *intentionally misrepresents facts about the product* or *fraudulently conceals information about the product* and *that conduct was a substantial cause of the claimant's*

---

[1] There are other motions pending in this case, consisting of motions to exclude experts, Emoral's Motion For Summary Judgment, *inter alia*, on statute of repose grounds, and Givaudan's second Motion For Summary Judgment As To All Claims, asserting additional grounds. However, owing to extensions of time for briefing, these motions are not yet ripe for disposition.

*harm.*" (Emphasis added). Herbst asserts that there are, at the very least, genuine issues of material fact as to whether Givaudan fraudulently concealed information about the safety of butter flavorings containing diacetyl that Givaudan sold to APC.[2]

In a Reply, filed April 11, 2018, Givaudan argues that Herbst's reliance on the "fraudulent concealment" exception fails, under the applicable "clear and convincing evidence" standard, because (1) he has presented no evidence from which a fact-finder could reasonably infer that Tastemaker, Givaudan's predecessor, intentionally misrepresented or fraudulently concealed any information about its butter flavorings, and (2) he lacks any evidence that Tastemaker acted with any intent to deceive. Givaudan also makes clear, in its Reply and in its response to Herbst's Statement Of Additional Material Facts, that it considers any evidence of alleged misrepresentations or concealments after Herbst's employment at APC ended in August of 1993 to be irrelevant. Indeed, Givaudan argues, there was no published information about the alleged association between butter flavorings containing diacetyl and lung disease prior to 2001.

Both parties request oral arguments on Givaudan's Motion For Summary Judgment. Contrary to the parties' assertions, however, I find that their written submissions are sufficient to resolve Givaudan's Motion. Therefore, I deem Givaudan's Motion fully submitted.

---

[2] Indeed, Herbst argues that the evidence he has identified satisfies both "intentional misrepresentation" and "fraudulent concealment," but that, in an effort to avoid repetition, he intends all his references to fraudulent concealment to include Givaudan's intentional misrepresentations, as well.

## II. LEGAL ANALYSIS
### A. Standards For Summary Judgment

Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact *and* that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thus, "[t]he movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Celotex*, 477 U.S. at 323). In response, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

When the parties have met their burdens, the district judge's task is as follows:

> "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, --- U.S. ----, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal quotations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,

> 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). . . . . "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Ricci*, 129 S. Ct. at 2677, quoting *Matsushita*, 475 U.S. at 587, 106 S. Ct. 1348.

*Torgerson*, 643 F.3d at 1042-43. Summary judgment is particularly appropriate, however, when only questions of law are involved, rather than factual issues that may or may not be subject to genuine dispute. *See, e.g., Cremona v. R.S. Bacon Veneer Co.*, 433 F.3d 617, 620 (8th Cir. 2006).

### B. Governing Law

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ryan v. Capital Contractors, Inc.*, 679 F.3d 772, 776 (8th Cir. 2012). The "governing law," here, is IOWA CODE § 614.1(2A)(a), the key language of which is quoted, above, and applicable decisions of the Iowa courts concerning statutes of repose and exceptions to them based on fraudulent concealment.

Section 614.1(2A) is a "statute of repose" rather than a "statute of limitations." *TSB Holdings, L.L.C. v. Bd. of Adjustment for City of Iowa City*, 913 N.W.2d 1, 12 (Iowa 2018); *Estate of Ryan v. Heritage Trails Assocs., Inc.*, 745 N.W.2d 724, 728 (Iowa 2008). As the Iowa Supreme Court has explained,

> We distinguished a statute of repose from a statute of limitations in *Bob McKiness Excavating & Grading, Inc. v. Morton Buildings, Inc.*, 507 N.W.2d 405, 408–09 (Iowa 1993). We stated,

> A statute of limitations bars, after a certain period of time, the right to prosecute an accrued cause of action.
>
> By contrast, a statute of repose "terminates any right of action after a specified time has elapsed, regardless of whether or not there has as yet been an injury."
>
>> A statute of repose period begins to run from the occurrence of some event other than the event of an injury that gives rise to a cause of action and, therefore, bars a cause of action before the injury occurs.
>
> Under a statute of repose, therefore, the mere passage of time can prevent a legal right from ever arising.
>
> *Id*. at 408 (citation omitted) (quoting *Hanson v. Williams County*, 389 N.W.2d 319, 321 (N.D. 1986)). Stated differently, "a statute of limitations affects only the remedy, not the right, … whereas a statute of repose affects the right itself, extinguishing existing rights or preventing rights from arising." *See Albrecht v. Gen. Motors Corp.*, 648 N.W.2d 87, 91 (Iowa 2002) (citation omitted).

*TSB Holdings, L.L.C.*, 913 N.W.2d at 11. The Iowa Supreme Court reiterated its prior holding that § 614.1(2A)(a) is a "statute of repose," because "the limitations period commenced from the date the aggrieved party first purchased the product or installed it for use." *Id*. at 12 (citing *Albrecht*, 648 N.W.2d at 92).

As to a "fraudulent concealment" exception to this statute of repose, the Iowa Supreme Court has explained,

> The common law doctrine of fraudulent concealment became a part of Iowa jurisprudence over a century ago in *District Township of Boomer v. French*, 40 Iowa 601, 603–04 (1875). The doctrine developed to "prevent a party from benefiting from 'the protection of a limitations statute when by his own fraud he has prevented the other party from seeking redress within the period of limitations.'" *Christy [v. Miulli]*, 692

6

> N.W.2d [694,] 702 [(Iowa 2005)] (quoting *Borderlon v. Peck*, 661 S.W.2d 907, 909 (Tex.1983)). The doctrine is a form of equitable estoppel that estops a party from raising a statute of limitations defense in certain circumstances. *Id*. at 701. We previously held that the "venerable" doctrine survived codification of the statute of repose found in Iowa Code section 614.1(9). *Koppes v. Pearson*, 384 N.W.2d 381, 387 (Iowa 1986), *abrogated on other grounds by Christy*, 692 N.W.2d at 701. Consequently, if proven, a party's fraudulent concealment allows a plaintiff to pursue a claim that would be otherwise time barred under the statute of repose. *See Koppes*, 384 N.W.2d at 386.

*Estate of Anderson ex rel. Herren v. Iowa Dermatology Clinic, PLC*, 819 N.W.2d 408, 414 (Iowa 2012). I note that the Iowa Supreme Court recognized a "fraudulent concealment" exception to the statute of repose in IOWA CODE § 614.1(9), for medical malpractice claims, even though that provision *does not* expressly state such an exception. Section § 614.1(2A)(a), the provision at issue, here, *does* expressly state such an exception. Thus, there can be no doubt that, "if proven, a party's fraudulent concealment allows a plaintiff to pursue a claim that would be otherwise time barred under" § 614.1(2A). *Cf. id.*

As the Iowa Supreme Court explained, further,

> A party seeking shelter [from the statute of repose in IOWA CODE § 614.1(9)] under the doctrine of fraudulent concealment must plead and prove the following:
>
>> (1) The defendant has made a false representation or has concealed material facts; (2) the plaintiff lacks knowledge of the true facts; (3) the defendant intended the plaintiff to act upon such representations; and (4) the plaintiff did in fact rely upon such representations to his prejudice.

> *Christy*, 692 N.W.2d at 702 (citation and internal quotation marks omitted). The party alleging fraudulent concealment must prove each of the elements by "a clear and convincing preponderance of the evidence." *Id*.
>
> Ordinarily, the plaintiff must prove the defendant engaged in affirmative conduct to conceal the plaintiff's cause of action. *Id*.; *Koppes*, 384 N.W.2d at 386. The affirmative conduct of concealment must be independent of and subsequent to the liability-producing conduct. *Christy*, 692 N.W.2d at 702.

*Estate of Anderson*, 819 N.W.2d at 414-15.

I agree with the parties that these elements of common-law fraudulent concealment apply to proof of the "fraudulent concealment" exception expressly stated in IOWA CODE § 614.1(2A)(a), albeit tailored to the specific language of the statutory exception. Thus, rather than fraudulent concealment of the plaintiff's "cause of action," *cf. id.*, the statutory language of the exception in § 614.1(2A)(a) requires fraudulent concealment of "information about the product." Also, the "fraudulent concealment" exception requires that the defendant's "fraudulent conduct . . . was a substantial cause of the claimant's harm." IOWA CODE § 614.1(2A)(a); *Baier v. Ford Motor Co.*, No. C04-2039, 2005 WL 928615, at *7 (N.D. Iowa April 21, 2005).

### C. Discussion

Contrary to Givaudan's contentions, I conclude that Herbst has generated genuine issues of material fact as to whether Tastemaker, Givaudan's predecessor, and later Givaudan, fraudulently concealed information about its butter flavorings containing diacetyl, and that Tastemaker (or Givaudan) acted with intent to deceive. First, I do not agree with Givaudan that any evidence of concealment or intent to deceive after the end of Herbst's employment at APC in August of 1993 is simply irrelevant.

8

Section 614.1(2A) states that, with exceptions not relevant, here, the statute of repose begins to run from when "the product was first purchased, leased, bailed, or installed for use or consumption," which the parties appear to agree in the case of APC and Herbst, as APC's employee, occurred in about 1991 and certainly no later than August 1993. That provision does not state any limitation on the time or period during which the "fraudulent concealment" must have occurred, however. Logically, such "fraudulent concealment" must have occurred during the 15-year period of repose after first purchase when the statutory repose period would otherwise have been running, *i.e.*, from some point in 1991 until some point in 2006. Thus, even if Givaudan is correct that there was no published information about the alleged association between butter flavorings containing diacetyl and lung disease prior to 2001, concealment of that fact with intent to deceive *after* 2001 would *also* be before the end of the statute of repose period otherwise applicable in 2006 and would, thus, be relevant to an exception to the running of the statute of repose prior to Herbst filing his claims. Such concealment, a rational trier of fact could conclude, might include concealment of a determination after the end of Herbst's employment at APC that possible lung disease (possibly even bronchiolitis obliterans) suffered by some employees at Tastemaker's plant prior to 1993 may have been linked to exposure to diacetyl. *Torgerson*, 643 F.3d at 1042-43 (stating the rational trier of fact standard at summary judgment).

Furthermore, the 1985 Flavor or Fragrance Ingredient Data Sheet (FFIDS) for diacetyl, Plaintiff's Appendix, 56-60, and Givaudan's conduct based on it *do* give rise to reasonable inferences from which a rational trier of fact could conclude that Givaudan or its predecessor concealed pertinent information from APC and, by extension, from Herbst. *Id*. Givaudan is correct that the 1985 FFIDS, indicates that "Statements Relevant to Making a Health Hazard Determination" consist of the following: "Irritation Data: Liquid and vapor may be irritating to skin and eyes. Vapor is irritating to throat and

lungs." *Id.* at 60. Givaudan is also correct that it provided *similar* information in its material safety data sheets (MSDSs) from 1993 onward, that its butter flavorings "May be irritating to skin and eyes," and that "Inhalation is irritating to nose, throat, and lungs," although the warning in the MSDS is not plainly linked to exposure to either liquid or vapor, as in the 1985 FFIDS. More importantly, the 1993 and later MSDSs do not address *all* the human health effects data from "inhalation" listed in Section IV of the 1985 FFIDS, which stated "Harmful. Sore throat, coughing; may be absorbed. High concentrations may cause irritation of respiratory tract; capable of producing systemic toxicity." *Id.* at 57 (internal citations omitted). Thus, the 1985 FFIDS, read as a whole, suggests considerably more than "irritation" as the result of inhalation, including that inhalation may be "harmful" and may produce "systemic toxicity," to the "respiratory tract," including the throat and lungs. A rational trier of fact could discount the testimony of Tastemaker's regulatory department head that "systemic toxicity" was not a reference to the lungs or respiratory system, but to a systemic toxic event, such as irritation or sensitization, as a post hoc definition that is inconsistent with the context in which that term is used in the 1985 FFIDS.

A rational trier of fact could also infer that Tastemaker was concealing its requirement of procedures, including respirators, for handling diacetyl and products containing diacetyl in its own plant, while indicating that only less rigorous procedures were required for handling butter flavorings containing diacetyl at APC's plant. A rational trier of fact could reject Givaudan's assertion that the procedures at the Tastemaker plant did not require respirators to be used in the presence of finished butter flavorings containing diacetyl, but only when an employee was using pure, liquid diacetyl in the spray dry department, as contrary to the language of Tastemaker's procedures. Those procedures state, in part, "Whenever liquid Diacetyl *or a product where liquid Diacetyl is present* is to be used, a respirator . . . must be worn," and, "Whenever

*material* [*i.e.*, without reference to whether in pure or liquid form or present in a product] is in tank, lids must be closed [and] [i]f ventilation (mechanical) is not connected to tank or is unavailable, a respirator must be used at all time while in the room." Plaintiff's Appendix at 129 (emphasis added). This language could reasonably be understood to apply to both pure or liquid diacetyl and products containing diacetyl, such as butter flavorings. Also, while Tastemaker's procedures warned, "Avoid heating or flame at all times" when handling diacetyl, *id.*, Tastemaker was aware that APC was heating the butter flavorings in the course of producing butter flavored microwave popcorn and that the microwave popcorn would also be heated when prepared by consumers.

While a rational trier of fact might reject some of the evidence on which Herbst relies to show concealment, a rational trier of fact would not be *required* to do so. Moreover, a rational trier of fact would not be required to accept Givaudan's *characterization* of the evidence as correct and beyond dispute. There is enough evidence, as discussed, above, giving rise to inferences of concealment for Herbst's claim to satisfy the "concealment" element of the "fraudulent concealment" exception to the statute of repose.

I am also unpersuaded by Givaudan's contention that Herbst has not generated genuine issues of material fact as to the "intent to deceive" element. Givaudan rejects what it contends is Herbst's argument that a showing of concealment is enough to show intent to deceive and contends that argument is based on a misreading of Judge Jarvey's decision in *Baier*. Givaudan contends that *Baier* was a case in which evidence existed from which jurors could infer intent to deceive, but that this is not such a case, because there is no evidence of concealment, in the first place, and even if a jury could find failure to provide information, there is no evidence that the failure was intentional or for the purpose of deceiving APC.

11

In *Baier*, there was evidence that Ford had withheld one crash report that showed the "drop-in" gas tank in a Mustang would rupture upon a rear-end collision, and, instead, reported to the federal government that the Mustang had met the federal crash test standard in a second test, but "did not mention or reference the modifications done to the frame of the car" that had allowed it to pass that test. *Baier*, 2005 WL 928615, at *1. Also, when the National Highway Traffic Safety Administration (NHTSA) conducted an investigation into the safety of Ford's "drop-in" gas tank line of vehicles, Ford did not produce any of its internal reports regarding failed tests or the dangers of "drop-in" gas tanks, so the NHTSA closed its investigation. *Id*. at *2. Judge Jarvey concluded this evidence generated genuine issues of material fact as to concealment. *Id*. at *5.

As to "intent to deceive," Judge Jarvey explained,

> [T]he relevant inquiry is not whether the defendant intended to deceive the plaintiffs with respect to a time bar, but whether the defendant intended to deceive the plaintiffs with respect to the product. The plaintiffs have produced sufficient evidence, as detailed above, to create a genuine issue of material fact as to whether Ford engaged in fraudulent conduct. This evidence also creates a genuine issue of fact as to whether Ford intended to deceive the plaintiffs, as potential purchasers and then as users of the car, about the Ford Mustang.

*Baier*, 2005 WL 928615, at *7. Thus, Judge Jarvey did conclude that evidence of concealment by Ford in that case *also* generated genuine issues of material fact on intent to deceive.

As indicated, above, I disagree with Givaudan's contention that there is no evidence of concealment in this case, so that there is no evidence from which a rational trier of fact could infer intent to deceive. Rather, I conclude that there *is* evidence of concealment and that some of Herbst's evidence of concealment, like Baier's, also gives rise to inferences of intent to deceive. For example, like Baier's evidence of concealment,

Herbst's evidence of concealment includes evidence of differences between what Tastemaker was telling APC were adequate procedures to handle butter flavorings containing diacetyl and the procedures that Tastemaker was requiring in its own plant for handling diacetyl *and products containing diacetyl*. That difference not only suggests concealment of known information, but intent to deceive APC into believing that butter flavorings containing diacetyl were not dangerous, because less stringent handling procedures were adequate. *Cf. id.* at *1-*2, *7 (identifying evidence of differences between information known to Ford and what Ford disclosed and holding this evidence of concealment also gave rise to an inference of intent to deceive). Similarly, other evidence of differences between what Givaudan knew about the possible links between diacetyl or products containing diacetyl and lung or respiratory diseases and what it required for safe handling of diacetyl and products containing diacetyl, on the one hand, and what Givaudan was telling customers about product safety and handling procedures, on the other hand, during the period that the statute of repose would otherwise have been running—*after* 1993, and even *after* 2001—also gives rise to inferences of intent to deceive.

### III. CONCLUSION

Upon the foregoing, Givaudan's February 9, 2018, Motion For Summary Judgment (docket no. 95) is **denied**.

**IT IS SO ORDERED**.

**DATED** this 20th day of September, 2018.

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA