**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

| | |
|---|---|
| MARLIN HERBST,<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**BUSH BOAKE ALLEN INC., et al.**<br><br>    **Defendants.** | **Case No. 5:17-cv-04008-MWB**<br><br>**PLAINTIFF'S RESISTANCE TO DEFENDANT EMORAL INC., FKA POLAROME INTERNATIONAL, INC.'S MOTION FOR SUMMARY JUDGMENT (DOC. 144)**<br><br>**ORAL ARGUMENT REQUESTED** |

## TABLE OF CONTENTS

I.  **INTRODUCTION** ................................................................................................ 1

II.  **FACTUAL BACKGROUND** ........................................................................... 3

  A.  Plaintiff Developed Bronchiolitis Obliterans From His Exposure to Diacetyl-Containing Butter Flavorings While Working at American Popcorn ........................................................................................................ 3

  B.  Plaintiff's Exposures to Emoral's Diacetyl ........................................................ 3

III.  **LEGAL STANDARD FOR SUMMARY JUDGMENT** ............................... 5

IV.  **ARGUMENT** ................................................................................................... 5

  A.  Iowa's 15-Year Statute of Repose Does Not Bar Plaintiff's Claims ..................... 5

    a.  Emoral Knew About the Health Hazards Associated with Diacetyl Yet Fraudulently Concealed This Information From Its Customers ............................................................................................. 8

    b.  Emoral Intended to Deceive its Customers And Ultimately, American Popcorn and Plaintiff Marlin Herbst, With Respect to its Diacetyl Products ........................................................... 14

    c.  Plaintiff Justifiably Relied On Emoral's Misrepresentations About its Diacetyl Products to its Customers, Like Givaudan and FONA Who Were Providing Diacetyl-Containing Flavorings to American Popcorn ...................................................................... 15

    d.  Emoral's Concealment Substantially Caused Plaintiff Marlin Herbst's Harm—Specifically, His Irreversible Lung Disease ................. 17

i

B.      The Sophisticated User Doctrine Does Not Shield Emoral From
        Liability in This Case ............................................................................ 18

C.      There is Abundant Evidence that Plaintiff Was Exposed to
        Emoral's Diacetyl During His Employment at American
        Popcorn That Caused His Bronchiolitis Obliterans ................................ 21

D.      Emoral is Not Entitled to Statutory Immunity in This Case ................. 24

V.      **CONCLUSION** ............................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baier v. Ford Motor Co.*,
  No. C04-2039, 2005 WL 928615 (N.D. Iowa Apr. 21, 2005)........................................ 6, 7, 14
*Baughman v. Gen. Motors Corp.*,
  780 F.2d 1131 (4th Cir. 1986) ............................................................................................... 25
*Bergfeld v. Unimin Corp.*,
  319 F.3d 350 (8th Cir. 2003) ........................................................................................... 18, 19
*Bergfeld v. Unimin Corp*,
  226 F.Supp.2d 970 (N.D. Iowa 2002)................................................................................... 19
*Christy v. Miulli*,
  692 N.W.2d 694 (Iowa 2005) ......................................................................................... 7, 8, 14
*Exxon Shipping Co. v. Pac. Res., Inc.*,
  789 F. Supp. 1521 (D. Haw. 1991) ......................................................................... 24, 25, 26
*Ford Motor Co. v. Wood*,
  119 Md. App. 1, 703 A.2d 1315 (1998)................................................................................ 25
*Fulbright v. Klamath Gas Co.*,
  271 Or. 449, 533 P.2d 316 (1975) .................................................................................. 26, 27
*Johnson v. Enron Corp.*,
  906 F.2d 1234 (8th Cir. 1990) ................................................................................................. 5
*Kolarik v. Cory Int'l Corp.*,
  721 N.W.2d 159 (Iowa 2006) ............................................................................................... 28
*McClendon v. Beck*,
  569 N.W.2d 382 (Iowa 1997) ................................................................................................. 8
*Mielke v. Ashland, Inc.*,
  No. 4:05-CV-88, 2007 WL 9711518 (S.D. Iowa Jan. 9, 2007) ...................................... 19, 22
*Nichols v. Westfield Indus., Ltd.*,
  380 N.W.2d 293)(Iowa 1985) ............................................................................................... 18
*Pelster v. Ray*,
  987 F.2d 514 (8th Cir. 1993) ................................................................................................. 18
*Powell v. Yellow Book USA, Inc.*,
  445 F.3d 1074 (8th Cir. 2006) ................................................................................................. 5
*Quick v. Donaldson Co.*,
  90 F.3d 1372 (8th Cir. 1996) ................................................................................................... 5
*Rowson v. Kawasaki Heavy Indus., Ltd.*,
  866 F. Supp. 1221 (N.D. Iowa 1994).................................................................................... 18
*Wabun-Inini v. Sessions*,
  900 F.2d 1234 (8th Cir. 1990) ................................................................................................. 5
*Weyerhaeuser Co. v. Thermogas Co.*,
  620 N.W.2d 819 (Iowa 2000) ........................................................................... 24, 25, 26, 27

Case 5:17-cv-04008-LTS-KEM   Document 214   Filed 12/07/18   Page 3 of 35

## Statutes

Iowa Code § 613.18(1)(a) ................................................................................... 24, 25, 26, 28
Iowa Code § 614.1(2A) ................................................................................................ 6, 8

## Regulations

29 C.F.R. § 1910.1200 ........................................................................................................ 15
29 C.F.R. § 1910.1200(g)(5) .............................................................................................. 16

## Other Authorities

63 Am.Jur.2d Products Liability § 140, at 183 .............................................................. 25
Restatement (Second) of Torts § 402A cmts ................................................................ 24

# I.    INTRODUCTION[1]

Defendant Emoral, Inc., formerly known as Polarome International, Inc. ("Emoral")[2] was a supplier of diacetyl, a food flavoring chemical added to flavorings for its buttery smell and taste. At issue in this case is Emoral's failure to warn its customers, Givaudan and Flavors of North America ("FONA"), who incorporated Emoral's diacetyl into their butter flavorings that ultimately were sold to Plaintiff's employer, American Popcorn, of its knowledge of hazards surrounding its diacetyl products.

Specifically, Emoral knew of diacetyl's dangerous propensity to cause irreversible lung disease 1) by as early as 1985 when its trade association provided a flavoring ingredient sheet for diacetyl that stated it was "harmful" and "capable of systemic toxicity"; 2) by 1986 when Emoral was named as a defendant in two lawsuits for its sales of diacetyl to the International Bakers plant where two food flavoring plant workers suffered from lung disease, clinically consistent with bronchiolitis obliterans, as a result of their exposures to diacetyl; and, 3) by 1992 when its <u>own</u> diacetyl supplier provided it with a material safety data sheet ("MSDS") that warned it to use a respirator with diacetyl; to only use diacetyl in a well-ventilated work environment; to use local exhaust to prevent aerosol generation; and, to avoid using diacetyl in open systems. Despite all of this this knowledge, Emoral said nothing to its customers. As a result, Plaintiff Marlin Herbst has been diagnosed with the lung disease, bronchiolitis obliterans.

Emoral now seeks to avoid liability for its actions and moves for summary judgment, making a number of arguments, all of which fail, and two of which have been previously decided

---

[1] Plaintiff incorporates as if stated fully herein, Plaintiff's Statement of Additional Material Facts, Declaration of J'Nan C. Kimak in Support of Plaintiff's Resistance to Defendant Emoral Inc. f/k/a Polarome International Inc.'s Motion for Summary Judgment; and Plaintiff's Appendix and Exhibits in Support of Plaintiff's Resistance to Defendant Emoral's Motion for Summary Judgment.
[2] All references to Emoral and Polarome are to be used interchangeably herein.

and denied by this Court in this and prior litigation. Emoral's dispositive motion should be denied for the following reasons.

Emoral first asks this Court to grant summary judgment on the basis that Plaintiff's claims are barred by Iowa's statute of repose. Emoral seeks this relief even though its fraudulent concealment equitably estops it from asserting the defense and despite the fact this Court has already denied Emoral's co-defendant, Givaudan's similar motion for summary judgment.

Emoral's next argument that it should be shielded from liability under the sophisticated user doctrine also lacks muster as Emoral cites no evidence of Givaudan's "sophisticated knowledge" or any on point authority to support its assertion. In addition, this Court previously denied a similar motion filed by Emoral in *Stillmunkes v. Givaudan Flavors Corporation.*

Emoral's third contention that Plaintiff has failed to identify evidence that he was exposed to Emoral's diacetyl is easily displaced by evidence that 1) Emoral was Givaudan's **main** diacetyl supplier, supplying 58%, or 58,006 lbs. of the diacetyl used in Givaudan's butter flavorings sold to American Popcorn during Plaintiff's employment; 2) formulas for FONA's butter flavorings at issue here, specifically identify Emoral as its diacetyl supplier; 3) Plaintiff has testified regarding his exposures to diacetyl-containing flavorings; 4) NIOSH's investigation at American Popcorn found diacetyl-induced lung injuries at the plant; and 5) Plaintiff's expert, Dr. Pue has opined that Plaintiff's bronchiolitis obliterans was caused by his exposure to diacetyl-containing flavorings.

Nor can Emoral claim statutory immunity. Emoral did not merely buy and sell diacetyl without imparting any of its own influence over the product. Instead, it labeled the products as its own, and provided its own information and warnings on the diacetyl it sold to Givaudan and

2

FONA. Emoral is an assembler of the defective product –diacetyl and is not immune. For these reasons, Plaintiff requests that this Court deny Emoral's Motion for Summary Judgment.

## II.    FACTUAL BACKGROUND

### A.    Plaintiff Developed Bronchiolitis Obliterans From His Exposure to Diacetyl-Containing Butter Flavorings While Working at American Popcorn

As previously chronicled by Emoral, Plaintiff Marlin Herbst worked at the American Popcorn plant in Sioux City, Iowa from 1978-1993 (PSOF 3, (*See* Emoral's Appendix at 059-060; 026).[3] During his employment, Mr. Herbst believed he was making food and that it was safe (PSOF 10, App. 0012). However, unbeknownst to him or his employer, American Popcorn, Mr. Herbst was being exposed to a dangerous food flavoring chemical, diacetyl, supplied by Emoral that was contained in the butter flavorings used at American Popcorn.[4] As a result of his exposure to diacetyl while employed at American Popcorn, Mr. Herbst has been diagnosed with the irreversible lung disease, bronchiolitis obliterans.[5]

### B.    Plaintiff's Exposures to Emoral's Diacetyl

For its Motion for Summary Judgment Emoral boldly represents that there is no evidence that either of its customers, "Givaudan or FONA sold any butter flavoring containing Emoral's diacetyl to the APC Plant."[6] However, Emoral knows this to not be true. Plaintiff has found clear evidence to the contrary.

Emoral supplied diacetyl to Givaudan[7] during the entire period of Plaintiff's exposure to diacetyl, 1991-1993.[8] Of the 101,710 lbs. of butter flavoring that Givaudan supplied to American

---

[3] As used herein, "PSOF" refers to Plaintiff's Statement of Additional Material Facts in Support of Plaintiff's Resistance to Emoral's Motion for Summary Judgment, filed contemporaneously with this Resistance.
[4] (PSOF 11, App. 0026-0047; see PSOF 56-62; 64-69).
[5] (PSOF 13, App. 0012-0013; App. 0026-0047).
[6] Emoral's Motion, Doc. 144-1, p. 16.
[7] Defendant Givaudan was known as Fries & Fries, Inc. from June 1990 until April 1997 when it changed its name to Tastemaker Corp. In June 1997 the entity was acquired by the Swiss company Givaudan and its name was changed to Givaudan-Roure Flavors Corporation. In 2000 the name was changed again to Givaudan Flavors

3

Popcorn during Marlin Herbst's employment, 58%, or 58,006 lbs. of the diacetyl used in Givaudan's butter flavorings sold to American Popcorn **came from Emoral**.[9] This proof that Emoral supplied diacetyl to Givaudan that then went into flavorings supplied to American Popcorn during Plaintiff's employment is found in Givaudan's discovery responses, Givaudan's sales charts, Emoral's sales charts and the testimony of Emoral's own corporate representatives (*see generally* PSOF 56-62). During this time, Emoral said nothing to Givaudan regarding the health hazards of diacetyl (PSOF 63, App. 0095), even though it had no reason to believe that Givaudan had any of its own information about the health hazards of diacetyl (PSOF 95, App. 0094). Givaudan relied on Emoral to provide the hazard information regarding its diacetyl (PSOF 96, App. 0387, App. 0508-0523).

Similarly, Emoral also supplied diacetyl to FONA, during the same 1991-1993 time period.[10] And while Emoral argues there is no evidence that FONA actually used its diacetyl in the butter flavorings sold to American Popcorn, FONA's formulas for its butter flavorings sold to American Popcorn during Plaintiff's employment, which account for approximately 5,217 lbs. of diacetyl-containing butter flavorings, identify Emoral's diacetyl **specifically as the supplier**.[11] In fact, Emoral was FONA's <u>sole</u> supplier of diacetyl starting in August 1992 (PSOF 65, App. 0360). Like Givaudan, FONA relied on Emoral to provide it with the health hazards associated with diacetyl, and FONA developed its own material safety data sheets based on the information provided to it from Emoral (PSOF 97, App. 0361).

---

Corporation, the current name. The corporate entity Givaudan was a general partner in a partnership called Tastemaker (Collectively these names are all called "Givaudan"). For purposes of this briefing, all references to Givaudan herein are meant to also include Fries & Fries and Tastemaker and are to be used interchangeably.

[8] (PSOF 56, App. 0109; 0293-0304; PSOF 61, App. 0329-0331; 0336-0337; PSOF 62, App. 0329-0331; 0336-0337; 0338-0339).

[9] (PSOF 62, App. 0329-0331; 0336-0337, 0338-0339).

[10] (PSOF 64, App. 0340-0346; App. 0350-0353; PSOF 65, App. 0360; PSOF 66, App. 0365-0367, App. 0503-0507; PSOF 67, App. 0368, 0366; PSOF 68, App. 0369, 0365; PSOF 69, App. 0370, 0365, 0367.

[11] (PSOF 65, App. 0360; PSOF 66, App. 0365-0367, App. 0503-0507; PSOF 67, App. 0368, 0366; PSOF 68, App. 0369, 0365; PSOF 69, App. 0370, 0365, 0367).

## III. LEGAL STANDARD FOR SUMMARY JUDGMENT

The Eighth Circuit recognizes that "summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun-Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir. 1990). Summary judgment is only appropriate where there is no genuine issue of material fact and the movants are entitled to judgment as a matter of law. *See*, *e.g.*, *Powell v. Yellow Book USA, Inc.*, 445 F.3d 1074 (8th Cir. 2006). In deciding a motion for summary judgment, the court must consider all the evidence and the reasonable inferences that arise from it in the light most favorable to the nonmoving party. *Id.*

"As this Court often reminds the parties, the trial court's function in ruling on summary judgment is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there are genuine issues for trial." (Ex. 1, App. 0471, 3/27/08 Order in *Vicki Stillmunkes v. Givaudan Flavors Corporation*, in the United States District Court for the Northern District of Iowa Cedar Rapids Division, Case No. C04-85-MWB, (Doc. 347) (Bennett, M.)(quoting *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir. 1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990).

## IV. ARGUMENT

### A. Iowa's 15-Year Statute of Repose Does Not Bar Plaintiff's Claims

Mr. Herbst is not relying on "unsupported assumptions and sheer speculation"[12] to conclude that Emoral intentionally misrepresented and/or fraudulently concealed what it knew about the health hazards of diacetyl, but rather evidence and facts collected from Emoral's own witnesses; Emoral's own documents; and the testimony and documentary evidence produced by Emoral's prior customers, Givaudan and FONA. Emoral tries to downplay the plethora of

---

[12] Emoral's Motion, Doc. 144-1, p. 6.

evidence against it by beating Plaintiff to the punch and listing it out in its own Motion, in an attempt to diminish its own knowledge and concealment. This Court should not be fooled.

Recently, this Court denied a very similar Motion for Summary Judgment on statute of repose grounds filed by Emoral's co-Defendant and former customer, Givaudan Flavors Corporation (Doc. 165) in this case. This Court's reasoning and holding should be the same for Emoral's Motion. While the facts and evidence regarding Emoral's concealment and misrepresentation are different than that of Givaudan's, there is sufficient evidence to satisfy the fraudulent concealment exception to the statute of repose for Emoral as well.

Iowa's statute of repose with respect to products is found at Iowa Code § 614.1(2A), and provides *inter alia*, that no action for personal injuries may be brought against a manufacturer, supplier, or designer of a product sounding in design defect or failure to warn, test, or label the product more than fifteen (15) years after the product was first purchased. The statute has an exception, however, which is relevant to the facts of this case:

> This subsection **shall not apply** if the manufacturer, assembler, designer, supplier of specifications, seller, lessor, or distributor of the product **intentionally misrepresents facts about the product or fraudulently conceals information about the product and that conduct was a substantial cause of the claimant's harm.**

Iowa Code Ann. § 614.1(2A) (emphasis added).

An illustrative decision that explored this exception in-depth is *Baier v. Ford Motor Co.*, No. C04-2039, 2005 WL 928615 (N.D. Iowa Apr. 21, 2005), from the Eastern Division of this Court. There, Magistrate Judge Jarvey conducted a thorough analysis of the exception and set forth the standard that "the issue in the statute of repose context is whether the defendant 'fraudulently conceal[ed] information about the product' that allegedly gives rise to their liability." *Id*. at *4, citing I.C.A § 614.1(2A).

6

In *Baier*, the plaintiff was rear-ended while driving a 1967 Ford Mustang, and the Mustang's gas tank ruptured, fuel leaked into the passenger compartment, and the fuel ignited, badly injuring the plaintiff. *Id*. at *1. In arguing that his claims were timely, the plaintiff pointed to crash tests performed by the defendant but not divulged to the National Highway Traffic Safety Administration ("NHTSA") when it was examining the safety of the defendant's gas tanks. *Id*. at *2.

In analyzing whether the statute of repose had passed, the *Baier* Court stated that the doctrine of fraudulent concealment is a form of equitable estoppel, which "prevents a defendant 'from asserting the bar of the statute on limitations' based on 'his agreement, misrepresentations, or conduct.'" *Id.* (internal citations omitted). The necessary elements of equitable estoppel are:

1) The defendant has made a false representation or has concealed material facts;

2) The plaintiff lacks true knowledge of the facts;

3) The defendant intended the plaintiff to act upon such representations; and,

4) The plaintiff did in fact rely upon such representations to his prejudice.

*Id*. at *4, quoting *Christy v. Miulli*, 692 N.W.2d 694, 702 (Iowa 2005).

Ultimately, the *Baier* Court denied the defendant's motion for summary judgment on statute of repose grounds, holding that the facts taken in the light most favorable to the plaintiffs provided sufficient evidence showing the defendant's fraudulent concealment of known defects of its product. Specifically, the Court agreed with the plaintiff that a jury could reasonably agree that the plaintiff "could justifiably rely upon the alleged misrepresentations made by [defendant] to a third-party, in this case NHTSA." *Id*. at *6. In other words, the jury could accept the plaintiff's arguments that: (1) "[Defendant] had reason to expect that its misrepresentations made to NHTSA would be passed on to a third party and that these misrepresentations were made with

the purpose of influencing the actions of another" *Id*.; and (2) that the plaintiff relied on the defendant's statements by virtue of NHTSA's conclusion that the gas tank did not pose any unreasonable safety risk. *Id*. at *2.

Like in *Baier*, the concealment and/or misrepresentation of material facts at issue in this case was made to a third party—Emoral's diacetyl customers, Givaudan and FONA. As in *Baier*, a jury could reasonably find that Mr. Herbst and his employer could justifiably rely upon the representations made by Emoral to a third party, in this case its customers. Here, both FONA and Givaudan confirmed that they relied on Emoral to tell them the health hazards associated with exposure to diacetyl, and that they incorporated the warnings from their suppliers, such as Emoral, into the final warnings provided to their customers, such as American Popcorn and its employees, like Marlin Herbst (PSOF 96, App. 0387, 0508-0523; PSOF 97, App. 0361).

### a.   *Emoral Knew About the Health Hazards Associated with Diacetyl Yet Fraudulently Concealed[13] This Information From Its Customers*

As explained in *Baier*, in order to prove the first element of fraudulent concealment, "the plaintiff must prove either (1) 'that the defendant affirmatively concealed the facts or' (2) 'a confidential or fiduciary relationship exists between the person concealing' the facts and 'the aggrieved party.'" *Id*. at *4, citing McClendon v. Beck*, 569 N.W.2d 382, 385 (Iowa 1997). Here, there is sufficient evidence for a jury to find that Emoral did conceal facts about the health hazards of diacetyl and, therefore, there is a genuine issue of material fact. *Id*.

Long before 2001, Emoral knew of the association between diacetyl and health hazards. Emoral incorrectly asserts "prior to 2001, there was no published information about the alleged association between butter flavors containing diacetyl and lung disease," however, as this Court

---

[13] The exception to Iowa Code §614.1(2A), requires that Plaintiff establish either Emoral's fraudulent concealment or intentional misrepresentation of the hazards of Emoral's diacetyl products. Iowa Code Ann. §614.1(2A)(emphasis added). Plaintiff's submitted evidence satisfies both. In an effort to avoid repetition, all references to fraudulent concealment necessarily include Emoral's intentional misrepresentations as well.

8

has previously explained, it is irrelevant whether there was any published information connecting exposure to diacetyl to bronchiolitis obliterans prior to 2001:

> Logically, such "fraudulent concealment" must have occurred during the 15-year period of repose after first purchase when the statutory repose period would otherwise have been running, i.e., from some point in 1991 until some point in 2006.

> Thus, even if [Emoral] is correct that there was no published information about the alleged association between butter flavorings containing diacetyl and lung disease prior to 2001, concealment of that fact with intent to deceive after 2001 would also be before the end of the statute of repose period otherwise applicable in 2006 and would, thus, be relevant to an exception to the running of the statute of repose prior to Herbst filing his claims.

(This Court's 9/20/18 Order Denying Givaudan's Summary Judgment Motion, Doc. 165, p. 9).

Additionally, it is simply an incorrect statement of fact that "prior to 2001, there was **no published *information***" about the association between exposure to diacetyl and health hazards. To the contrary, Emoral's collection of information was vast. The first published "information" regarding diacetyl's health hazards was in 1985, years before Plaintiff's first exposure to Emoral's diacetyl. That year, the Flavors & Extract Manufacturers Association ("FEMA")—which Emoral was a member of—published its "Flavor or Fragrance Ingredient Data Sheet" ("FFIDS") for diacetyl.[14] This Court previously conducted a thorough analysis of the 1985 FFIDS in its September 20, 2018 Order (Doc. 165, p. 9-10). The same analysis applies here. As a member of FEMA, Emoral had access to the 1985 FFIDS for diacetyl.[15] The FFIDS stated that inhalation of diacetyl was "harmful" and "capable of producing systemic toxicity" (PSOF 22, App. 0079; 0116). Despite having the information from the 1985 FFIDS for diacetyl, Emoral chose not to include it in its MSDSs for the diacetyl it sold to its customers, including Givaudan

---

[14] (PSOF 20, App. 0077-0082; PSOF 21, App. 0068-0069, App. 0102, App. 0116; PSOF 22, App. 0079, App. 0116).
[15] (PSOF 21, App. 0068-0069, App. 0102, App. 0116; PSOF 23, App. 0068-0069, App. 0116, App. 0089, App. 0129-0130).

and FONA.[16] None of Emoral's MSDSs during the relevant time period contained the words describing diacetyl as being "harmful" or "capable of producing systemic toxicity."[17] Additionally, while Emoral relies on testimony from Nancy Higley, the head of Givaudan's regulatory department,

> A rational trier of fact could discount the testimony of Tastemaker's regulatory department head that "systemic toxicity" was not a reference to the lungs or respiratory system, but to a systemic toxic event, such as irritation or sensitization, as a post hoc definition that is inconsistent with the context in which that term is used in the 1985 FFIDS.

(This Court's 9/20/18 Order Denying Givaudan's Summary Judgment Motion, Doc. 165, p. 10). The FFIDS and Emoral's subsequent conduct based on it gives rise to reasonable inferences from which a jury could conclude that Emoral concealed pertinent information which it knew about the hazards of its diacetyl.

Emoral also failed to tell its customers that sold diacetyl-containing butter flavorings to American Popcorn about the 1985 International Bakers NIOSH investigation and the fact that it had been named as defendant in two subsequent lawsuits in 1986 brought by two food factory workers suffering from lung disease, consistent with bronchiolitis obliterans, as a result of their exposures to flavoring chemicals, including diacetyl (PSOF 40, App. 0288). While Emoral pretends in its Motion that these lawsuits did not place Emoral on further notice that diacetyl, rather than a "host of other products," was what caused the injured plaintiff's respiratory injuries,[18] Emoral was in fact named as a defendant *because of its sale of diacetyl* to the International Bakers plant.[19] In addition, Emoral was properly served and participated in the case through its retained counsel (PSOF 32, App. 0218-0235). In those same lawsuits, Emoral

---

[16] (PSOF 24, App. 0116-0117, 0133-0140; PSOF 93, App. 0116-0117).
[17] (PSOF 24, App. 0116-0117, 0133-0140; PSOF 91, App. 0262, *cf* App. 0079).
[18] Emoral's Motion, Doc. 144-1, p. 10.
[19] (PSOF 31, App. 0185-0190, 0191-0196; 0198-0200, citing App. 0204; App. 0207-0217; *see also* App. 0484-0496, citing App. 0489, 0491).

received the report of plaintiffs' medical expert, Dr. Susan Daum, an occupational medicine specialist from Mt. Sinai Medical Center, New York, and several other experts who identified diacetyl as one the chemicals that caused the plaintiffs' injuries.[20] Dr. Daum further stated in her affidavit,

> The fact that the defendants supplied chemicals to International Bakers Services, Inc. as ultimate users and consumers without having first tested these chemicals for inhalation or taken other appropriate measures to see that they were safe for use by humans is tantamount to using the Blenders at International Bakers Services, Inc. as "Blue Collar Guinea Pigs".

(PSOF 34, App. 0199-0200, citing App. 0204 which listed diacetyl). Emoral deposed Dr. Daum in the *Kois* and *Spaulding* cases (PSOF 35, App. 0236-0248; 0249-2058); received discovery responses from plaintiffs which identified plaintiffs' diacetyl exposures, specifically to Polarome's diacetyl, "Polarome Manufacturing Company was the supplier of the liquid Diacetyl I worked with;"[21] and, hired experts in the lawsuits.[22] Despite its active participation in these lawsuits, Emoral still said nothing to its customers (PSOF 40, App. 0288).

Armed with the knowledge of the health hazards from diacetyl from the International Bakers investigation and subsequent lawsuits and the 1985 FFIDS, in 1992, Emoral was again specifically given more warnings for diacetyl from its **own** diacetyl supplier. Like it had in the past, Emoral failed to pass this information on to its customers. Emoral's diacetyl supplier, Gist-Brocades, provided a MSDS for diacetyl, dated July 13, 1992 that said to use a respirator if risk of inhalation may occur (PSOF 42, App. 0103-0104, 0292). Gist-Brocades' MSDS further warned users to only use the diacetyl in a well-ventilated work environment; use local exhaust to prevent aerosol generation; and, to avoid using the diacetyl in open systems[23] Yet, Emoral did

---

[20] (PSOF 33, App. 0198-0200, citing App. 0204; *see also* App. 0484-0496, citing App. 0489, 0491).
[21] (PSOF 30, App. 0207-0217, citing to App. 0209).
[22] (PSOF 37, App. 0100-0101, App. 0114-0116, App. 0277-0279, App. 0280-0281).
[23] (PSOF 44, App. 0104, App. 0292; PSOF 43, App. 0103-0104, App. 0291).

not give its customers this MSDS.[24] Instead, it created its own MSDS for the exact same diacetyl product that omitted the warnings to use a respirator; utilize a well-ventilated work environment; and avoid use in open systems.[25]

Emoral placed its own labels and warnings on the containers of diacetyl it sold (PSOF 87, 0372). Yet its labels did not say that exposure to diacetyl could cause lung injury (PSOF 88, App. 0380-0381). Nor did they say what its supplier had told Emoral—that when working with diacetyl, respiratory protection was needed; the work environment needed to be well-ventilated, using local exhaust; and to avoid using diacetyl in open systems (PSOF 42-45, App. 0103-0104, App. 0291-0292, App. 0117-0118, App. 0262-0263, App. 0133-0140). Instead, the health hazard risk Emoral placed on its label for diacetyl stated that it was a **low** health hazard (PSOF 90, App. 0092).

Emoral knew of the health hazards caused by diacetyl. Despite its knowledge, it purposefully buried its head in the sand, and took no action to discover more about the hazards posed to users of its diacetyl products. Emoral hired someone to develop its MSDSs who had no training or experience in industrial hygiene, regulatory affairs, or preparing MSDSs.[26] Emoral did not hire any outside consultants or industrial hygienists to assist with the preparation of its MSDSs,[27] nor did it conduct or sponsor any animal testing relating to the inhalation of diacetyl.[28] Emoral had previously hired industrial hygienist as experts in the International Bakers' lawsuits, but failed to consult with these experts in its regular course of business.[29]

---

[24] (PSOF 45, App. 0117-0118, App. 0103-0104, App. 0262-0263, App. 0291-0292; *Cf*: Polarome MSDS's (App. 0133-0140).
[25] (PSOF 45, App. 0117-0118, App. 0103-0104, App. 0262-0263, App. 0291-0292); *Cf*: Polarome MSDS's (App. 0133-0140).
[26] (PSOF 46, App. 0085; PSOF 47, App. 0090; PSOF 48, App. 0086; PSOF 49, App. 0085-0086; 0088).
[27] (PSOF 50, App. 0111; PSOF 52, App. 0112)
[28] (PSOF 53, App. 0096, App. 0110).
[29] (PSOF 37, App. 0100-0101, App. 0114-0116, App. 0277-0279, App. 0280-0281).

Emoral took steps to protect its own employees from diacetyl, *i.e.,* packaging diacetyl in an isolated area with minimal levels of vapor concentration, while at the same time saying nothing to its customers (PSOF 92, App. 0118).  Even after Marlin Herbst worked at American Popcorn, Emoral told its European customers that its diacetyl product was "Harmful by inhalation," but only told its American customers, such as Givaudan and FONA, that diacetyl "may cause respiratory irritation." (PSOF 93, App. 0116-0117).

The evidence is abundantly clear that Emoral knew both before and during Plaintiff's employment at the American Popcorn plant and fraudulently concealed that diacetyl could be "harmful" and "capable of producing systemic toxicity;" that workers at a food manufacturing plant suffered from lung disease, consistent with bronchiolitis obliterans as a result of diacetyl exposures and, that respirators were required when working with diacetyl; that a well-ventilated work environment with local exhaust was required when working with diacetyl; and that diacetyl should not be used in open systems.[30] Taking the evidence in the light most favorable to Plaintiff, at a minimum, there is a genuine issue of material fact as to whether Emoral fraudulently concealed known facts about the hazards of its diacetyl.

> While a rational trier of fact might reject some of the evidence on which Herbst relies to show concealment, a rational trier of fact would not be required to do so. Moreover, a rational trier of fact would not be required to accept [Emoral's] characterization of the evidence as correct and beyond dispute.
>
> There is enough evidence, as discussed, above, giving rise to inferences of concealment for Herbst's claim to satisfy the "concealment" element of the "fraudulent concealment" exception to the statute of repose.

(This Court's 9/20/18 Order Denying Givaudan's Summary Judgment Motion, Doc. 165, p. 11).

---

[30] (App. 0079; App. 0291-0292).

13

### b. Emoral Intended to Deceive its Customers And Ultimately, American Popcorn and Plaintiff Marlin Herbst, With Respect to its Diacetyl Products

The third element for equitable estoppel/fraudulent concealment is that "the defendant intended the plaintiff to act upon such [false] representations." *Baier*, at \*7, citing *Christy*, 692 N.W.2d at 702. As explained by Judge Jarvey:

> [T]he relevant inquiry is not whether the defendant intended to deceive the plaintiffs with respect to a time bar, but whether the defendant intended to deceive the plaintiffs with respect to the product. The plaintiffs have produced sufficient evidence, as detailed above, to create a genuine issue of material fact as to whether Ford engaged in fraudulent conduct. This evidence also creates a genuine issue of fact as to whether Ford intended to deceive the plaintiffs, as potential purchasers and then as users of the car, about the Ford Mustang.

*Baier*, 2005 WL 928615, at \*7. Judge Jarvey thus concluded that evidence of concealment by Ford *also* created genuine issues of material fact on Ford's intent to deceive.[31]

Like this case, in *Baier* the defendant did not deceive the plaintiff directly, but rather the NHTSA, which the plaintiff was entitled to rely upon. Similarly here, Emoral did not deceive Marlin Herbst directly, but rather concealed what it knew about diacetyl from its customers, including Givaudan and FONA, who Plaintiff then relied upon to provide his employer with adequate information regarding their products incorporating diacetyl. This evidence of concealment gives rise to inferences of Emoral's intent to deceive. Like in *Baier*, there is evidence here of concealment that includes differences between what Emoral knew regarding health hazards of diacetyl and what Emoral was warning its customers of with respect to diacetyl (PSOF 92, App. 0118). Additionally, there is evidence that even after Marlin Herbst's employment at American Popcorn, Emoral told its American Popcorn customers, such as

---

[31] *See also* this Court's 9/20/18 Order Denying Givaudan's Summary Judgment Motion, Doc. 165, p. 12.

14

Givaudan and FONA, less than what it was telling its European customers, even when it had contrary health hazard information in its possession.[32]

There is sufficient evidence to create a genuine issue of fact as to whether Emoral engaged in fraudulent conduct, which as in *Baier*, next creates a genuine issue of material fact as to whether Emoral intended to deceive its customers, such as Givaudan and FONA, which Emoral had reason to expect would be passed on to the Plaintiff and his employer. *Baier* at 7. As such, summary judgment is not appropriate.

> **c.     *Plaintiff Justifiably Relied On Emoral's Misrepresentations About its Diacetyl Products to its Customers, Like Givaudan and FONA Who Were Providing Diacetyl-Containing Flavorings to American Popcorn***

Plaintiff and his employer, American Popcorn, had a right to rely on Emoral's misrepresentations to its customers, Givaudan and FONA, who were supplying diacetyl-containing flavorings to American Popcorn. Like *Baier*, Emoral had reason to expect that its misrepresentations/concealment to its customers would be passed on to a third party, like American Popcorn and Plaintiff who believe the "food" he was working with was safe. (PSOF 10, App. 0012).

Emoral, as a chemical importer, was governed by OSHA and its regulations that required it to issue adequate warnings to its customers. Specifically, the OSHA Hazard Communication Standard, 29 C.F.R. § 1910.1200, required Emoral to evaluate and classify the products it sold, including diacetyl, and then provide a material safety data sheet with each shipment. This Standard required that:

Each material safety data sheet is to include the following:

a.     The health hazards of the hazardous chemical, including signs and symptoms of exposure, and any medical conditions which are generally

---

[32] (PSOF 93, App. 0116-0117).

recognized as being aggravated by exposure to the chemical. 1910.1200(g)(2)(iv).

b.    Any generally applicable precautions for safe handling and use which are known to the chemical manufacturer, importer or employer preparing the material safety data sheet, including appropriate hygienic practices, protective measures during repair and maintenance of contaminated equipment, and procedures for clean-up of spills and leaks.  1910.1200(g)(2)(viii).

c.    The date of preparation of the material safety data sheet or the last change to it.  1910.1200(g)(2)(xi).

d.    The chemical manufacturer, importer or employer preparing the material safety data sheet shall ensure that the information recorded accurately reflects the scientific evidence used in making the hazard determination. If the chemical manufacturer, importer or employer preparing the material safety data sheet becomes newly aware of any significant information regarding the hazards of a chemical, or ways to protect against the hazards, this new information shall be added to the material safety data sheet within three months. If the chemical is not currently being produced or imported the chemical manufacturer or importer shall add the information to the material safety data sheet before the chemical is introduced into the workplace again.

Exh. 56, App. 0500, 29 C.F.R. § 1910.1200(g)(5).

Emoral violated this standard, by not including what it knew about the health hazards of diacetyl—from the 1985 FFIDS; the International Bakers NIOSH investigation; the two lawsuits filed against Emoral because of its diacetyl supply to the International Bakers plant; and the Gist-Brocades MSDS, which *inter alia*, properly warned to use a respirator—on its material safety data sheets provided to its customers.

Not only did Givaudan and Emoral have a *right* to rely on Emoral, the evidence is that they actually *did* rely on Emoral. As previously explained, Givaudan relied on Emoral to provide the health hazards associated with Emoral's diacetyl products (PSOF 96, App. 0387, App. 0508-0523). And like Givaudan, FONA relied on Emoral to provide it with the health hazards associated with diacetyl, and FONA developed its own material safety data sheets based on the information provided to it from Emoral (PSOF 97, App. 0361). In turn, American Popcorn and

16

its employees relied on their suppliers and would not have risked employees' health working around butter flavors if it had known the dangers of diacetyl (PSOF 98, App.0463(a)). And, Plaintiff Marlin Herbst would have taken steps to protect himself if Emoral had properly warned Givaudan and FONA (PSOF 100, App. 0012).

> ### d. *Emoral's Concealment Substantially Caused Plaintiff Marlin Herbst's Harm—Specifically, His Irreversible Lung Disease*

Neither Marlin Herbst nor his employer American Popcorn knew what Emoral knew— that diacetyl was "harmful" and "capable of producing systemic toxicity;"[33] that respiratory protection should be used; to use local exhaust in a well-ventilated work environment to prevent aerosol generation; and, to not use diacetyl in open systems.[34] As a result, Plaintiff has now been diagnosed with bronchiolitis obliterans from his exposures to Emoral's diacetyl in butter flavorings used at the American Popcorn plant during his employment.[35] As detailed above, Givaudan and FONA relied on Emoral to share its knowledge regarding the hazards of its diacetyl products. Had Emoral properly warned its customers that it knew that diacetyl was "harmful" and "capable of producing systemic toxicity" and that respirator use, local exhaust, and ventilation were mandatory in the presence of diacetyl, they could have incorporated those same warnings into the MSDSs provided with their diacetyl-containing butter flavorings to the American Popcorn plant, and Marlin Herbst would have taken steps to protect himself (Ex. 2, App. 0012). Had Marlin Herbst known of said dangers, he would have worn a respirator around Emoral's diacetyl (*Id.*). Instead, he relied upon Emoral's misrepresentations to its customers like Givaudan and Emoral to his prejudice and developed bronchiolitis obliterans. (*Id.*).

---

[33] (PSOF 25, App. 0079, App. 0012-0013; PSOF 15-16, App. 0006-0007).
[34] (PSOF 42-43 App. 0103-0104, App. 0291-0292).
[35] (PSOF 13, App. 0012-0013, App. 0026-0047).

Like in *Baier*, and like in this Court's previous order with respect to Givaudan's Motion regarding the statute of repose, there is more than sufficient evidence to create a genuine issue of material fact as to whether Emoral's fraudulent concealment substantially caused Plaintiff's harm. *Baier* at 7, ("[i]n Iowa, questions of causation are for the jury") (citing *Rowson v. Kawasaki Heavy Indus., Ltd.*, 866 F. Supp. 1221, 1238 (N.D. Iowa 1994)(citing *Nichols v. Westfield Indus., Ltd*. 380 N.W.2d 293)(Iowa 1985); *see also Pelster v. Ray*, 987 F.2d 514, 524 (8th Cir. 1993)("[t]o satisfy the element of causation, a plaintiff need not prove that the defendant's conduct was the only cause, the necessary cause or even the most important cause of the plaintiffs' damages. The law requires that a plaintiff only show that the defendant's conduct constituted a substantial factor in producing the plaintiff's injury").[36] For these reasons, this Court should deny Defendant's Motion for Summary Judgment on statute of repose grounds.

### B.   The Sophisticated User Doctrine Does Not Shield Emoral From Liability in This Case

Emoral next makes a half-hearted argument regarding the sophisticated user doctrine. Tellingly, Emoral includes no evidence, facts, or analysis regarding its co-Defendant Givaudan's "sophisticated knowledge" as compared with its own, but rather merely states that the sophisticated user doctrine should apply. In doing so, Emoral relies almost exclusively on the Eighth Circuit decision of *Bergfeld v. Unimin Corp.*, 319 F.3d 350 (8th Cir. 2003). The user that was sophisticated there, however, was the employer, with a closer connection to the plaintiffs than the supplier. *Bergfeld* would only be analogous if Emoral was arguing American Popcorn was the sophisticated user in this case. This, it cannot do, as American Popcorn has confirmed it

---

[36] In this case, in 2004, Emoral finally concedes causation as its own 2004 material safety data sheet admits that its diacetyl causes bronchiolitis obliterans, "Prolonged exposure to high concentrations may cause lung disease (bronchiolitis obliterans) (PSOF 85, App. 0446). Emoral's corporate representative, Frank Bruno further confirmed that Emoral stated this because it was required by law to be truthful in its statement of the hazards (PSOF 85, App. 0354).

knew nothing of the hazards associated with exposure to diacetyl during Mr. Herbst's period of employment at the plant (PSOF 16, App. 0006-0007).

This distinguishing factor was analyzed by the Southern District of Iowa in *Mielke v. Ashland, Inc.*, No. 4:05-CV-88, 2007 WL 9711518, at *5 (S.D. Iowa Jan. 9, 2007). There, the Court found it significant that since "the employer was in a better position to warn its employees, it was reasonable for the sand supplier to rely on its customer to convey information to the employees." *Id.*, citing *Bergfeld*, 319 F.3d at 354. The *Mielke* Court explained how the *Bergfeld* Court "placed special emphasis on the fact that there was an **employer-employee relationship** between the purchaser and the plaintiff." *Id.*, citing *Bergfeld v. Unimin Corp*, 226 F.Supp.2d 970 (N.D. Iowa 2002) at 978 (emphasis added). And because the purchaser was a "sophisticated user charged with protecting its employees" the defendant supplier did not have a duty to warn the purchaser's employees. *Id.*

Here, Givaudan was not Mr. Herbst's employer, nor was there any special relationship between Givaudan and American Popcorn's employees that was different or stronger to the relationship between Emoral and American Popcorn's employees. Givaudan was not the employer nor "in a better position to warn" employees, therefore it was not reasonable for Emoral to rely on Givaudan to somehow convey health hazard information about Emoral's own diacetyl that Emoral itself had not shared with Givaudan. *See Mielke*, 2007 WL 9711518, at *5.

Emoral previously made a similar argument to this very Court in the case of *Stillmunkes v. Givaudan Flavors Corporation, et al.* Case No. 1:04-85-MWB, (N.D. Iowa, Mar. 27, 2008) (Bennett). There, Emoral argued that it did not have a duty to warn another one of its customers, Symrise, regarding diacetyl because Symrise was a sophisticated user (See Order attached hereto as Exhibit 53). Emoral cited to *Bergfeld* in support of its sophisticated user argument in that case

as well. In opposition, after distinguishing *Bergfeld* due to the employer-employee relationship explained more fully above, Emoral's customer Symrise explained:

> In this case, however, Polarome has offered no evidence to suggest that [Symrise] had *any* independent knowledge—much less extensive knowledge—of the health hazards of diacetyl. Rather, Polarome improperly assumes that just because [Symrise] manufactured butter flavoring and generally worked with hazardous chemicals, that [Symrise] would know the health hazards unique to diacetyl.

(Exh. 54, App. 0476-0477, Symrise's Opposition to Emoral's Motion for Summary Judgment in *Stillmunkes*, Case No. 1:04-cv-00085-MWB, Document 222). Ultimately, this Court held that genuine issues of material fact precluded summary judgment in Emoral's favor (Exh. 53, App. 0471-0472, *Stillmunkes* Order).

This Court should hold the same in this case. There is clear evidence that Emoral failed to appropriately warn Givaudan about the health hazards caused by exposure to diacetyl, through both its deficient material safety data sheets and labels. Emoral placed its own labels on the containers of diacetyl it sold to Givaudan, and occasionally even repackaged the diacetyl altogether.[37] The labels and warnings that Emoral placed on the diacetyl did not say that exposure to diacetyl could cause bronchiolitis obliterans or permanent lung injury (PSOF 88, App. 0380-0381). In fact, Emoral did not include *any* reference on its labels to any of the health hazards associated with diacetyl (PSOF 89, App. 0093). Emoral did not include the language that respiratory protection was needed; that the work environment needed to be well-ventilated; local exhaust should be used; and, to avoid using diacetyl in open systems—language previously provided by its diacetyl supplier, Gist Brocades' 1992 MSDS.[38] Nor did Emoral include language regarding its own internal procedures it was using in its own plant to protect its own workers, *i.e.,* packaging diacetyl in an isolated area with minimal levels of vapor concentration

---

[37] (PSOF 87, App. 0372; PSOF 86, App. 0265-0266).
[38] (PSOF 42-45, App. 0103-0104, App. 0291-0292, App. 0117-0118, App. 0262-0263).

(PSOF 92, App. 0118). Instead, Emoral stayed quiet and told customers like Givaudan that the health hazard risk was "low" (PSOF 90, App. 0092).

Givaudan relied on Emoral to provide the health hazards associated with Emoral's diacetyl products (PSOF 96, App. 0387, App. 0508-0523). Despite all Emoral knew about the health hazards of diacetyl, including when it was sued by two individuals who suffered from a respiratory disease from exposure to diacetyl, Emoral did not warn its customers, like Givaudan. Emoral failed to provide this warning, even though it had no reason to believe that Givaudan would have any information to know that the inhalation of diacetyl vapors could cause lung disease (PSOF 95, App. 0094).

Summary judgment cannot be granted under these facts. A genuine issue of material fact remains as to whether or not Givaudan was a "sophisticated user" of diacetyl that Emoral had no duty to warn. As shown above, Emoral knew that diacetyl was harmful and posed a hazard to human health. Yet, it said nothing to Givaudan. Emoral's Motion should be denied.

C.       **There is Abundant Evidence that Plaintiff Was Exposed to Emoral's Diacetyl During His Employment at American Popcorn That Caused His Bronchiolitis Obliterans**

Emoral knows that its own diacetyl was present at the American Popcorn plant during Plaintiff's employment there, yet for its Motion for Summary Judgment misleadingly suggests otherwise. It argues that Plaintiff has identified **no evidence** that Givaudan or FONA sold any butter flavoring containing Emoral's diacetyl to American Popcorn.[39] Emoral states over and over again, in over-emphasized text, as if though saying it enough times will make it true, that "**no evidence whatsoever has been produced establishing the sale of Givaudan's butter**

---

[39] Emoral's Motion, Doc. 144-1, p. 16.

**flavoring, containing Emoral's diacetyl to APC."**[40] These statements misrepresent the evidence produced in this case, of which Emoral is well aware.

Plaintiff is not making the leap in logic that Emoral accuses—that merely because Givaudan and FONA purchased Emoral's diacetyl during Plaintiff's period of employment, that diacetyl must have necessarily been included in the flavorings at the plant. To the contrary, Plaintiff has evidence that both Givaudan and FONA specifically incorporated diacetyl <u>from Emoral</u> into their butter flavoring products sold to American Popcorn.

As detailed in-depth in Section II(B), Givaudan identified Polarome as a source of its diacetyl for its American Popcorn flavorings.[41,42] Importantly, Givaudan did not just identify Polarome but instead identified it **as its main supplier, supplying 58,006 lbs. or 58% of the diacetyl used during Plaintiffs' employment**.[43,44] Similarly, at the same time FONA's formulas for its 5,217 lbs. of butter flavorings sold to American Popcorn specifically identified Polarome as the diacetyl supplier for said products.[45,46]

Plaintiff has additionally testified to his exposures to diacetyl-containing flavorings during his employment, stating that he recalled seeing a yellow-orange haze while working in the mixing room (PSOF 70, App. 0052), and that he smelled butter throughout his employment inside the American Popcorn plant (1991-1993)[47] (PSOF, 71, 0050, 0053); and, that he knew the products he worked around contained butter flavorings (PSOF, 72, App. 0051).

---

[40] *Id*. (emphasis in original).
[41] (PSOF 61, App. 0329-0331; App. 0336-0337).
[42] (PSOF 61, App. 0329-0331; App. 0336-0337).
[43] (PSOF 62, App. 0329-0331; App. 0336-0337, App. 0338-0339).
[44] (PSOF 56-62, App. 0109, App. 0293-0304, App. 0305-0316, App. 0318; 0323, App. 0324, App. 0329-0331; App. 0336-0337, App. 0338-0339; App. 0449-0458; App. 0463-0467; App. 0388).
[45] (PSOF 66, App. 0365-0367, App. 0503-0507; PSOF 67, App. 0368, 0366; PSOF 68, App. 0369, App. 0365; PSOF 69, App. 0370, App. 0365; App. 0367).
[46] (PSOF 65, App. 0360).
[47] Givaudan's own expert, Doug West, a flavorist at Givaudan confirmed that the butter flavorings sold to American Popcorn had a buttery taste and aroma and the buttery aroma that you smell is the diacetyl (PSOF 60, App. 0388).

22

Moreover, Plaintiff's exposures to Emoral's diacetyl were further substantiated by the National Institute of Occupational Safety and Health (NIOSH), who came to the American Popcorn plant and conducted a Health Hazard Evaluation to evaluate the risk for lung disease in American Popcorn workers exposed to butter flavorings (PSOF 73, App. 0390-0394), and found that "Area diacetyl air concentrations in the mixing room were 0.57 parts per million (ppm) parts air by volume when liquid and paste flavorings were in use on July 29...Mixers' exposure to diacetyl increased to 80 to 120 ppm for several minutes while pouring liquid butter flavoring into a tank" PSOF 74, App. 0393. As a result, NIOSH concluded,

> Air concentrations of diacetyl, a butter flavoring chemical known to cause injury to airways in animal studies, were highest in the mixing room. . . Six of 13 workers with experience as mixers had abnormal lung function".

PSOF 75, App. 0392. And, consistent with Marlin Herbst's exposures stated,

> Some workers with mixing experience at the American Pop Corn Company plant may have developed abnormal lung function due to brief, intense exposures during mixing activities, such as those that occur when workers weigh and measure flavorings, pour them manually into open tanks of heated soybean oil, and look into tanks, especially if respiratory protection is not consistently and appropriately utilized. This risk can be present even when ventilation maintains low average air concentrations of flavoring chemicals.

PSOF 76, App. 0395.

As a result of Plaintiff's exposures to diacetyl-containing flavorings, Dr. Pue has opined in this case that "...based on the NIOSH reported levels of diacetyl in the mixing room, the short term acute exposure to diacetyl that Mr. Herbst experienced in the mixing room in 1991 was at levels far exceeding the REL and was high enough to cause the FRBOS. The same is true of Mr. Herbst's exposures in production. In addition to his other documented exposures, which were sufficient in and of themselves to cause his FRBOS, it is my opinion to reasonable degree of

23

medical certainty that Mr. Herbst's QC exposures increased and worsened the permanency of his disease" (PSOF 84, App. 0045).

For Emoral to ignore all of this evidence, just to state over and over again that there is no evidence its diacetyl was ever at the American Popcorn plant during Plaintiff's period of employment, is disingenuous at best. As detailed above, Mr. Herbst is not asking the trier of fact to simply assume that Emoral's diacetyl was used in the butter flavorings at the plant while he was employed there. Instead, a genuine issue of material fact remains, rendering summary judgment improper in this case.

### D.      Emoral is Not Entitled to Statutory Immunity in This Case

Emoral is not entitled to statutory immunity pursuant to Iowa Code § 613.18(1)(a) because it was an assembler of the defective product—diacetyl. The role an assembler makes in providing a defective product, and its subsequent liability for that product, was explored in depth by the Iowa Supreme Court in *Weyerhaeuser Co. v. Thermogas Co.*, 620 N.W.2d 819, 825 (Iowa 2000). There, the Court explained: "Whether the theory of liability is negligence, strict liability, or breach of warranty, authorities recognize several justifications for holding the assembler liable for the failure of a component it did not manufacture." *Id*. at 825.

The Court analyzed the several justifications for holding assemblers liable for the goods they sell. The first is because "the public has a right to expect that a reputable seller will stand behind its goods, and the burden of accidental injuries is properly placed upon those who market the defective component." *Id.,* citing *Exxon Shipping Co. v. Pac. Res., Inc.*, 789 F. Supp. 1521, 1527 (D. Haw. 1991) (citing Restatement (Second) of Torts § 402A cmts. c, e). Another justification is the position that an assembler is in—a position to exert pressure on the

manufacturer of the defective product to improve the safety of the product. *Id.*, citing *Exxon Shipping Co.*, 789 F. Supp. at 1527; 63 Am.Jur.2d Products Liability § 140, at 183.

Other justifications for holding assemblers liable for products they did not manufacture include:

1) the assembler derives an economic benefit from the sale of the product that incorporates the defective component;

2) the assembler has the ability to test and inspect the component when it is in its possession; and,

3) by including the defective component in its finished product, the assembler represents to the consumer and ultimate user that the component is safe.

*Id.* (numbering added), citing *Baughman v. Gen. Motors Corp.*, 780 F.2d 1131, 1132–33 (4th Cir. 1986); *Ford Motor Co. v. Wood*, 119 Md. App. 1, 703 A.2d 1315, 1331 (1998), 63 Am.Jur.2d Products Liability § 140, at 183.

In *Weyerhaeuser Co.*, the district court below had sustained the defendant's motion for directed verdict on the plaintiff's claims for strict liability and breach of implied warranty (the same claims Emoral asks this Court to dismiss in its present motion). *Id.* at 824. The issue on appeal was whether the defendant was an "assembler," "designer," or "manufacturer" within the meaning of Iowa Code § 613.18(1)(a). The Court defined "assembler" as a party "that incorporates a defective component part into its finished product and places the finished product into the stream of commerce is liable for injuries caused by a defect in the component part." *Id.* (internal citations omitted). In order to establish assembler liability, the Court explained, "the plaintiff must show that the assembler actually sold or otherwise placed the defective product on the market." *Id.* at 825, citing *Baughman*, 780 F.2d at 1132; *Exxon*, 789 F.Supp. at 1527.

Regarding the repackaging of products, the Court stated: "[T]he containers in which products are sold are so closely identified with the sale of the product that the container's

25

dangerous propensities are the equivalent of the dangerous propensities of the product itself." *Id.*, citing *Fulbright v. Klamath Gas Co.*, 271 Or. 449, ——, 533 P.2d 316, 320 (1975). Quoting *Prosser & Keeton on the Law of Torts*, the Court stated:

> The tide of decisions has swept away the highly metaphysical distinction between the product and the container in which it is sold, which used to perplex some courts in the food cases. The two are sold as an integrated whole, and it is inconceivable that anyone would buy one without the other.

*Id.* at 826, citing W. Page Keeton, et al., Prosser & Keeton on the Law of Torts § 99, at 694–95 (5th ed.1984).

Ultimately, the Iowa Supreme Court in *Weyerhaeuser Co.* held that "the container—the tank—cannot logically be separated from its contents—the liquid propane—when the two are placed in the stream of commerce as a unit." *Id.* at 827. Accordingly, the defendant was an assembler that was not entitled to statutory immunity under § 613.18(1)(a). All of the justifications to apply assembler liability were present:

1) Thermogas derives an economic benefit from the sale of a product that included a defective component.

2) Thermogas had the ability to test and inspect the defective component when it was within its possession.

3) Thermogas also had the ability to exert pressure on the manufacturer of the defective component to enhance the component's safety.

4) Finally, by placing its product into the stream of commerce, Thermogas represented to the consumer and ultimate user—in this case, Weyerhaeuser— that the component was safe. Conversely, Weyerhaeuser had a right to expect that Thermogas would stand behind its product.

*Id.* (numbering added).

The same analysis applies to the present case, and shows that Emoral was an assembler of the diacetyl sold to Givaudan and FONA. At the very least, a genuine issue of material fact remains regarding Emoral's assembler status, rendering summary judgment improper.

Specifically, when Emoral sold diacetyl to its customers it would place its own labels and warnings onto the containers of diacetyl (PSOF 87, App. 0372). Emoral would additionally disregard the material safety data sheets that accompanied its supplier's diacetyl products and prepare and provide its own material safety data sheets for the diacetyl it sold.[48] These labels and warnings did not state that exposure to diacetyl could cause permanent lung injury or bronchiolitis obliterans. *Id*.

In this case, the defective product is diacetyl, sold with the component container that Emoral re-labeled as its own, while failing to provide adequate warnings about what it knew of the hazards of diacetyl. Like in *Weyerhaeuser Co.*, the containers bearing Emoral's labels and warnings cannot logically be separated from their contents—the diacetyl—when the two are placed in the stream of commerce as a unit. *Weyerhaeuser Co.* at 827. All of the justifications to hold Emoral liable as an assembler of diacetyl are present:

1) Emoral derived an economic benefit from the sale of a product that included a defective component (diacetyl).

2) Emoral had the ability to test and inspect the diacetyl when it was within its possession, it merely chose not to do so (PSOF 53, App. 0096, App. 0110).

3) Emoral also had the ability to exert pressure on the manufacturer of the diacetyl to enhance the component's safety—namely, to provide adequate warnings on the labels and material safety data sheets.[49]

4) Finally, by placing its diacetyl products into the stream of commerce, Emoral represented to the consumer and ultimate user—in this case, Givaudan, FONA, and later American Popcorn and Plaintiff Marlin Herbst—that the diacetyl was safe. Conversely, Givaudan, FONA, American Popcorn and Plaintiff had a right to expect that Emoral would stand behind its diacetyl products.

*Id.* at 827.

---

[48] (PSOF 88, App. 0380-381; PSOF 89, App. 0093).
[49] In fact, Emoral's diacetyl supplier Gist-Brocades did provide safety warnings that Emoral then disregarded on its own material safety data sheets and labels.

Here, Emoral's failure to warn of the hazards of diacetyl has a direct causal connection to Plaintiff's injuries, and the dangerous nature of the product that gives rise to Plaintiff's strict liability and breach of implied warranty claims. Emoral did not merely buy and sell diacetyl without imparting any of its own influence over the product. Instead, it labeled the products as its own, and provided its own information and warnings on the diacetyl it sold to Givaudan and FONA.[50]  This re-labeling distinguishes this case from that of *Kolarik v. Cory Int'l Corp.*, 721 N.W.2d 159 (Iowa 2006). There, the defendant was an olive importer and wholesaler, who repackaged bulk shipments of pimento-stuffed green olives by emptying the drums the olives came in; washing the olives; and placing them in a brine solution in glass jars. *Id*. at 161.

The Iowa Supreme Court held this did not qualify the defendant as an "assembler" within the meaning of § 613.18(1)(a):

> We are convinced that the assemblers' exclusion contained in section 613.18(1)(*a*) is aimed at those situations in which an assembling process has some causal connection to a dangerous condition in the product that gives rise to a strict-liability claim or a product condition that constitutes a breach of an implied warranty of merchantability. Because the repackaging of the olives by defendants did not contribute to the condition that underlies plaintiff's product-liability claim, defendants are afforded the immunity granted by the statute.

*Id*. at 162. Here, Emoral's assembling process in placing its own labels and (defective) warnings on the diacetyl has a causal connection to the dangerous condition in the product that gives rise to Plaintiff's strict liability and breach of implied warranty claims. Had Emoral provided proper warnings about what it knew about the hazards of diacetyl on the containers of diacetyl, end users would have known to: wear respiratory protection; use local exhaust in a well-ventilated work environment to prevent aerosol generation; and not use diacetyl in open systems— Plaintiff's injuries would not have occurred. It cannot be said that Emoral's labeling process "did not contribute to the condition that underlies plaintiff's product-liability claim." *Id*. Accordingly,

---

[50] (PSOF 87-91, App. 0372, App. 0380-0381, App. 0093, App. 0092, App. 0262, *cf*. 0079).

Emoral should not be afforded the immunity granted by the statute, and its dispositive motion should be denied with respect to these two claims. At the very least, a genuine issue of material fact as to Emoral's assembler role remains. Summary judgment should not be granted under these facts.

## V.     CONCLUSION

This Court should allow this case to proceed to trial. None of Emoral's arguments made in support of its request for summary judgment show there is no genuine issue of material fact. Instead, as shown above, several genuine issues of material fact remain, rendering summary judgment improper. Emoral fraudulently concealed information that it knew about diacetyl, and acted with an intent to deceive its diacetyl customers. It is accordingly not provided the protection of Iowa's statute of repose. Emoral is also not protected from liability by the sophisticated user doctrine, as there is clear evidence that it failed to warn its customer Givaudan about what it knew of the hazards caused by exposure to diacetyl. Despite Emoral's protestations to the contrary, there is ample evidence to show that both Givaudan and FONA used Emoral's diacetyl in the flavorings sold to American Popcorn, where Plaintiff Marlin Herbst worked during his employment and as a result of Plaintiff's exposures to said products, Plaintiff now suffers from bronchiolitis obliterans. Lastly, Emoral, as an assembler of the diacetyl products sold to Givaudan and FONA, is not entitled to statutory immunity.

For these reasons, Plaintiff respectfully requests that this Court deny Emoral's Motion for Summary Judgment.  Plaintiff requests oral argument on Emoral's motion.

Respectfully submitted,

*s/ J'Nan C. Kimak*

KENNETH B. McCLAIN (admitted pro hac vice)
STEVEN E. CRICK (admitted pro hac vice)
J'NAN C. KIMAK (admitted pro hac vice)
ANDREW K. SMITH (admitted pro hac vice)
MICHAEL S. KILGORE (admitted pro hac vice)
NICHELLE L. OXLEY (admitted pro hac vice)
HUMPHREY, FARRINGTON & McCLAIN, P.C.
221 W. Lexington, Suite 400
Independence, Missouri 64050
(816) 836-5050
(816) 836-8699 fax
kbm@hfmlegal.com
sec@hfmlegal.com
jck@hfmlegal.com
aks@hfmlegal.com
msk@hfmlegal.com
nlo@hfmlegal.com

AND

DENNIS M. McELWAIN          AT0005253
JAY M. SMITH               AT0007387
SMITH & McELWAIN LAW OFFICE
505 5th Street, Suite 530
Sioux City, Iowa 51101
(712) 255-8094
(712) 255-3825 fax
smitmcel@aol.com
**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of December, 2018, I electronically filed the foregoing with the Court using the Court's CM/ECF system which sends notification of same to all counsel of record also listed below:

*s/ J'Nan C. Kimak*
**ATTORNEY FOR PLAINTIFFS**

Robert M. Slovek
Matthew E. Enenbach
Kutak Rock LLP
The Omaha Building
1650 Farnam Street
Omaha, NE 68102-2186
(402) 346-6000
(402) 346-1148 fax
Robert.Slovek@KutakRock.com
matthew.enenbach@kutakrock.com

and

Kimberly E. Ramundo
Stephen J. Butler
Thompson Hine LLP
312 Walnut Street, Suite 1400
Cincinnati, OH 45202
(513) 352-6587
(513) 251-4771
Kim.Ramundo@thompsonhine.com
Steve.butler@thompsonhine.com
**ATTORNEYS FOR GIVAUDAN**
**FLAVORS CORPORATION**

Douglas L Phillips
Klass Law Firm, L.L.P.
Mayfair Center, Upper Level
4280 Sergeant Road, Ste. 290
Sioux City, IA 51106
(712) 252 1866
(712) 252 5822 fax
phillips@klasslaw.com

and

Jason Meyer
Christopher J. Mulvaney
Gordon & Rees
101 West Broadway, Suite 2000
San Diego, CA 92101
619-270-7858 Telephone
(619) 696-7124 Facsimile
jmeyer@gordonrees.com
cmulvaney@gordonrees.com
**ATTORNEYS FOR EMORAL, INC.**

31