**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

MARLIN HERBST,

    Plaintiff,

vs.

GIVAUDAN FLAVORS CORPORATION and EMORAL, INC., f/k/a Polarome International, Inc.,

    Defendants.

No. C 17-4008-MWB

**OPINION AND ORDER REGARDING DEFENDANT EMORAL'S MOTION FOR SUMMARY JUDGMENT**

_____

**TABLE OF CONTENTS**

*I.*    *INTRODUCTION*.................................................................................*2*

*II.*   *LEGAL ANALYSIS* ............................................................................*3*
    *A.*    *Summary Judgment Standards*.....................................................*3*
    *B.*    *Analysis*....................................................................................*5*
        *1.*    *The statute of repose*........................................................*5*
        *2.*    *Causation* ........................................................................*6*
            *a.*    *The "sophisticated user" defense* ..............................*6*
            *b.*    *Proof of exposure to Emoral's diacetyl* ......................*8*
        *3.*    *Mere distributor immunity*...............................................*10*

*III.*   *CONCLUSION* .................................................................................*14*

## I. INTRODUCTION

In this case, plaintiff Marlin Herbst alleges that he suffers from bronchiolitis obliterans (aka "popcorn lung") and/or other lung or respiratory diseases or impairments from working with butter flavorings containing diacetyl at the American Popcorn Company (APC) plant in Sioux City, Iowa, between 1991 and August 1993. On January 27, 2017, Herbst brought products liability claims under strict liability and negligence and a claim of breach of implied warranties against various "manufacturing defendants," which are companies that allegedly designed, manufactured, distributed, and/or sold diacetyl-containing butter flavorings to APC, and against various "diacetyl defendants," which are companies that allegedly designed, manufactured, marketed, distributed, and/or sold diacetyl that was used by APC. The remaining "manufacturing defendant" is Givaudan Flavors Corporation, and the remaining "diacetyl defendant" is Emoral, Inc. Trial in this matter is set to begin on March 11, 2019.

This case is now before me on Emoral's September 4, 2018, Motion For Summary Judgment.[1] After various extensions, Herbst filed his Resistance on December 7, 2018, and Emoral filed its Reply on December 14, 2018. On December 19, 2018, Herbst requested, and I granted, leave to file a sur-reply to respond to unanticipated arguments in Emoral's reply. I indicated that I would give the sur-reply whatever consideration I deemed appropriate.

---

[1] Emoral's Motion is the last dispositive motion in this case. On February 9, 2018, defendant Givaudan filed its First Motion For Summary Judgment on all of Herbst's claims on the ground that they are barred by the applicable 15-year statute of repose. I denied Givaudan's First Motion For Summary Judgment on September 20, 2018. On September 4, 2018, Givaudan filed its Second Motion For Summary Judgment, as well as three motions challenging experts. I denied all four of those motions on December 3, 2018.

Both parties request oral arguments on Emoral's Motion, but I conclude that the parties' written arguments and supporting materials are sufficient. Therefore, Emoral's Motion is deemed fully submitted without oral arguments.

## II. LEGAL ANALYSIS

Emoral seeks summary judgment on all of Herbst's claims on the following grounds: (1) Herbst's claims are barred by Iowa's statute of repose; (2) Herbst cannot establish causation for any of his claims against Emoral; and (3) as a mere distributor of diacetyl, Emoral is not liable to Herbst under Iowa law on his claims of strict liability and breach of warranties. Herbst denies that summary judgment is appropriate on any of his claims. Before considering Emoral's arguments, I will summarize the standards for summary judgment.

### A. *Summary Judgment Standards*

Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact *and* that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thus, "[t]he movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Celotex*, 477 U.S. at 323). In response,

"[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

When the parties have met their burdens, the district judge's task is as follows:

> "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, --- U.S. ----, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal quotations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). . . . . "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Ricci*, 129 S. Ct. at 2677, quoting *Matsushita*, 475 U.S. at 587, 106 S. Ct. 1348.

*Torgerson*, 643 F.3d at 1042-43. Summary judgment is particularly appropriate, however, when only questions of law are involved, rather than factual issues that may or may not be subject to genuine dispute. *See, e.g., Cremona v. R.S. Bacon Veneer Co.*, 433 F.3d 617, 620 (8th Cir. 2006).

With these standards in mind, I turn to consideration of Emoral's arguments for summary judgment on all of Herbst's claims.

### B. Analysis

#### 1. *The statute of repose*

Emoral's first argument for summary judgment is based on the 15-year statute of repose for products cases under Iowa law, IOWA CODE § 614.1(2A)(a). Like Givaudan, Emoral argues that Herbst's claims, brought nearly 23 years after his employment at APC ended, are barred by this statute of repose, which Emoral argues expired as to Herbst's claims in 2008. Emoral also contends that no exception to the expiration of the statute of repose is applicable, here. Herbst argues that his claims are not barred, because IOWA CODE § 614.1(2A)(a) expressly excepts claims from the statute of repose "if the manufacturer, assembler, designer, supplier of specifications, seller, lessor, or distributor of the product *intentionally misrepresents facts about the product* or *fraudulently conceals information about the product* and *that conduct was a substantial cause of the claimant's harm*." (Emphasis added). Herbst asserts that there are, at the very least, genuine issues of material fact as to whether Emoral, like Givaudan, fraudulently concealed information about the safety of diacetyl. In reply, Emoral argues that there are no triable issues of fact on "fraudulent concealment," because it was not the sole source of information about diacetyl, where Givaudan and FONA, another flavorings manufacturer, had access to sources of information regarding the hazards of diacetyl that extended far beyond the information provided by Emoral, so Emoral could not conceal information its customers already knew.

First, I conclude that, just as he did in response to Givaudan's argument for summary judgment on this issue, Herbst has met his burden at summary judgment to identify evidence from which a rational trier of fact could conclude that Emoral concealed information about the possible hazards of lung injuries from handling diacetyl. *Torgerson*, 643 F.3d at 1042-43 (stating the rational trier of fact standard at summary judgment). Next, I am not convinced, and Emoral has pointed to no authority holding,

that evidence of Emoral's concealment is irrelevant, because another entity purportedly knew more and concealed more—not least because Emoral has not pointed to information about diacetyl that Givaudan purportedly knew that Emoral did not or when and how Emoral knew that Givaudan had more information than Emoral did. On the record presented, a rational trier of fact could conclude that Emoral, like Givaudan, was concealing information about the dangers of diacetyl so that manufacturers, like APC, would continue to use diacetyl or products containing diacetyl, which would maintain the demand for diacetyl. While a rational trier of fact might reject some of the evidence on which Herbst relies to show knowledge and concealment by Emoral—for example, in light of evidence that there may have been gaps in Emoral's membership in FEMA—a rational trier of fact would not be *required* to do so.

The part of Emoral's Motion For Summary Judgment seeking summary judgment on statute of repose grounds is **denied**.

### 2. *Causation*

Emoral's argument for summary judgment on Herbst's inability to establish causation has two prongs.

#### a. *The "sophisticated user" defense*

First, Emoral argues that Herbst cannot establish "causation," because of the applicability of the "sophisticated user" defense. Specifically, Emoral argues that it was under no duty to warn APC, or even Givaudan and FONA, of potential dangers of diacetyl, because Givaudan and FONA were using diacetyl to formulate their flavorings and were "sophisticated users" who then had the responsibility to warn APC and/or its employees. Herbst argues that Emoral has not pointed to evidence demonstrating that Givaudan was a "sophisticated user," but merely assumes that it was, and that Emoral misses the fact that the "sophisticated user" in the case on which it relies was the direct employer of the injured worker, so that it was in a better position to warn its employees,

6

which is not the case, here. Herbst also contends that there is evidence that Givaudan relied on Emoral to provide information about health hazards of diacetyl. In reply, Emoral reiterates that Givaudan was a "sophisticated user" and that Herbst is trying to have it both ways, asserting that Givaudan fraudulently concealed information about diacetyl, but then arguing that Givaudan was not a "sophisticated user." Emoral also argues that it is the degree of knowledge of the intermediate entity, not its position as an employer of the injured person, that establishes the "sophisticated user" defense.

The parties have framed their arguments primarily in terms of the "sophisticated user" defense discussed in *Bergfield v. Unim Corp.*, 319 F.3d 350 (8th Cir. 2003), and *Mielke v. Ashland, Inc.*, No. 4:05-CV-88, 2007 WL 9711518 (S.D. Iowa Jan. 9, 2007), which based the defense on *Restatement (Second) Torts* § 388(b). In *Wright v. Brooke Group, Ltd.*, 652 N.W.2d 159 (Iowa 2002), however, the Iowa Supreme Court adopted the *Restatement (Third) of Torts: Products Liability*. *See, e.g., Nationwide Agribusiness Ins. Co. v. SMA Elevator Constr., Inc.*, 816 F. Supp. 2d 631, 653 (N.D. Iowa 2011) (citing *Scott v. Dutton-Lainson Co.*, 774 N.W.2d 501, 504 (Iowa 2009)). In *Daughetee v. Chr. Hansen, Inc.*, 960 F. Supp. 2d 849 (N.D. Iowa 2013), another "popcorn" case, I reiterated my conclusion that, notwithstanding Iowa's adoption of the *Restatement (Third)*,

> the "intermediary" defense is still viable under Iowa law. Specifically, I find that *Restatement (Third)* § 2(c) and comment *i* recognize a defense to a warning defect claim based on the duty of an intermediary—and not even necessarily a "learned" or "sophisticated" intermediary—to warn the end user. Section 2 expressly considers whether "the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, *or a predecessor in the commercial chain of distribution*."

7

*Daughetee*, 960 F. Supp. 2d at 870 (quoting *Nationwide Agribusiness Ins. Co.*, 816 F. Supp. 2d at 653–54, in turn quoting *Restatement (Third) of Torts: Products Liability* § 2(c) (emphasis added)).

Applying the *Restatement (Third)* standard to the parties' arguments and evidence, I conclude that, taking the facts in the light most favorable to Herbst as the non-moving party, *see Torgerson*, 643 F.3d at 1042-43, a rational trier of fact could reject application of Emoral's "intermediary" defense. Specifically, a rational trier of fact could conclude that Emoral's diacetyl was not only dangerous if inhaled, but that Emoral knew it. Moreover, a rational trier of fact could conclude that the likelihood that intermediaries, like Givaudan, would convey that information either to APC or APC's employees, was greatly reduced or eliminated if Emoral, itself, withheld information concerning the dangers posed by diacetyl from Givaudan and had no basis to believe that Givaudan knew more about the dangers of diacetyl than Emoral did. Thus, a rational trier of fact could conclude that Givaudan could not be relied on as a reasonable conduit for necessary information about diacetyl, if Emoral was not first forthcoming to Givaudan about the possible dangers of diacetyl. A rational trier of fact could conclude, further, that Givaudan might either be ignorant of the dangers of diacetyl or motivated to conceal them from APC or its employees. *See Daughetee*, 960 F. Supp. 2d at 871 (considering these factors in light of *Restatement (Third) of Torts: Products Liability*, § 2(c), cmt. *i*).

Thus, the part of Emoral's Motion For Summary Judgment relying on the "sophisticated user" or "intermediary defense" to defeat causation is **denied**.

### b. *Proof of exposure to Emoral's diacetyl*

The second prong of Emoral's "causation" argument for summary judgment is that Herbst has failed to identify evidence that he was ever exposed to Emoral's diacetyl while employed at APC. Emoral argues that Herbst has shown only that its diacetyl was in the chain of distribution, then relies on mere speculation that he was exposed to any

butter flavorings containing diacetyl distributed by Emoral and mere speculation that, but for exposure to Emoral's diacetyl, he would not have sustained his claimed injuries. Herbst counters that he has pointed to abundant evidence that he was exposed to Emoral's diacetyl during his employment at APC and that that exposure caused his bronchiolitis obliterans. In particular, he points to evidence that Emoral's predecessor, Polarome, was Givaudan's main supplier of diacetyl—58,006 lbs. or 58% of the diacetyl used during Herbst's employment—and that FONA identified Polarome as the diacetyl supplier for its butter flavorings—5,217 lbs. of which FONA sold to APC. He also recounts his evidence of exposure to butter flavorings and the evidence identifying that exposure as the cause of his lung injury. In reply, Emoral argues that Herbst is attempting to fill in the "gaps" in his causation evidence with documents and exhibits filed under seal that he has never before provided to Emoral, but which should have been disclosed to Emoral during discovery. Emoral contends that Herbst must either be barred from relying on this evidence or required to disclose it to Emoral immediately. What Herbst cannot be allowed to do, Emoral argues, is sandbag Emoral. In his sur-reply, Herbst argues that he has properly disclosed all of the evidence on the causation issue on which he now relies, including in his appendix in support of his resistance and in prior discovery responses.

It is true that a products liability plaintiff may not rely solely on speculation to establish causation. *See, e.g., Kleve v. General Motors Corp.*, 210 N.W.2d 568, 571 (Iowa 1973); *see also Boddicker v. American Honda Motor Co., Inc.*, No. C10–1018, 2011 WL 5101912, at *12 (N.D. Iowa Oct. 25, 2011) (citing *Kleve* and *O'Dell v. Ford Motor Co.*, No. 4:06–CV–00523–CFB, 2008 WL 2880384 *9 (S.D. Iowa Jan. 9, 2008)). Here, however, the evidence to which Herbst now points is sufficient that a rational trier of fact could conclude that it is not merely possible that Herbst's lung disease was caused by Emoral's diacetyl, but more probable than any other theory based on the evidence.

9

*Id*. Thus, the part of Emoral's Motion For Summary Judgment relying on Herbst's purported failure to prove causation is **denied**.

On the other hand, Emoral is correct that Herbst cannot rely on evidence at trial that was not properly disclosed during discovery. Assuming, without deciding, that there may be some evidence on which Herbst relies in his resistance to Emoral's Motion For Summary Judgment that has not already been disclosed to Emoral, and recognizing Herbst's contention that all evidence has been properly disclosed, Herbst must promptly disclose any previously undisclosed evidence.

### 3. *Mere distributor immunity*

As its last ground for summary judgment, Emoral argues that it is entitled to statutory immunity to Herbst's strict liability and breach of warranty claims under IOWA CODE § 613.18(1)(a), because it was merely a wholesale distributor of diacetyl who simply passed the product along to a purchaser and lacked control over the design and assembly of the product. Herbst disputes this contention, on the ground that Emoral was an "assembler," because it repackaged and relabeled the diacetyl with its own inadequate warnings. He argues that all the justifications for holding "assemblers" liable apply in this case. In reply, Emoral asserts that it is not an "assembler" that can be held liable, because there is nothing but a "remarkable leap in logic" to suggest that Emoral's mere repackaging is the same as assembling a defective product in the way that a product and its container were a single product in the case on which Herbst relies, particularly where its package never injured anyone.

The statute in question provides as follows:

> 1. A person who is not the assembler, designer, or manufacturer, and who wholesales, retails, distributes, or otherwise sells a product is:
>
> a. Immune from any suit based upon strict liability in tort or breach of implied warranty of merchantability which arises

solely from an alleged defect in the original design or manufacture of the product.

IOWA CODE § 613.18(1)(a). The parties properly focus on two cases interpreting this provision.

In the first of those cases, *Weyerhaeuser Co. v. Thermogas Co.*, 620 N.W.2d 819 (Iowa 2000), the Iowa Supreme Court considered the liability of a company that supplied the plaintiff with fifteen LP tanks each day, specifically, by collecting empty tanks from the plaintiff and replacing them with filled tanks. 620 N.W.2d at 822. The Iowa Supreme Court explained, in part, "We think all of the justifications for the theory [of assembler liability] prompted the legislature not to immunize from liability assemblers who incorporate defective component parts into their finished product and then place that product into the stream of commerce." *Id.* at 826. In reaching that conclusion, the court approved the theory that the container cannot logically be separated from its contents when the two are sold as a unit, explaining,

> One writer sees the rule as one of common sense:
>
> The tide of decisions has swept away the highly metaphysical distinction between the product and the container in which it is sold, which used to perplex some courts in the food cases. The two are sold as an integrated whole, and it is inconceivable that anyone would buy one without the other. When a bottle of beer explodes and puts out the eye of the man about to drink it, surely nothing should be less material than whether the explosion is due to a flaw in the glass of the bottle or to overcharged contents.
>
> W. Page Keeton, et al., *Prosser & Keeton on the Law of Torts* § 99, at 694–95 (5th ed.1984) [hereinafter Prosser].

*Weyerhaeuser Co.*, 620 N.W.2d at 826.

As to the merits in the case before it, the court in *Weyerhaeuser* concluded as follows:

> All the justifications for applying assembler liability to Thermogas exist here. Thermogas derives an economic benefit from the sale of a product that included a defective component. Thermogas had the ability to test and inspect the defective component when it was within its possession. Thermogas also had the ability to exert pressure on the manufacturer of the defective component to enhance the component's safety. Finally, by placing its product into the stream of commerce, Thermogas represented to the consumer and ultimate user—in this case, Weyerhaeuser—that the component was safe. Conversely, Weyerhaeuser had a right to expect that Thermogas would stand behind its product.

*Weyerhaeuser Co.*, 620 N.W.2d at 827.

Subsequently, in *Kolarik v. Cory Int'l Corp.*, 721 N.W.2d 159 (Iowa 2006), the Iowa Supreme Court considered the liability as an "assembler" of a company that removed bulk olives from drums and repackaged them in jars. 721 N.W.2d at 162. The court concluded,

> We are convinced that the assemblers' exclusion contained in section 613.18(1)(a) is aimed at those situations in which an assembling process has some causal connection to a dangerous condition in the product that gives rise to a strict-liability claim or a product condition that constitutes a breach of an implied warranty of merchantability. Because the repackaging of the olives by defendants did not contribute to the condition that underlies plaintiff's product-liability claim, defendants are afforded the immunity granted by the statute.

*Kolarik*, 721 N.W.2d at 162.

In light of *Weyerhaeuser* and *Kolarik*, I conclude that there are genuine issues of material fact, at the very least, as to whether Emoral can be held liable as an "assembler"

under IOWA CODE § 613.18(1)(a). *See Torgerson*, 643 F.3d at 1042-43 (stating standards for summary judgment). First, Herbst has pointed to evidence that Emoral did not simply repackage the diacetyl, as in *Kolarik*. Rather, there is evidence that when Emoral repackaged the diacetyl, it also relabeled it with its own allegedly inadequate warnings and inadequate information, and it is the failure to provide adequate information about the dangers of diacetyl that allegedly contributed to the condition that underlies Herbst's products aliability claims. *Compare Kolarik*, 721 N.W.2d at 162. Thus, unlike the defendant in *Kolarik*, there are genuine issues of material fact as to whether Emoral is entitled to statutory immunity.

Furthermore, there is evidence that the justifications for applying "assembler" liability identified in *Weyerhaeuser*, 620 N.W.2d at 827, exist here. Herbst has pointed to evidence that Emoral derives an economic benefit from the sale of a product that included a defective component, the diacetyl packaged with inadequate warnings; that Emoral had the ability to test and inspect the diacetyl and, most importantly, to provide adequate safety information about it; that Emoral had the ability to exert pressure on flavorings makers to enhance the safety of diacetyl by providing adequate warnings and information; that by placing the diacetyl into the stream of commerce, Emoral represented to both flavorings makers, such as Givaudan, and flavorings users, such as APC and its employees, that the diacetyl was safe with the warnings and information provided; and that Givaudan and APC had a right to expect that Emoral would stand behind its product and the warnings and information about it that Emoral provided. *See Weyerhaeuser Co.*, 620 N.W.2d at 827.

Consequently, the part of Emoral's Motion For Summary Judgment asserting "distributor" immunity to Herbst's strict liability and warranty claims under IOWA CODE § 613.18(1)(a) is **denied**.

### *III.  CONCLUSION*

Upon the foregoing, Emoral's September 4, 2018, Motion For Summary Judgment (docket no. 144) is **denied** in its entirety.

**IT IS SO ORDERED**.

**DATED** this 21st day of December, 2018.

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA